# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

```
DENYONNA N. REED,              )
                               ) CIVIL ACTION
             PLAINTIFF,        )
                               )
VS.                            ) COMPLAINT 5:22-CV-00068
                               )
I.Q. DATA INTERNATIONAL,       )
INC.,                          )
                               )
             DEFENDANT.        )
                               )
                               )
```

-----------------------------------

ORAL VIDEOCONFERENCE DEPOSITION OF

DENYONNA N. REED

OCTOBER 21, 2022

Volume 1

-----------------------------------

ORAL VIDEOCONFERENCE DEPOSITION OF DENYONNA N.

REED, produced as a witness at the instance of the

DEFENDANT, and duly sworn, was taken in the above-styled

and numbered cause on the 21st day of October, 2022,

from 10:02 a.m. to 11:08 a.m., via Zoom, before Michelle

Hill, CSR in and for the State of Texas, reported by

machine shorthand, pursuant to the Federal Rules of

Civil Procedure.

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        MR. MARWAN DAHER
          SULAIMAN LAW GROUP, LTD.
 5        2500 S. Highland Avenue
          Suite 200
 6        Lombard, Illinoise 60148
          (630) 575-8188
 7
     FOR THE DEFENDANT, I.Q. DATA INTERNATIONAL, INC.:
 8
          MR. BENJAMIN E. HAMEL
 9        AND
          MR. DYLAN BASS
10        SERPE|ANDREWS, PLLC
          2929 Allen Parkway
11        Suite 1600
          Houston, Texas 77019
12        (713) 452-4400

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX
                                               PAGE
2    Appearances.............................................  2

3    DENYONNA N. REED

4        EXAMINATION BY MR. HAMEL............................   4

5
     REPORTER'S SIGNATURE......................................  50
6
                          EXHIBITS
7
     NO.  DESCRIPTION                               PAGE
8
         NO EXHIBITS MARKED.....................................
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE REPORTER:  My name is Michelle Hill,

2  Texas CSR 5663.  I am reporting this deposition remotely

3  by stenographic means from Lubbock, Texas.  The witness

4  is located in San Antonio, Texas.

5    DENYONNA N. REED,

6  having been first duly sworn, testified as follows:

7    EXAMINATION

8  BY MR. HAMEL:

9    Q.   Good morning, Ms. Reed.  How are you doing

10  today?

11    A.   Good morning.  I'm fine.

12    Q.   Ms. Reed, today we are here taking your

13  deposition in a lawsuit that you filed in the Western

14  District of Texas against I.Q. Data International, Inc.

15  Does that sound right?

16    A.   Yes, sir.

17    Q.   Okay.  Have you ever filed a lawsuit before?

18    A.   No, sir.

19    Q.   Okay.  Have you ever given a deposition

20  before?

21    A.   No, sir.

22    Q.   Okay.  Nothing to be worried about.  Just very

23  briefly, the way that this works, I ask questions; you

24  answer them.  It's not a test.

25    You're not stuck here.  If you need to

**DENYONNA N. REED  -  October 21, 2022**

1 take a break at any time, please just let me know.

2 Happy to take a break.

3           The only thing I will ask is, if I have a

4 question posed to you, that you go ahead and respond to

5 the question before we take any break.

6      A.   Yes, sir.

7      Q.   This wonderful lady right here up in the

8 corner of your screen is our court reporter.  I suspect

9 that more than once during this deposition, she will

10 admonish me for speaking too quickly.

11          One of the things that makes her job very

12 difficult is if you and I talk over each other.  So what

13 I will ask is, if you would please let me finish my

14 complete question before you start your answer, and I

15 will do my utmost to let you complete your full answer

16 before I ask my next question.  Fair enough?

17     A.   Yes.

18     Q.   Okay.  We are not in a courtroom today.  We're

19 not in front of a judge or a jury; however, this is

20 sworn testimony under oath.  So the penalties of perjury

21 do apply, and you are obligated to tell the truth.

22     A.   Yes, sir.

23     Q.   Okay.  Certainly not trying to infer anything.

24 It's just one of the these weird questions we need to

25 ask.  You aren't on any substances today that would

1  prevent you from being able to give full and truthful

2  testimony, are you?

3      A.   No, sir.

4      Q.   Okay.  I haven't ever gotten yes to that

5  question yet, but still got to ask it.  I'm sure some

6  day I might, but not today.  So good to hear that.

7           Last thing, if I ever ask you a question,

8  and you're confused about it, or I said it weirdly, or

9  just don't -- you know, didn't hear me, the internet

10 cuts out, whatever, please just go ahead and let me know

11 and ask me to rephrase the question.  I probably asked a

12 bad question, and I'm happy to go ahead and rephrase it

13 in a way that you can understand it.  Sound good?

14     A.   Yes.

15     Q.   Great.  So if you would for me briefly, could

16 you just tell me why it is that you felt the need to

17 bring this lawsuit that's the reason we're here today?

18     A.   So initially back in November of 2021, prior

19 to that, I started rebuilding my credit and really

20 focusing on cleaning up my credit and started the

21 building process.

22           I get a -- so at this point, I'm checking

23 my credit constantly every day, just because I'm on the

24 process of building and looking to buy a home.

25           So this particular day, I get the

 1  notification, and I'm like, hey, where did this come

 2  from?  I never lived at this apartment complex.  I'm not

 3  sure why my name and another person's name is on here

 4  saying that I owe them this amount of money.

 5            So when I looked at the case, I called the

 6  apartment complex, which is Icon Apartments.  I called

 7  them, and I tried to figure out what was going on

 8  with -- why I am being charged an amount of money, and

 9  they kind of just gave me the runaround.

10            They didn't want to give me -- they didn't

11  want to answer any questions.  They didn't want to let

12  me know why I was -- why this was showing up on my

13  credit report.  I tried to speak to the property

14  manager.  I also called the owners of the property, and

15  no one would give me any answers.

16            So at this point, I became extremely

17  frustrated.  I reached out to the debt collector.  They

18  wouldn't give me any answers.  They -- which is I.Q.

19  Data.  I reached out to them get answers concerning this

20  alleged debt that was on my credit report, and they

21  wouldn't give me any answers.  They just kind of gave me

22  the runaround.

23            And at this point, I became very

24  frustrated.  My current lease at my apartment complex

25  was up.  I was looking to move, and because I owed this

1 apartment complex alleged debt that's now on my credit,

2 it's very hard for me to move into another complex

3 because everybody is looking at this as, oh, you owe

4 this person money, so we're going to deny your

5 application.

6       So that became frustrating going through

7 that process and not just getting any direct answers or

8 able to get it off of my credit report was the main

9 reason that I went ahead and decided to take legal

10 matters.

11   Q. Okay.  A couple things I'd like to break down

12 about that if we could.  So you said this started

13 November of 2021; is that correct?

14   A. Yes, sir.

15   Q. Okay.  And the alleged debt was owed to Icon

16 Apartments.  Did I hear that right?

17   A. Yes, sir.

18   Q. Okay.  Are you familiar with Icon Apartments,

19 or was it just, you know, who are these people?  What's

20 going on?

21   A. Well, I -- initially I -- in 2020 -- I'm not

22 sure the exact date or month -- I went to the complex.

23 I viewed the property.  I filled out an application with

24 them to -- I was going to stay at the property; however,

25 I was still hunting for different -- in different areas.

1  I filled out the application.  I paid the application

2  fee, and I was still hunting for other apartments.

3           So I found another apartment.  I called

4  Icon Apartments and told them, hey, I'm not going to

5  move here.  I found another property.  And they agreed

6  with that.  They said, you won't get your application

7  fee back, which I was fine with.  I told them, okay, I

8  don't -- you know, that's fine I can't get my

9  application fee back, but I'm no longer going to move

10  over here.  I found another property.  That was the only

11  contact I had with this apartment.

12           After that I didn't -- it was no more

13  contact with them until I seen the -- until I seen it

14  pop up on my credit report.

15     Q.   Gotcha.  So you said you couldn't remember

16  exactly when it was that you would have visited the Icon

17  Apartments, but did you say sometime in 2020 or earlier

18  in 2021?

19     A.   No, it was in 2020.  It was -- I would say

20  around in April of 2020.

21     Q.   Okay.  And filled out the application, paid

22  the application fee.  Did you sign a lease and then

23  cancel it, or you just never signed a lease?

24     A.   I never signed a lease.  I only filled out the

25  application, and that was it.  I never signed a lease.

**DENYONNA N. REED - October 21, 2022**

1     Q.   Gotcha.  And do you happen to remember around

2  what date it was when you were speaking with those folks

3  at the Icon Apartments saying, hey, you know, I know I

4  submitted this application, but I'm not going to be

5  signing a lease?

6     A.   It had to be towards -- it had to be mid

7  April, around April 14th of 2020.

8     Q.   Okay.  Do you happen to recall the name of the

9  person you spoke to?

10     A.   No, sir.

11     Q.   Gotcha.  Do you have any email correspondence

12  with them, anything like that?

13     A.   No, sir.

14     Q.   Okay.  That's totally fine.  Were you able to

15  get another -- so I assume -- you didn't move in to the

16  Icon Apartments.  Did you move into a new apartment

17  shortly thereafter?

18     A.   Yes, sir.

19     Q.   Okay.  What's the name of that apartment?

20     A.   At the time it was The Life at Castle Hills.

21     Q.   One more time.

22     A.   The Life at Castle Hills.

23     Q.   Gotcha.  And I gather from you saying, at that

24  time, are you no longer in that apartment?

25     A.   I'm currently still here.

1      Q.    Okay.  Great.  About how long after you

2  contacted Icon and told them, you know, application, but

3  I'm not going to sign there, did you move into the new

4  apartment?

5      A.    It was that same month, within a couple days

6  of that.

7      Q.    Gotcha.  And you're still currently there,

8  right?

9      A.    Yes, sir.

10      Q.    Awesome.  One thing you mentioned earlier, you

11  said, you were very focused on rebuilding your credit,

12  and that's why you were paying a lot of attention to

13  your credit reports.  What exactly were you rebuilding

14  your credit from?

15      A.    Just cleaning up old debt that was on there

16  like medical bills and things of that.  Just trying to

17  pay some things off in order to, as I mentioned, looking

18  to buy a home, so that was the direction I was heading

19  towards.

20      Q.    Gotcha.  So some medical debt.  Any other kind

21  of debt?  Student loans, credit card debt, anything like

22  that?

23      A.    No credit card debts.  Student loans, I paid

24  off all my student loans, and I was just paying off some

25  medical bills that was still on there.

1    Q.    Were you able to take advantage of that

2  program with the student loans, or were you one of

3  those, you know, unfortunate ones where you were

4  responsible enough to pay off your student loans?  You

5  kind of got hung out to dry a little?

6    A.    Yeah.  I actually paid them off myself before

7  that happened.

8    Q.    Well, you know, good for you.  So you know,

9  unfortunate, but good enough.  Have you ever been

10  contacted by a debt collector before?

11    A.    Yes.

12    Q.    How many times?  You can ballpark it for me.

13  It doesn't need to be a specific number.

14    A.    Five or six.

15    Q.    Okay.  And was it related to different debts,

16  or was it just that medical debt that we were talking

17  about?

18    A.    Just medical.

19    Q.    Gotcha.  And has that medical-debt issue

20  gotten resolved, or is that still outstanding?

21    A.    No, it's been resolved.

22    Q.    Okay.  When exactly was that paid off?

23    A.    January, around January of this year, 2022.

24    Q.    Okay.  So when you are monitoring -- excuse

25  me.  When you're monitoring your credit, is that just

1  something you do online?  Is there an app for that?  How

2  exactly are you monitoring your credit, or do you have

3  an alert set up?

4      A.   I have an alert set up with Experian, with

5  Credit Karma, and then Credit Sesame as well.

6      Q.   Gotcha.  So if something gets reported on your

7  credit, explain that to me.  What happens?  Does it just

8  ping on your phone, and then you click on it?

9      A.   Yes.  It gets a notification, and then I also

10  get text messages, and I also get notified by email.

11      Q.   Okay.  So get a ping on your phone, click on

12  it, and what exactly does it say?  Does it say, you

13  know, Icon Apartments are reporting this amount?

14      A.   Yes, at the time that's what happened.  It

15  showed me that I had a new -- a new debt on my credit.

16  So I clicked on it, and it said $984, and I scrolled

17  down, and it said Icon Apartments with the address on

18  it.

19      Q.   Gotcha.  And obviously, you know, I never

20  lived at the Icon Apartments.  What is this, right?

21      A.   Right.

22      Q.   So after that what was -- did you contact I.Q.

23  Data first, or did you contact the Icon Apartments first

24  once you saw that credit ping?

25      A.   Initially I contacted the Icon Apartments

1  first.

2      Q.    Okay.  And do you happen to recall the name of

3  the person you spoke to there?

4      A.    No, sir.

5      Q.    Okay.  What, if anything, did you talk to the

6  folks at the Icon Apartments about?

7      A.    I just talked to the lady that works in the

8  office.  I asked her, hey, I'm seeing this debt on my

9  credit report.  Could you explain this to me?  What is

10  this about?

11          And she's like, well, we don't have any

12  information from you.  So I then did ask to speak to

13  either a manager or the property manager that was on,

14  and she's like, well, he's busy.  So he'll have to give

15  you a call back.

16          I waited about two hours.  No one

17  contacted me back.  I reached back out to them.  They

18  still gave me the runaround.  Oh, he's still busy.  Can

19  we take a message?  I left my name, number, waited till

20  the end of the business day, still didn't get any

21  information.  No one contacted me back.

22          I called the next morning as soon as they

23  opened.  Same thing.  Oh, he's not in right now.  It was

24  a constant runaround before I actually spoke to the

25  property manager.  And then once I did speak to the

1  property manager, which probably was about a week span

2  of trying to get in contact with him.  The ladies in the

3  office were doing what they can to look up the

4  information, but they just wouldn't -- they couldn't

5  give me anything.

6            So once I finally talked to the property

7  manager, he stated that he did see that my name was on a

8  lease with another lady's name, which I have no idea who

9  she is.  And then he said that they were going to do an

10  internal investigation to figure out what was going on.

11      Q.   Gotcha.  So are we still talking about the

12  same time period, which would have been like early to

13  mid November 2021?

14      A.   Correct.

15      Q.   Okay.  Alert comes up.  You called in to the

16  office of the apartments.  They're kind of giving you

17  the runaround.  Property manager not there for like a

18  week or so, right?

19      A.   Correct.

20      Q.   Okay.  And then eventually the property

21  manager does get back to you, and he told you they were

22  just going to do an internal investigation?

23      A.   Correct.

24      Q.   Okay.  When was the next time you heard from

25  them?

1      A.    Actually I had to reach back out to them

2   because they wasn't -- like, as I mentioned, they wasn't

3   corresponding with me, so I gave it about a week.   I

4   reached back out to the property.   Still no answers.

5   Still trying to get ahold of the property manager.

6               He said, well, they're still doing an

7   investigation.   Probably about mid December is when I

8   spoke to him again, and he said that he did reach out to

9   I.Q. Data.   Upon his investigation, he reached out to

10  I.Q. Data to go ahead and get the alleged debt removed

11  from my credit report.

12      Q.    Okay.   And you said that was sometime in mid

13  December that he told you that?

14      A.    It could have been mid December or January

15  of 2022.

16      Q.    Sometime between mid December, early

17  January -- mid December 2021, January 2022?

18      A.    Correct.

19      Q.    Okay.   And the substance of what he told you

20  was, you know, we messed this up.   You're right.   We're

21  going to contact I.Q. Data.   We'll get this taken off

22  your credit report?

23      A.    Yes, sir.

24      Q.    Okay.   Did you ever receive any letters from

25  I.Q. Data?

1     A.    Yes.

2     Q.    Okay.  What kind of letter did you receive

3  from I.Q. Data?

4     A.    I received an initial -- just a debt

5  collection letter saying that I owed this amount of

6  debt.  It had my name and then the other lady's name on

7  it as well.

8     Q.    Okay.  Do you happen to recall around what

9  time that was?

10    A.    That was in December of 2021.

11    Q.    Same time?  Okay.  And you were living at --

12  well, you never lived at the Icon Apartments.  You were

13  living at the -- I'm blanking on the name again where

14  you currently are.  Castle something?

15    A.    The Life at Castle Hills, yes.

16    Q.    Life at Castle Hills, okay.  And so is that

17  where they sent the letter?

18    A.    Yes, sir.

19    Q.    Gotcha.  And how many letters total did you

20  receive?  Is that the only one?

21    A.    I received that letter from them.  And then

22  when I originally reached out to them, the young man on

23  the phone, the customer service representative, told me

24  that I would have to fill out a fraud form for them, and

25  I received that fraud form from them as well.

1    Q.    Gotcha.  So one letter about the debt, and

2  then after you contacted them, they sent you that fraud

3  form?

4    A.    Correct.

5    Q.    Okay.  And I heard you say that you called

6  them.  Prior to that, had they ever contacted you by

7  phone at all?

8    A.    Yes, they did.  They contacted me, but I never

9  had any communication with them because I didn't know --

10  it was a debt collector, but I didn't know who -- you

11  know, who it was.

12    Q.    Okay.

13    A.    So I --

14    Q.    And was it like -- sorry.  No.  Go ahead.

15    A.    I never had any communications with them, but

16  once I noticed -- when I did reach out to them, I

17  noticed that I had a missed call from them with the same

18  number.  So that's how I knew they did reach out to me.

19    Q.    Gotcha.  And so in terms of time line here,

20  did you receive the letter before or after you heard

21  back from the property manager that he was going to call

22  I.Q. Data and tell that, you know, that they needed to

23  take this debt away?

24    A.    I received the letter before that.

25    Q.    Okay.  How about the phone call, before or

1  after?

2      A.   I would say before.  Before I actually spoke

3  with the property manager.  Before.

4      Q.   Okay.  Once you had -- you know, had the

5  conversation with the property manager, what made you

6  reach out to I.Q. Data?

7      A.   I reached out to I.Q. Data prior to the

8  property manager because I couldn't get ahold of the

9  property manager, and they --

10     Q.   Oh, okay.  So this was that period where he

11  had not -- he said he was going to do the investigation,

12  but he hadn't gotten back to you yet?

13     A.   Correct.

14     Q.   Gotcha.  And so it's obviously still on your

15  credit report, so you contact I.Q. Data to ask them

16  what's going on?

17     A.   Right.

18     Q.   Okay.  What did they tell you when you

19  contacted them?

20     A.   So I spoke with two representatives the first

21  day that I initially called, and the first guy that I

22  spoke with, he told me that -- he's the one that said

23  the fraud form.  He told me that I needed to fill out

24  the fraud form for this alleged debt that's on my credit

25  report.

1             And so I called -- after I hung up with

2    him, I called back, and I spoke to another

3    representative, and he's the one that really kind of

4    told me what was going on with the credit.  I knew

5    nothing from Icon that -- from the apartment complex.

6    He's the -- the one from I.Q. Data is the one that

7    explained.

8             He said, it looks like you have an old

9    debt from this apartment complex, and you're on a lease.

10   I think he told me her name was Alexis something.  I

11   don't remember her last name.  I'm sorry.  But he said,

12   you and this young lady have an outstanding debt to this

13   apartment complex.  And I said, well, I never lived

14   there.

15            And he said, well -- he said I needed

16   to -- I believe he told me that I needed to reach out to

17   the apartment complex to get the situation handled, but

18   he's the one that gave me the information on the other

19   young lady because I knew nothing about that.

20        Q.   Okay.  So at that point when you were speaking

21   with I.Q. Data, you didn't even know that there was this

22   other person who was on this lease or anything like

23   that, right?

24        A.   No, sir.

25        Q.   Okay.  And is it fair to say that, you know,

1  you had already contacted to Icon at that point, so did

2  you tell him, hey, you know, I already reached out to

3  the apartment complex?  Here's what they said?

4      A.   Correct.  And I said, I haven't -- I said, I

5  haven't -- because at that time, I had not heard back

6  from Icon Apartments that -- from Icon Apartments at

7  that time.

8      Q.   Okay.  What did he tell you when you told him

9  you had -- you know, I already contacted the apartment?

10     A.   Honestly, I don't remember what he said at

11  that time.  I couldn't remember if he requested -- if he

12  advised the fraud form or not, but I believe the

13  initial -- the first person that I spoke with is the

14  person that requested the fraud form.  I can't remember

15  what the second guy told me to do after I reached out to

16  Icon Apartments.

17     Q.   Okay.  And just for, you know, the jury who

18  doesn't understand, what exactly was the purpose of the

19  fraud form?

20     A.   I really don't know why he told me to fill out

21  a fraud form because I think he was trying -- I told him

22  that this wasn't my debt, and he said that, well, you

23  have to fill out a fraud form for us to do an

24  investigation on the alleged debt that's in your name.

25          And so he said that if somebody -- he said

1  it looked like somebody may have used your social

2  security or applied for something in your name, so you

3  would have to fill out a fraud form.

4     Q.   Okay.  Did you ever fill out that fraud form?

5     A.   No, sir.

6     Q.   Gotcha.  After you had these calls with the

7  I.Q. Data, and they asked you to fill out the fraud

8  form, and you didn't do that, what was the next thing

9  that happened?  Did you hear back from anyone else?  Or

10  I know you spoke with the guy at the Icon Apartments.

11  After you spoke with him, what happened next?

12     A.   So I kind of was just sitting in limbo at that

13  point.  I didn't -- I didn't hear anything back from

14  I.Q. Data.  I didn't hear anything back from the Icon

15  Apartments.

16          I think it was maybe March or April

17  of 2022, when the debt finally came off of the credit

18  report, and I still was trying to reach out to Icon

19  Apartments just to get some information on when it was

20  coming off because I was looking to move, and that was

21  hindering me tremendously from moving.

22          So I was just kind of just stuck in limbo

23  because I wasn't hearing anything from either party.

24     Q.   Okay.  Let's break that down a little bit.  So

25  as far as the credit reporting, it was still continuing

1  to show up on your credit report after you had spoken

2  with I.Q. Data and the property manager at Icon, fair?

3      A.    Yes.

4      Q.    Okay.  Do you happen to know whether it was

5  marked as disputed or undisputed?

6      A.    No, sir.

7      Q.    Okay.  Do you understand the difference

8  between a disputed and an undisputed debt?

9      A.    Yes, sir.

10      Q.    Okay.  Do you have any reason to believe that

11  after you spoke with either Icon or I.Q. Data, that the

12  debt was not marked as disputed?

13      A.    No, sir.

14      Q.    Okay.  So entirely possible that after you

15  spoke with them, they said, hey, you know, this is

16  wrong, reporting it to the credit agency, the correct

17  agency marked it as disputed.  That's totally possible,

18  right?

19      A.    Yes.

20      Q.    Okay.  Do you happen to know whether anyone

21  can take any adverse action against you over a disputed

22  debt?

23      A.    No, sir.

24      Q.    Gotcha.  If I was to represent to you that no

25  one can take adverse action against you based on a

**DENYONNA N. REED  -  October 21, 2022**

1  disputed debt until that dispute is resolved, would you

2  have any reason to dispute that?

3      A.    No, sir.

4      Q.    Okay.  I believe -- and correct me if I didn't

5  hear you correctly.  So as far as time line, you know,

6  this stuff happened mid December, early January.  When

7  did you -- without getting into the substance of any

8  conversations, when did you first contact an attorney?

9      A.    January of 2022 -- this year, January of 2022.

10      Q.    Okay.  So that would have been shortly after

11  you had these conversations with I.Q. Data and Icon,

12  fair?

13      A.    Yes.

14      Q.    Gotcha.  But you still had not heard back from

15  them at that point?

16      A.    Correct.

17      Q.    Gotcha.  Did the debt ever come off of your

18  credit report?

19      A.    Yes.

20      Q.    And when did that happen?

21      A.    April of 2022.

22      Q.    Okay.  So in total, the time period we're

23  talking about here where this debt was appearing on your

24  credit report, that's from November 2021 to April 2022;

25  is that right?

1       A.    Yes.

2       Q.    Gotcha.  And during that time, I think I heard

3  you correctly say that you were trying to move

4  apartments at that time, right?

5       A.    Yes, sir.  My lease was currently up at my

6  current complex, and so I was planning on moving

7  November or December of 2021.

8       Q.    Gotcha.  So how long was -- I think I heard

9  you say that you signed your lease around April of 2021,

10  so does that mean you would have been running out April

11  2022?

12      A.    Correct.  Well, no, my lease was up -- I

13  signed my lease in 2020.  That's when I initially

14  applied at Icon Apartments in 2020.  So I was here

15  currently for a whole year.  I was already paying my --

16  in April of 2021, I was -- after my lease was up I

17  didn't resign.  I was still paying month to month.

18             And then November or December was when I

19  was planning on moving, and we had a new complex come in

20  and take over.  So at that time, I was ready to go ahead

21  and transition to a new place any ways.

22      Q.    Gotcha.  So you were paying month to month.

23  November, December comes in.  They bring in new property

24  management people at the place you're currently at, so

25  you were looking for new places?

1          A.    Correct.

2          Q.    Okay.  How many new places did you look at?

3          A.    I would say about ten.

4          Q.    Ten different -- and same thing.  Just another

5     apartment complex?

6          A.    Yes, sir.

7          Q.    Gotcha.  And did you ever fill out any

8     applications at any of those places?

9          A.    Yes.

10          Q.    Gotcha.  And did any of them ever say anything

11     about, you know, hey, sorry, your credit.  There's this

12     issue here, so we can't rent you this apartment,

13     anything like that?

14          A.    Yes.  I did get denied at two places, and then

15     also, once I noticed that pattern, I kind of started

16     asking, hey, if I apply, I do have a debt that's on my

17     credit showing from -- you know, an alleged debt from

18     another property.  Could that deny me in any way?  And

19     they did advise me, yes.

20                So I didn't want to waste anymore money

21     paying application fees or paying for admin fees and

22     things like that.  So I kind of just stopped applying at

23     that point.

24          Q.    Okay.  So let's break that down a little bit.

25     So you had some applications get denied, right?

1    A.    Yes.

2    Q.    Okay.  And no one specifically told you though

3  that the reason that the application was getting denied

4  was because you had this debt.  You asked, hey, is it

5  possible that a debt could do this?  And they said, yes,

6  that's possible.  Is that fair?

7    A.    No, sir.

8    Q.    Okay.

9    A.    So the complexes that I did apply at, I asked

10  what was the reason for the denial, and they did tell me

11  because of the old property that was on my credit

12  report, that I owed a property.

13          So after those two got denied, I started

14  asking other properties before I applied, could this

15  deny me, so I wouldn't spend money with application fees

16  and admin fees, and they're the -- after that -- at that

17  point is when the properties were like, yeah, you could

18  get denied.  There's a possibly you could get denied

19  because of an old property because it looks like you

20  broke a lease.

21    Q.    Gotcha.  So the first two apartment complexes,

22  they said, hey, this old debt that's on here is an

23  issue, fair?

24    A.    Correct.

25    Q.    The rest of the places, you just asked, hey,

1  could this be an issue?  They said, possibly, and so you

2  just didn't even go through with it, right?

3      A.   Yes, sir.

4      Q.   Okay.  Did you pay application fees for those

5  first two places that you applied to?

6      A.   Yes.

7      Q.   Do you happen to recall how much the

8  application fee was?

9      A.   One was $75 for the first apartment complex,

10 and there was also a $25 admin fee, so it was a hundred

11 dollars for that.  The second property, I paid $50 for

12 the application fee, and then it was $50 admin fee, so

13 that was also a hundred dollars.

14     Q.   Okay.  And that was nonrefundable?

15     A.   Yes, sir.

16     Q.   Gotcha.  So you were out $200 for those

17 applications?

18     A.   Correct.

19     Q.   Awesome.  So when -- around what time was that

20 you said -- you know, we've been talking November,

21 December, January.  So was this in that November to

22 January window when you were reaching out to these

23 folks?

24     A.   Yes.

25     Q.   Okay.  Did you still have the medical debt

1  issue at that time?

2      A.    Yes, because I didn't pay that off until

3  January of 2020.

4      Q.    Okay.  So that would also have been on your

5  credit report as well?

6      A.    Correct.

7      Q.    Gotcha.  As far as correspondence with those

8  first two places where you submitted the application, do

9  you have any emails from those folks discussing your

10  application, anything like that?

11      A.    I don't have any emails.  I did go into the

12  property to fill out the application.  I may have -- I

13  may still have one or two emails where we kind of -- I

14  was trying to just check the status of the application

15  still in my inbox.

16      Q.    Gotcha.  Okay.  So you wouldn't have any

17  difficulty accessing those, assuming that, you know, you

18  still had those emails.  You haven't purged a bunch of

19  emails or anything like that, right?

20      A.    No, sir.

21      Q.    Okay.  Do you happen to recall the name of

22  those two apartment complexes?

23      A.    One is called The Ventera.  It's called the

24  Life at Ventera.  It's here in San Antonio.

25      Q.    And what about the other one?

1  A.   I want to say it's called The Park Place.  I

2  can't remember the last name of it.  It's called Park

3  Place -- I'm sorry.  This was like a year ago.

4  Q.   No problem at all.  Like I said, it's not a

5  memory test.  So Park Place something, right?

6  A.   Something like that, yes, sir.

7  Q.   And then presumably, if you had email

8  correspondence with them, the name of the apartment

9  complex would probably in there somewhere, right?

10  A.   Uh-huh.

11  Q.   Gotcha.  As far as the current apartment that

12  you're staying at, were you -- did you just continue to

13  do month to month?

14  A.   Yes, sir.

15  Q.   Okay.  When the new folks -- the new ownership

16  group came in, did your rent go up, down, stay the same?

17  A.   My rent went up, and their month-to-month

18  contract went up to $300 a month.

19  Q.   What was it previously?

20  A.   A hundred dollars a month for not being under

21  a contract.

22  Q.   Okay.  Was there any particular reason you

23  didn't want to go under contract?  You were still

24  looking to move, so you didn't want to get locked in for

25  a year or something?

1          A.    Yes, that was the reason.

2          Q.    Okay.  But as far as the price going up, that

3    was related to new ownership and the month-to-month

4    rental, right?  That wasn't anything related to your

5    credit?

6          A.    Correct.  Yes, sir.

7          Q.    Okay.  Great.  One thing, I forgot to mention

8    this at the beginning.  This is, you know, the new Zoom

9    world we live in.  If at any time we get disconnected or

10   anything like that, or you can't hear me or anything,

11   just go ahead and put your hand in the air.

12              That lets me know that, you know,

13   something cut out or the internet is weird or anything

14   like that.  So we make sure that we can stop, get you

15   back on, get everything sorted, and then continue with

16   the record, fair?

17         A.    Okay.  Yes, sir.

18         Q.    Great.  I'd like to go over a couple of

19   statements in your petition if that's all right.  Did

20   you see a copy of your petition before it was filed?

21         A.    Yes, sir.

22         Q.    Okay.  Again, without getting into the

23   substance of any conversations you had with your

24   attorney, how many times did you speak with them after

25   first contacting them before this petition was filed?

1          MR. DAHER:  Objection.  I mean, what's

2  the relevance of that question, other than trying to get

3  privileged information?

4          MR. HAMEL:  I'm not asking about any of

5  the substance, so it's not privileged, and it goes to

6  one of our potential affirmative defenses, which would

7  be if this was filed in bad faith.

8          MR. DAHER:  There's no affirmative

9  defense.  Are you talking about bona fide error?

10          MR. HAMEL:  No, I'm not talking about

11  bona fide error, and I'm also not asking for the

12  substance, so it's not privileged.  I mean, you can

13  instruct her not to answer.  I'm asking her how many

14  times she contacted you, not what she talked about.

15          MR. DAHER:  You can answer, Ms. Reed.

16      A.   We've been in contact several times prior to

17  that.

18      Q.   (BY MR. HAMEL) Okay.  Have you ever paid them

19  anything for their fees?

20      A.   No, sir.

21      Q.   Gotcha.  And you said several times, so you

22  know, you reached out, you contacted them, had a

23  discussion.  Was that the only discussion you had prior

24  to the lawsuit being filed, or did you have multiple

25  discussions?

1        A.    We've had multiple discussions.

2        Q.    Did you get a chance to review your petition

3   before it was filed?

4        A.    Yes, sir.

5        Q.    Gotcha.  All right.  So a couple of things in

6   the petition I wanted to go through.  There were some

7   statements in here that I wanted to make sure I double

8   checked.

9        A.    Uh-huh.

10       Q.    It says here, "Plaintiff", which would be you,

11  "felt extremely worried that there could be negative

12  consequences if she did not pay the debt, even though

13  she did not owe the subject debt."  Does that sound

14  familiar?

15       A.    Yes, sir.

16       Q.    Okay.  You obviously knew you didn't owe this

17  debt, right?

18       A.    Correct.

19       Q.    Okay.  What were you concerned about then as

20  far negative consequences if you didn't pay it, given

21  that you knew that you did not owe this debt?

22       A.    So just the negativity of it being on my

23  credit report for one, and two, I was really stressed

24  out about moving.  So the fact that I could not move,

25  and that was affecting me in a negative way because I

1  couldn't currently get out of the situation that I was

2  in.  My space had became extremely too small to

3  accommodate me and my child, so I was just really

4  stressed out about that.

5              And then in between that time, I wasn't

6  hearing anything back from I.Q. Data or the Icon

7  Apartments.  So it's just showing up on my credit report

8  as you owe this money.  So that was extremely stressful.

9      Q.    Okay.  So in -- to break that down then.  So

10  in terms of negative consequences, what you were

11  concerned about was that this showing up on your credit

12  report was going to damage your credit, fair?

13      A.    Correct.

14      Q.    Okay.  The next statement is, "Defendant,"

15  which would be I.Q. Data International's, "misleading

16  conduct has severely disrupted Plaintiff's life and

17  general wellbeing, as Plaintiff constantly feared

18  serious consequences."  Does that sound familiar?

19      A.    Yes.

20      Q.    Okay.  What misleading conduct are you

21  referring to in that statement?

22      A.    When you say misleading, as far as just

23  representing me in a negative connotation of something

24  that I did not do.  So when I initially reached out to

25  them to figure out what's going on, the first

1  conversation that I had with the first guy, he made me

2  feel like I owed this debt.  He made me feel like I had

3  no other choice but to pay this, and the only other

4  option I had was to fill out a fraud form to make --

5       Q.    Okay.  Sorry.  Go ahead.

6       A.    That's it.

7       Q.    All right.  What statements did he make to you

8  that made you feel like you had to pay this debt

9  notwithstanding the fact that you didn't owe it?

10       A.    I just felt like he -- when I was explaining

11  it to them, even with the initial reaching out to Icon

12  Apartments, just by getting the runaround, and nobody's

13  like -- nobody was trying to take initiative to figure

14  out what's going on with this made me feel like that

15  was -- I felt defeated because I didn't feel like there

16  was nothing I could do.

17            That's really the reason I reached out to

18  an attorney because I felt defeated.  Like there was

19  nothing -- like I couldn't handle the situation, or I

20  couldn't take matters into my own hands at that point is

21  the reason I reached out to an attorney because I felt

22  defeated.

23       Q.    Okay.  Would it be fair for me to say then

24  that it was not because of any specific statement by

25  I.Q. Data that you felt like you had to pay this debt.

1  It was that they weren't being helpful.  They were

2  basically saying, not my problem, fair?

3      A.    Fair, yes.

4      Q.    Okay.  As far as -- you know, you said this

5  severely disrupted your daily life.  How did it severely

6  disrupt your daily life?

7      A.    At the time, when I was -- when I initially

8  moved here, I moved into a one-bedroom.  My son was not

9  living with me at the time.  He was with his dad.  And

10  then starting the school year, he moved back home with

11  me.  And so I'm in a one-bedroom, and I need more space

12  for me and my -- to accommodate me and my child.

13          So being in this one-bedroom apartment, my

14  son doesn't have his own space.  He has to, you know, be

15  in a room with me.  He's 10 years old, so he needs his

16  own room.  And so that was just -- it was very stressful

17  because I felt like, as a parent, I couldn't make

18  accommodations for my child.

19          And that was the reason that I started to

20  really hunt in November to move because my child was in

21  the home with me.

22      Q.    Okay.  So the primary issue -- and please let

23  me know if I'm not -- you know, if this isn't right.

24  The primary issue was you felt that this was impacting

25  your ability to get a different apartment with more

1 space for -- you know, so you and your son could spread

2 out, fair?

3     A.   Correct.  And then I have also a small

4 business as well that I also run from home, so I just

5 needed more space based upon the business was -- kind of

6 had me more heavy at the time, so I needed more space

7 also to move to accommodate for my business.

8     Q.   Okay.  What kind of business is it?

9     A.   It's baking.  I do like parties and birthday

10 parties, weddings.  I bake cakes and party favors and

11 things like that.

12     Q.   Awesome.  So like you just have a catering

13 business?

14     A.   Yes, sir.

15     Q.   Okay.  Did you go to school for that?  Like

16 did you go to culinary school or anything, or just

17 you're just really good at baking?

18     A.   Sorry.

19     Q.   No worries.

20     A.   No, I didn't go to school for anything.  I

21 just was really good, self-taught.  My grandma just

22 taught me everything.  Family cooks and bakes, so just

23 kind of self-taught.

24     Q.   Yeah.  I was going to say, grandmothers are

25 sometimes the best teachers, right?  So in terms of the

1  business, how is that going?

2      A.    It's going pretty well.  I've kind of slowed

3  down.  I kind of just do just -- I guess like private

4  things here and there.  I don't do it as much because I

5  still -- I don't have the space to accommodate for

6  larger parties at the time.

7      Q.    Okay.  Is that the only thing you're doing for

8  work right now, or do you have a second job?  Or I mean,

9  I guess that would be the second job.  So do you have a

10  primary job, other than the catering stuff?

11      A.    Yes.

12      Q.    What do you do?

13      A.    I work for the State of Texas for Maximus.

14      Q.    Maximus, okay.  What do you do for them?

15      A.    So I'm a customer service representative

16  for --

17      Q.    Gotcha.

18      A.    Yes.

19      Q.    And how long have you been doing that?

20      A.    For the last -- I just transitioned jobs, so

21  for the last four months.

22      Q.    Okay.  So that's a new job as of four months

23  ago?

24      A.    Yes.

25      Q.    What were you doing prior to that?

1          A.    I was working for Mission Lane.

2          Q.    Okay.  And how long did you work for them?

3          A.    A year and a half.

4          Q.    Okay.  New job going well?  No issues there?

5          A.    Yes.

6          Q.    I'd like to talk about a couple other things

7    in the petition.  So one of the statements made in the

8    petition is, "Defendant demanded payment from

9    Plaintiff."

10              Is that referring to the letter that you

11   were sent, or is that about something else?

12         A.    That was referring to the letter that was sent

13   for payment, and then also I believe the guy on the

14   phone also asked for a payment.

15         Q.    Which guy?  Would that be the first call or

16   second call?

17         A.    First call.

18         Q.    First call.  And was that before or after you

19   told him that, you know, hey, I've never lived there; I

20   don't owe that?

21         A.    I believe that was before because when I first

22   got on the phone, he was like, we show that you have a

23   such-and-such outstanding debt.  How would you like to

24   pay this.

25         Q.    Gotcha.  After you told him it was disputed,

**DENYONNA N. REED  -  October 21, 2022**

1  did anybody demand payment from you?

2      A.   Not that I can recall.

3      Q.   Okay.  Did you receive anymore letters after

4  that point asking for payment?

5      A.   No, sir.

6      Q.   Gotcha.  Regarding kind of the day-to-day

7  stressful stuff, you ever -- have you seen a doctor

8  about that?

9      A.   I was in -- shortly in counseling just for

10  mental issues.

11     Q.   Okay.

12     A.   Not -- yes, sir.

13     Q.   What -- when you say counseling, is that with

14  a psychiatrist, psychologist, just a --

15     A.   Psychiatrist.

16     Q.   Psychiatrist?

17     A.   Yes.

18     Q.   How long have you been seeing a psychiatrist?

19     A.   I was seeing them for three months.

20     Q.   Okay.  And when did that start?

21     A.   That started June of 2022 up until about

22  October -- about August of this current year, 2022.

23     Q.   So June 2022 to August 2022; is that right?

24     A.   Uh-huh, yes, sir.

25     Q.   Okay.  And that would have been after the

1  credit -- the debt was removed from the credit report,

2  fair?

3      A.    Correct.

4      Q.    Okay.  What -- are you asserting that

5  basically you needed to go see the psychiatrist because

6  this debt was reported on your credit?

7      A.    Along with mental -- other mental issues, yes.

8      Q.    Okay.  I mean, obviously a very stressful time

9  for a lot of folks, so I totally understand that.  So it

10 wasn't the only reason you were going to do that, but

11 you're saying it was a reason?

12     A.    Sure.

13     Q.    Okay.  Do you happen to know the name of the

14 psychiatrist?

15     A.    Well, it was with my EAP which is for my

16 company, so they just recommend a different psychiatrist

17 every time.  I can give you the names of them, but it

18 was just -- it was just sessions that I was getting that

19 I was -- like 30-minute-increment sessions that I was

20 getting from -- with my company, my employer.

21     Q.    Gotcha.  Would that have been the State of

22 Texas one or the prior Mission Lanes?

23     A.    Well, Mission Lanes.  That was with Mission

24 Lanes, yeah.

25     Q.    Okay.  Was it just Telehealth?

**DENYONNA N. REED - October 21, 2022**

1  A.  Yes.

2  Q.  And you said 30-minute sessions, different

3  person every time, fair?

4  A.  Uh-huh.  You would just call in.  It was very

5  private sessions.  Like you would just call in and get,

6  you know, counseling for whatever you're going through

7  at that time.

8  Q.  Have you ever done any counseling like that at

9  any time in the past?

10  A.  No.

11  Q.  And I think you said, you know, a different

12  person every time.  If you needed to, you could probably

13  get a list of them, but you don't remember off the top

14  of your head, fair?

15  A.  Uh-huh.

16  Q.  Gotcha.  And no longer doing that though,

17  right?  Those ended in August of 2022?

18  A.  Yes.

19  Q.  Okay.  Did you ever take any medication or

20  anything like that?

21  A.  No, sir.

22  Q.  As far as out-of-pocket damages that you're

23  alleging related to this credit-reporting issue, did you

24  have any payments you had to make other than the

25  application fees?

1    A.    Just for the extra month-to-month fees that I

2    was paying for -- to the new property.

3    Q.    Okay.  And to be fair, I think you did say

4    that the month-to-month stuff was a new ownership group

5    came in and increased the rent, right?

6    A.    Correct.  Well, they increased the rent.  The

7    rent was increased, but in addition to the rent being

8    increased, it was an additional $300 per month, which

9    I'm still currently paying.

10    Q.    Okay.  So if you had been able to find a new

11    apartment, maybe you could have found a better rate than

12    having to just kind of eat the rent increase that was

13    put in by the new ownership?

14    A.    Yes, sir, absolutely.

15    Q.    Gotcha.  In terms of your interactions with

16    I.Q. Data International, are you alleging that anyone at

17    I.Q. Data knew that this debt should not have been

18    reported on your credit and was just still trying to

19    collect the debt from you any way?

20    A.    I'm not sure.  To be honest, I'm not sure.

21    Q.    Well, let me break it down this way, right?

22    So you call them up.  He says, hey, you owe this; you

23    need to pay it, right?

24    A.    Yes.

25    Q.    Okay.  And you say, I don't owe this.  I've

1  never lived at the Icon Apartments.  I have no clue what

2  this is.  I'm disputing this, right?

3      A.   Uh-huh.

4      Q.   Okay.  And he says, okay, fine.  You can fill

5  out this fraud form?

6      A.   Correct.

7      Q.   Okay.  Anything about that, did that lead you

8  to believe that he knew that you did not owe this, and

9  yet in spite of his knowledge of that fact, he was still

10  trying to collect the debt from you?

11      A.   The first guy made me feel that way, yes.

12      Q.   Okay.  What about how he acted led you to

13  believe that he knew that you didn't owe this debt, and

14  he was still trying to collect it from you?

15      A.   I think it was just -- it was the

16  persistentness (sic), and I'm not -- I can't say that he

17  a hundred percent knew.  I think he was just doing his

18  job at the end of the day.  That's just what he's paid

19  to do.

20            So I think it was just the persistency of

21  it, and it made me feel very uncomfortable, which is the

22  reason I called -- after I hung up with him, I called

23  and spoke to someone else, because I --

24      Q.   Okay.  The second person you spoke to, did

25  they make you feel like they knew that this debt was

**DENYONNA N. REED  -  October 21, 2022**

1  owed and they -- that this debt was not owed, and they

2  just didn't care?

3      A.   No.  That's the guy that -- the second guy I

4  spoke to was the one that initially told me about that

5  someone else was on the lease.  He initially told me

6  about the other person that was on the lease.  So no, he

7  didn't make me feel that way at all.

8      Q.   And again, that first person, the issue you

9  had with him was his persistence, I think you said.  So

10  it's basically he kept insisting either you pay this, or

11  you fill out the fraud form?

12      A.   Correct.  It was either you do this or do

13  that, yes.

14      Q.   Either pay it or fill out the fraud form?

15      A.   Correct.

16      Q.   Gotcha.  At any time -- this may feel like an

17  obvious question, so I'm sorry.  I kind of got to go

18  through it.  I mean, you obviously knew this whole time,

19  this entire process that you didn't owe this debt,

20  right?

21      A.   Correct.

22      Q.   Okay.  Do you recall ever receiving a copy of

23  interrogatories that we sent to you?

24      A.   No, sir.

25      Q.   Okay.  Do you know what an interrogatory is?

**DENYONNA N. REED  -  October 21, 2022**

1      A.    No, sir.

2      Q.    It's a big-ole legal work, so I'm not going to

3   blame you for that.  We lawyers, we like our big words.

4   Basically, they were just questions that we sent to you

5   that we wanted you to answer.  Does that sound familiar?

6      A.    Yes, sir.

7      Q.    Did you answer those questions?

8      A.    Yes, sir.

9      Q.    Okay.  So one of those ones I'd like to ask

10   you about.  We stated, "if you contend that you have

11   suffered mental anguish or emotional distress for which

12   you're entitled to recover damages in this lawsuit and

13   for which you have seen a healthcare provider or

14   therapist, state the name of such healthcare provider,

15   if any, the date on which you began seeing them, and the

16   amounts, if any, which you have been charged for such

17   services."

18            Your response to that was "at this time

19   Plaintiff has not seen a healthcare provider due to the

20   anguish and distress caused by Defendant."  That's

21   obviously not right, is it?

22      A.    Yes, sir, but I think at the time that was

23   filled out I had not seen the psychiatrist or anything

24   at the time when that was filled out.

25      Q.    Okay.  So at the time that this was filled

1  out, you hadn't done that, but now you have?

2      A.   Yes.

3      Q.   Gotcha.

4      A.   That's correct.

5      Q.   Gotcha.  Ms. Reed, I think I am almost done,

6  so why don't we do this.  Would it be all right -- well,

7  and your attorney may have some questions for you as

8  well.  Would it be all right if we could take a quick

9  five-minute break so I can go over my notes?  We'll come

10  back, and then I'll probably be done?

11      A.   Sure.

12           MR. DAHER:  Yep.  No worries.

13           (Break taken from 10:50 a.m. to 11 a.m.)

14      Q.   (BY MR. HAMEL)  Ms. Reed, I only have like two

15  or three more questions for you and then, unless your

16  attorney has any followups, that will probably be it.

17           So one thing we discussed, this debt came

18  off your credit report April 2022.  We've talked about

19  that, right?

20      A.   Uh-huh.

21      Q.   Okay.  You are still at The Life at Castle

22  Hills apartment, right?

23      A.   Correct.

24      Q.   Okay.  Same apartment that you've been renting

25  this whole time, new apartment?

1    A.    It was -- it's the same apartment, yes.  It's

2 just under new management, so it is under a new name

3 now.

4    Q.    Got you.  Any particular reason why you were

5 not able to move into a new apartment after the debt was

6 removed from your credit report?

7    A.    Just because I was still playing catchup.

8 Honestly, when they hit me with the $300, I got

9 extremely behind in bills.  That's just the honest

10 truth.  So I didn't want to leave here until I like kind

11 of just caught up with all my bills and making sure I'm

12 able to pay what was owed here.

13    Q.    Okay.  So I think if I understood you

14 correctly, what you're saying is, the issue is when they

15 increased your rent, you maybe got a little bit behind

16 in some of those payments, so you don't want to try and

17 switch because then these folks are going to be coming

18 after you, fair?

19    A.    Correct.  And it was -- also the increase in

20 rent, and then as I mentioned, the month-to-month fees

21 were starting to add up.

22    Q.    Okay.  Have you gotten caught back up on those

23 or still trying to catch up?

24    A.    No.  Almost to where I need to be, but yes,

25 sir.

1    Q.    So not quite yet?

2    A.    Not quite yet, yes.

3    Q.    Gotcha.  That's all I have for you right now.

4              MR. HAMEL:  So I will pass the witness.

5              MR. DAHER:  No further questions.  Thank

6    you.

7              THE REPORTER:  Do you want her to read

8    and sign?

9              MR. DAHER:  We'll waive.

10             THE REPORTER:  Would the attorneys please

11   state on the record how they would like their copies?

12             MR. HAMEL:  E-transcript please.

13             MR. DAHER:  Same here.

14             (Deposition concluded at 11:03 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1           IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3    DENYONNA N. REED,          )  CIVIL ACTION
                                 )
 4              PLAINTIFF,        )
                                 )
 5    VS.                        )
                                 )  COMPLAINT 5:22-CV-00068
 6    I.Q. DATA INTERNATIONAL,   )
      INC.,                      )
 7                               )
                DEFENDANT.       )
 8

 9

10           REPORTER'S CERTIFICATION

11        DEPOSITION OF DENYONNA N. REED

12             DENYONNA N. REED

13

14       I, Michelle Hill, Certified Shorthand Reporter in

15   and for the State of Texas, hereby certify to the

16   following:

17       That the witness, DENYONNA N. REED, was duly sworn

18   by the officer and that the transcript of the oral

19   deposition is a true record of the testimony given by

20   the witness;

21       That the amount of time used by each party at the

22   deposition is as follows:

23   MR. MARWAN DAHER.....00 HOUR(S):00 MINUTE(S)

24   MR. BENJAMIN E. HAMEL.....00 HOUR(S):50 MINUTE(S)

25
```

 1          That pursuant to information given to the

 2    deposition officer at the time said testimony was taken,

 3    the following includes counsel for all parties of

 4    record:

 5    FOR THE PLAINTIFF:   MR. MARWAN DAHER

 6    FOR THE DEFENDANT, I.Q. DATA INTERNATIONAL, INC.:

 7    MR. BENJAMIN E. HAMEL AND MR. DYLAN BASS

 8          That $_____ is the deposition officer's

 9    charges to the Defendant for preparing the original

10    deposition transcript and any copies of exhibits;

11          I further certify that I am neither counsel for,

12    related to, nor employed by any of the parties or

13    attorneys in the action in which this proceeding was

14    taken, and further that I am not financially or

15    otherwise interested in the outcome of the action.

16          Certified to by me this 2nd day of November, 2022.

17

18

19                        _____
                          Michelle Hill
20                        Texas CSR No. 5663
                          Expiration Date:  07/31/2024
21                        Court Reporters Clearinghouse
                          1225 North Loop West, Suite 327
22                        Houston, Texas 77008
                          713-626-2629
23

24

25