IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DENYONNA N. REED, | § | |
| | § | |
| *Plaintiff,* | § | SA-22-CV-00068-FB |
| | § | |
| vs. | § | |
| | § | |
| I.Q. DATA INTERNATIONAL, INC., | § | |
| | § | |
| *Defendant.* | § | |

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns Defendant I.Q. Data International, Inc.'s Motion for Summary Judgment Pursuant to the Bona Fide Error Defense [#24] and Defendant I.Q. Data International, Inc.'s Motion for Summary Judgment [#25]. The District Court referred this case for all pretrial proceedings pursuant to Western District of Texas Local Rule CV-72 and Appendix C [#12]. The undersigned has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is recommended that Defendant's motions for summary judgment be denied.

### I. Background

This case arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"), and Texas Debt Collection Act, Tex. Fin. Code § 392, *et seq.* ("TDCA"). Plaintiff Deonna N. Reed alleges that she discovered in December 2021 that Defendant I.Q. Data International, Inc. ("I.Q. Data"), a debt collection agency, was incorrectly reporting a debt she allegedly owed to Icon Apartments ("Icon") for $894.00. (Compl. [#1], at ¶ 10.) Reed claims she

1

was never a resident of and never signed a lease with Icon.  (*Id.* at ¶ 11.)  According to Reed's Complaint, she attempted to contest the debt, but I.Q. Data continued to pursue collection of the debt and did not timely resolve the issue.  (*Id.* at ¶¶ 13–22.)  By this suit, Reed alleges that I.Q. Data made false, deceptive, and misleading representations regarding a debt in violation of both statutes. *See* 15 U.S.C. § 1692e; Tex. Fin. Code § 39.304.  Reed seeks statutory and actual damages under the FDCPA and TDCA, as well as punitive damages, for I.Q. Data's attempt to collect a debt she was not obligated to pay.  (Compl. [#1], at 7.)

I.Q. Data has filed two motions for summary judgment, seeking summary judgment on all of Reed's claims.  I.Q. Data's first motion for summary judgment [#24] seeks summary judgment on the bona fide error defense available under both the FDCPA and TDCA on the basis that any violation of these statutes was unintentional.  The second motion [#25] seeks summary judgment on all of Reed's claims on the basis that Reed cannot establish any concrete injury related to I.Q. Data's alleged conduct sufficient to establish Article III standing and cannot prove actual damages sufficient to entitle her to damages under the TDCA.  Reed has filed responses in opposition to both motions [#32, #33], to which I.Q. Data has filed replies [#34, #35].  The motions are ripe for review.

## II.  Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  A dispute is genuine only if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Westphal*, 230 F.3d at 174.

### III.  Summary Judgment Record

The following facts comprise the summary judgment record and are undisputed unless otherwise noted. The debt at issue was assigned to I.Q. Data for collection on November 17, 2021, after Reed was listed as a party to an apartment lease agreement with Icon, the putative creditor, and the lease was in default. (Interrogatory Resp. [#33-1], at 4, 6.) Reed had visited Icon in April of 2020, filled out an application for a residential lease, and paid the application fee, but never executed the lease or resided there. (Pl.'s Dep. [#33-5], at 9:19–25.)

3

Reed discovered the debt in December of 2021 because she was "cleaning up old debt that was on [her credit report] like medical bills" so she could buy a home or move into another apartment.  (*Id.* at 11:1–13:20.)  Reed had been paying rent on a month-to-month basis at her current apartment at Life at Castle Hill Apartments since April 2021 and knew her rent was set to increase in November or December of 2021 as a result of a new property management company taking over the complex.  (*Id.* at 25:8–21.)  Reed desired to move to a new apartment because she did not have adequate space in her one-bedroom apartment to live with her 10-year-old son and to run her small baking business from home.  (*Id.* at 36:7–37:14.)

In December of 2021, Reed received an initial debt collection letter from I.Q. Data regarding the debt.  (*Id.* at 17:2–10, 18:19–24.)  This was the only letter Reed received attempting collection of the debt at issue.  (*Id.* at 17:19–21.)  The letter is not in the summary judgment record, but a copy of the debt account in the record links Reed to the Icon lease and erroneously lists both Reed and another individual, Alexia Bartholomew, as residents owing over $800 in unpaid rent, water, sewer, and trash charges, as well as pest control fees and a lease termination fee.  (Debt Account [#24-1], at 2.)  I.Q. Data does not dispute that the debt did not ever belong to Reed and was assigned to Reed in error.  (Requests for Admission [#33-2], at 4.)

Reed first attempted to address the disputed debt by contacting Icon directly.  (Pl.'s Dep. [#33-5], at 16:19–23.)  Reed claims Icon initially gave her the "runaround," so she contacted I.Q. Data to find out more information about the debt.  (*Id.* at 17:21–18:4.)  The summary judgment record contains audio recordings of five calls between Reed and representatives of I.Q. Data that occurred in December 2021 and March 2022.  The record reflects that Reed placed two calls with I.Q. Data on December 23, 2021.  (Audio Recordings [#33-4, #33-9].)  In the first call, Reed relayed that she had discovered the Icon debt on her credit report and did not know why it was

appearing on her report, as she had never resided at Icon.  (Audio Recording [#33-4].)  An employee named Nick stated he would send Reed a fraud packet so she could contest the debt. (*Id.*)  Reed then called back for more information.  (Audio Recording [#33-9].)  In the second call, an employee named Chris provided Reed with the name of the other individual listed on the lease and recommended Reed not fill out the fraud packet, as he thought the debt was likely the result of a creditor error, not fraud.  (*Id.*)  Reed testified in her deposition that she never filled out the fraud form because eventually the property manager for Icon admitted the debt was a mistake and agreed to contact I.Q. Data to request the debt be removed from Reed's credit report.  (Pl.'s Dep. [#33-5], at 16:19–23, 23:4–15.)

According to I.Q. Data's discovery responses, as soon as Reed reported the debt as disputed, I.Q. Data began an investigation into the debt's validity.  (Interrogatory Resp. [#33-1], at 6.)  The only evidence of this investigation in the summary judgment record is a single email I.Q. Data sent to Icon on January 13, 2022, indicating that the debt at issue had been marked as disputed and that, according to Reed, the debt belonged solely to Ms. Bartholomew.  (Email [#24-1], at 13.)  The email requested information from Icon regarding the lease application and any "roommate addition documents" by January 20, 2022, so that I.Q. Data could proceed with collection activity.  (*Id.*)  The letter further states that if Icon did not respond to the information request, I.Q. Data "may be required to cease collection activity and close the file."  (*Id.*)

Approximately one month after Reed reported the debt as disputed, on January 26, 2022, she filed this lawsuit against I.Q. Data because the Icon debt still had not been removed from her credit report.  Reed also sent dispute letters to various credit reporting agencies after she filed suit. (Dispute Letters [#33-3], at 2–13.)  Although the dispute letters are dated January 17, 2022, according to the certified mail receipts, the letters were not mailed until February 15, 2022.

(Certified Mail Receipts [#33-3], at 4.)  The letters requested the deletion of the Icon debt from Reed's credit profile and included a copy of her driver's license and pay stub.  (Dispute Letters [#33-3], at 2–13.)

In March 2022, the debt still had not been removed from Reed's credit reports.  Reed again contacted I.Q. Data on March 9 and 11, 2022, in an attempt to get more information regarding the status of her dispute.  (Audio Recording [#33-6], Audio Recording [#33-7].)  In a first call on March 9, 2022, Reed spoke with an employee named Angela, who refused to provide Reed any information about the disputed debt and offered to take a message.  (Audio Recording [#33-6], at 1.)  Reed called back later that same day and spoke to an employee named Josh, requesting to speak with someone who could handle complaints.  (Audio Recording [#33-7].)  Josh similarly responded that all he could do was take a message for a call back.  (*Id.*)  Reed had her last call with I.Q. Data on March 11, 2022, when she spoke with Chris again.  (Audio Recording [#33-8], at 1.)  Chris relayed the same thing; he was unable to assist Reed in any way and could only offer a message and a call back.  (*Id.*)  As I.Q. Data points out in its briefing, the refusal of its employees to provide information to Reed over the phone regarding the status of the disputed debt could have been due to the fact that Reed had already filed suit against I.Q. Data at that time.  The debt was ultimately removed from Reed's credit report sometime in April 2022.  (Pl.'s Dep. [#33-5], at 23:16–21.)

The summary judgment record also contains deposition testimony and discovery responses regarding Reed's alleged injuries caused by I.Q. Data's conduct.  Reed's Complaint alleges that I.Q. Data's errors in reporting and attempting to collect a debt caused her emotional and mental distress and damaged her reputation as a consumer.  (Compl. [#1], at ¶¶ 19–22.)  Reed also testified in her deposition that I.Q. Data's actions caused her economic hardship, as she was allegedly

unable to move to another apartment complex before the rent increase because her credit report showed the Icon debt.  (Pl.'s Dep. [#33-5], at 7:23–8:5.)  According to Reed, she looked at ten possible new apartments, submitted applications with two apartment complexes, both of which were denied for the stated reason of the debt on her credit report related to unpaid rent.  (*Id.* at 26:23, 27:9–12, 29:21–30:3.)  Reed testified that she lost $200 in application fees and did not want to waste her time and money on new applications while the debt was still appearing on her credit report, so she stopped applying for new apartments.  (*Id.* at 26:23, 29:21–30:3.)  When her rent increased by $300 a month for a month-to-month lease, Reed testified that she could not keep up with her expenses and fell "extremely behind" on her bills.  (*Id.* at 48:7–25.)  Reed still resides at the same apartment and testified that she has been unable to move due to her financial situation.  (*Id.* at 10:25–11:9.)  Even though the disputed debt has been removed from her credit report, Reed testified that she does not want to leave the apartment until she is "caught up with all [her] bills."  (*Id.* at 48:7–25.)

### IV.  Motion for Summary Judgment on Standing

Because standing is jurisdictional, *see United States v. Hays*, 515 U.S. 737, 742 (1995), the undersigned first considers the issues raised in motion #25.  I.Q. Data's motion argues that Reed lacks standing to sue I.Q. Data under the FDCPA and TDCA because she cannot establish that she suffered an injury in fact traceable to I.Q. Data's alleged misconduct.  The Court should deny the motion.

Article III of the United States Constitution specifies that the "judicial Power of the United States" extends only to "Cases" and "Controversies."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016).  The concept of standing is essential to Article III's case-and-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The party invoking federal jurisdiction

bears the burden of establishing standing. *Id.* at 560. In the context of a motion for summary judgment, as here, a plaintiff must set forth by affidavit or other evidence specific facts, which accepted as true, establish all elements of standing. *Id.*

Standing consists of three elements: (1) an injury in fact, i.e., the invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural and hypothetical; (2) a causal connection between the injury and the conduct complained of, i.e., an injury "fairly traceable" to the challenged actions of the I.Q. Data, as opposed to resulting from some independent action of some third party not before the court; and (3) the likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision. *Id.* at 560–61. Again, I.Q. Data argues Reed lacks standing because she cannot establish that she suffered an injury in fact, the first element of standing. I.Q. Data's motion focuses primarily on Reed's lack of evidence of emotional injury.

Reed argues in her response to I.Q. Data's motion, however, that she has standing to pursue her claims primarily because of the economic losses and financial hardship she suffered, not just emotional injuries. Reed argues she was unable to move to a new apartment due to the Icon debt being placed in collection and erroneously appearing in her credit report. Reed argues that I.Q. Data's false reporting of the Icon debt lowered her credit score, which resulted in the denial of multiple housing applications, which in turn caused her to lose application fees and forced her to stay at her current apartment on a month-to-month basis at a higher rate of rent. Reed has provided sworn deposition testimony regarding this injury, and the undersigned finds it is a particularized and concrete injury sufficient to confer Article III standing.

**A.      Reed has not presented evidence that establishes standing based on her alleged emotional injuries.**

I.Q. Data's motion primarily seeks summary judgment for lack of standing based on Reed's failure to establish a concrete and particularized emotional injury.  Reed's Complaint focuses on this category of damages, as do her discovery responses.  The undersigned agrees with I.Q. Data that the summary judgment record lacks sufficient evidence to establish standing based on Reed's alleged mental and emotional injuries.

Reed's Complaint alleges she was "extremely worried that there could be negative consequences if she did not pay the debt, even though she did not owe the subject debt"; that "I.Q. Data's inaccurate reporting and lack of urgency to rectify the problem on Reed's credit report has cause [her] much distress and damages her good reputation as a consumer"; that "I.Q. Data's misleading conduct has severely disrupted [her] daily life and general well-being;" and that "Reed was forced to seek the assistance of counsel, . . . thus incurring costs and expenses."  (*Id.* at ¶¶ 19–22.)  Numerous interrogatories and requests for production asked Reed for information regarding her mental anguish and emotional distress.  (Discovery Requests and Responses [#25-1], at 5–7.)  Reed's responses, which were served on September 28, 2022, stated that she had not yet seen a healthcare provider or therapist due to the alleged anguish and distress caused by I.Q. Data's false reporting of her Icon debt.  (*Id.*)  And Reed has not supplemented her discovery responses on this issue.

I.Q. Data also asked Reed about seeing a psychiatrist in her deposition, and Reed testified that she started seeing a mental health professional in June through August 2022 about the stress caused by the false debt reporting and other mental issues.  (*Id.* at 46–47.)  This testimony conflicts with Reed's interrogatory responses, in which she stated that she had not seen a psychiatrist or mental health professional regarding the alleged distress she suffered from the reporting of the

Icon debt as of the end of September.  Regardless, Reed confirmed in her deposition that at the time she filed her lawsuit, she had not seen a psychiatrist or any other mental health professional related to her alleged emotional distress.  (*Id.* at 47.)

Standing is determined at the time a suit is filed.  *See Davis v. FEC*, 554 U.S. 724, 734 (2008) ("While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.") (quotation omitted)).  Reed has not provided the Court with sufficient evidence, taken as true, to establish that she had a concrete and particularized psychological injury at the time her suit was filed in January 2022.

Moreover, the only documents produced by Reed in response to I.Q. Data's requests for production regarding her claim for emotional-distress damages were the following: (1) dispute letters regarding the debt Reed sent to TransUnion, Equifax, and Experian dated January 17, 2022; (2) a copy of Reed's driver's license; (3) one of Reed's earnings statements; and (4) an email from Credit Karma showing that the Icon debt had been reported on Reed's credit report as of December 20, 2021.  (Docs. Produced [#25-1], at 11–35.)  None of these documents provide evidence regarding an emotional or mental injury for purposes of standing.  *See Lujan*, 504 U.S. at 560. Reed has not established standing to sue based on these alleged injuries.  However, she has presented sufficient evidence that she has suffered a financial injury, as is explained below.

**B.     Reed has standing to seek relief related to her alleged economic injury.**

The financial injury Reed describes in her deposition testimony constitutes an actual injury sufficient to confer standing.  Therefore, lack of standing is not a basis for jurisdictional dismissal of Reed's claims, and I.Q. Data's motion should be denied.

First, Reed's financial injury is particularized.  The Supreme Court in *Spokeo* explained that for an injury to be "particularized," it "must affect the plaintiff in a personal and individual way."  *Spokeo*, 578 U.S. at 339 (quotations and citations omitted).  Reed testified that she suffered financial harm by being unable to move to a new apartment due to the disputed debt appearing on her credit report at the time she submitted applications for new apartment complexes.  This injury is personal to Reed and affects her individually.

Reed's alleged financial injury is also concrete.  The Supreme Court recently addressed the concrete-injury requirement of standing in a class action arising under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* (FCRA).  *See TransUnion LLC v. Ramirez*, --U.S.--, 141 S. Ct. 2190 (2021).  For an injury to be concrete, it must bear a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," such as physical and monetary harms.  *Id.* at 2204 (citing *Spokeo*, 578 U.S. at 340–41).  Although Congress also has the authority to create statutory causes of action for intangible harms, this "does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III."  *Id.* at 2205.  "For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law."  *Id.*  "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court."  *Id.* (emphasis in original).  For example, the "mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm," whereas the dissemination of misleading credit reports to third parties causes a concrete injury.  *Id.* at 2210.

Following *TransUnion*, the Fifth Circuit *sua sponte* vacated a class-certification order in a case arising under the FDCPA—the federal statute at issue here—and remanded the case with instructions to dismiss for lack of standing.  *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816 (5th Cir. 2022).  In *Perez*, the Fifth Circuit applied *TransUnion* to hold that the class representative had failed to demonstrate a concrete injury that could confer standing to sue under the FDCPA where she had only received one single unwanted and misleading communication from a debt collection law firm regarding a debt that was no longer enforceable under Texas law. *Id.* at 823–26.  Here, Reed is not alleging injury based solely on the receipt of one collection letter from I.Q. Data or solely based on a technical statutory violation; she has articulated an actual financial injury caused by the debt being placed in collection.

I.Q. Data argues in its briefing that the Court should not consider Reed's financial injury in evaluating standing because (1) she did not plead any facts related to this injury in her Complaint or include any reference to this injury in her various discovery responses, and (2) she conceded in her deposition that she had other debt on her credit report at the time she was attempting to move that was unresolved and valid.  It is true that none of Reed's assertions regarding her financial injuries appear in Reed's Complaint or in Reed's discovery responses, and Reed has not supplemented her responses to address these alleged injuries as required by Rule 26(e)(1).  (*See* Discovery Requests [#25-1], at 7 (asking Reed to produce all documents supporting any "actual damages" suffered as a result of I.Q. Data's alleged conduct).)  It is also true that Reed testified to having other debts on her credit report that were legitimate debts, specifically medical debt, that had not been paid off at the time she had hoped to move and avoid the increased rent at her current apartment.  (Pl.'s Dep. [#33-5], at 11:15–12:23.)  Yet nothing in the summary judgment record establishes as a matter of law that these other debts and not the Icon debt caused Reed's

applications to be denied, and Reed testified in her deposition that her two denied housing applications were due to the Icon debt, not her medical debt.  Additionally, Reed did plead "actual damages" in her Complaint, even if she failed to provide information regarding these damages in her pleadings or discovery responses.  (Compl. [#1], at 7.)  Reed properly expounded upon her injuries in her deposition.

In summary, at this summary judgment stage, Reed's deposition testimony demonstrates a concrete and particularized injury sufficient to confer Reed with Article III standing to sue I.Q. Data under the FDCA and TDCA.   In light of this finding, the Court need not address Reed's alternative arguments that she has standing based solely on the possible reputational harm flowing from an inaccurate credit report or the loss of time and costs associated with mailing dispute letters and contacting I.Q. Data and various credit reporting agencies.  I.Q. Data has failed to establish it is entitled to summary judgment as a matter of law based on a lack of standing, and this Court has jurisdiction to consider Reed's claims.

Finally, I.Q. Data's argument that Reed cannot prevail on her claim under the TDCA due to her inability to prove actual damages fails for the same reasons the Court should deny the motion to summary judgment for lack of standing.  The Court should deny I.Q. Data's motion for summary judgment based on lack of standing in full.

### V.  Motion for Summary Judgment on Bona Fide Error Defense

I.Q. Data argues it is entitled to summary judgment on all of Reed's claims under the bona fide error defense available under both the FDCPA and TDCA.  The Court should also deny this motion.

The FDCPA and TDCA provide a "bona fide error" defense for debt collectors accused of statutory violations. *See* 15 U.S.C. § 1692k(c); Tex. Fin. Code § 392.401. Section 1692k(c) of the FDCPA provides:

> A debt collector may not be held liable in any action brought under [the FDCPA] if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. § 1692k(c). Section 392.401 of the TDCA similarly provides that "[a] person does not violate this chapter if the action complained of resulted from a bona fide error that occurred notwithstanding the use of reasonable procedures adopted to avoid the error." Tex. Fin. Code § 392.401.

To prevail on its bona fide error defense under the FDCPA (and TDCA), I.Q. Data must establish that: (1) its violation of the statute was unintentional; (2) it resulted from a bona fide error; and (3) that it had reasonably adopted procedures in place to avoid such an error. *Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1239 (5th Cir. 1997) (FDCPA); *CA Partners v. Spears*, 274 S.W.3d 51, 71 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (TDCA). The bona fide error defense is an affirmative defense for which the I.Q. Data bears the burden of proof. *Smith v. Moss Law Firm, P.C.*, No. 3:18-CV-2449-D, 2020 WL 584617, at *10 (N.D. Tex. Feb. 6, 2020).

The first prong of the bona fide error defense is a subjective test requiring a credibility determination concerning the I.Q. Data's assertions that the violation was unintentional. *See Smith v. ProCollect, Inc.*, Case No. 6:09-CV-0350, 2011 WL 1375667, at *6 (E.D. Tex. Apr. 12, 2011). Under the first prong, "[t]he debt collector need only show that its FDCPA violation was

unintentional, not that its actions were unintentional." *Liu v. Arrow Fin. Servs., LLC*, No. CIV.A. H-08-3116, 2010 WL 1994190, at *3 (S.D. Tex. May 17, 2010).

The second and third prongs are analyzed under an objective test. *Smith*, 2011 WL 1375667, at *6. The second prong requires a showing that the error was made in good faith and without fraud. *Id.* To analyze whether the I.Q. Data's procedures satisfy the third prong, an inquiry is needed to assess (1) whether any procedures were actually implemented, and (2) whether such procedures were reasonably adapted to avoid the specific error at issue. *Id.*

In support of the defense, I.Q. Data provides the Court with copies of its policies and procedures and evidence providing further details about those policies. I.Q. Data maintains an Identity Theft Procedure, which requires cessation of collection activity upon receipt of a report of identity theft or fraud. (Identity Theft Procedure [#24-1], at 6–7.) I.Q. Data also maintains a FCRA Policy, requiring review of account information to ensure its accuracy and integrity. (FCRA Policy [#24-1], at 18–21.) Finally, I.Q. Data maintains a Consumer Dispute Policy to ensure that it complies with the appropriate standards for "investigating, reporting, and responding to consumer disputes." (Consumer Dispute Policy [#24-1], at 9–11.) I.Q. Data also provides the Court with the affidavit of Michael Gulbranson describing I.Q. Data's process for ensuring its debts are valid. (Gulbranson Aff. [#24-1], at 15–16.) According to Mr. Gulbranson, "[w]hen an account is assigned to I.Q. Data for collection, I.Q. Data requires the original creditor to provide documents/information" evidencing the subject debt. (*Id.* at 15–16.) Mr. Gulbranson also states that "I.Q. Data reviews the materials provided by the original creditor for obvious errors before initiating any communications with the debtor and before reporting the debt" and "if any errors are identified, I.Q. Data contacts the original creditor and requires them to address the errors and/or provide additional information or documents relating to the debt at issue." (*Id.* at 16.)

After considering this record under the governing summary judgment standard, the undersigned concludes I.Q. Data is not entitled to summary judgment on its affirmative defense because it has not established as a matter of law that its error with respect to the Icon debt was unintentional, the first prong of the bona fide error defense inquiry.

I.Q. Data argues its violation of the FDCPA was not intentional because the record demonstrates that it reasonably relied on the account information regarding the debt at issue provided by Icon and was unaware that Reed was not a party to the lease agreement when it reported the debt on Reed's credit report and sought collection.  I.Q. Data further argues that Reed's name was listed on the lease at issue due to a computer glitch within Icon's management software and therefore was at the result of a "good faith innocent clerical error."  This may be true, but I.Q. Data has not provided the Court with any summary judgment evidence to support this assertion.  The only evidence in the record regarding the lease information and the debt is a copy of the first page of the lease agreement, which reflects solely Ms. Bartholomew's name on the lease and does not have any reference to or record of Reed being a party to the lease.  (Lease [#24-2], at 1.)  The record also contains account information regarding the debt that lists both Reed and Ms. Bartholomew.  (Debt Account [#24-1], at 1.)  However, there is no testimony in the record from any representative of I.Q. Data regarding what it received from Icon regarding the debt; when it received it; and whether it had any access to the underlying lease documents at the time it attempted collection of the debt.[1]  Nor did I.Q. Data provide the Court with any affidavits or declarations detailing these facts.

---

[1] Reed had asked the Court for a continuance of her response deadline so that she could first depose I.Q. Data before responding, but the undersigned denied the motion on December 12, 2022 [#29].

The affidavit of Mr. Gulbranson focuses solely on I.Q. Data's general policies and procedures in reviewing materials provided by original creditors for any obvious errors before initiating communications with a debtor or reporting the debt.  (Gulbranson Aff. [#24-1], at 15–16.)  These statements may bear on the third prong of the bona fide error defense analysis as to whether I.Q. Data maintained policies and procedures to avoid errors, but they do not address any facts that address the intentionality or unintentionality of I.Q. Data's actions with respect to the Icon debt specifically.  The Court cannot award I.Q. Data summary judgment on its affirmative defense based solely on arguments asserted in its summary judgment briefing.  There are numerous questions that remain unanswered by the summary judgment briefing due to the lack of evidence regarding the Icon debt specifically as opposed to I.Q. Data's policies generally.

If the evidence ultimately establishes that I.Q. Data had a copy of the lease agreement from Icon prior to initiating collection activities, a factfinder could find that its error was not unintentional and that it did not follow its policies and procedures regarding confirming the validity of a debt prior to collection.  Moreover, the record establishes that it took approximately four months for I.Q. Data to delete the erroneous debt from Reed's credit reporting.  The only evidence in the record regarding affirmative acts taken by I.Q. Data to investigate Reed's dispute of the Icon debt is a single email sent to Icon asking for more information.  On this record, a factfinder could also conclude that the delay in removing Reed's debt and lack of additional affirmative steps to address the erroneous debt in a timely manner undermine I.Q. Data's credibility regarding the alleged unintentionality of its error and its adherence to any procedures in place to avoid such errors.  Because I.Q. Data failed to prove the first prong of the bona fide error defense as a matter of law, the undersigned will not address the other prongs of the defense.

In summary, I.Q. Data has not carried its burden to demonstrate that there is no genuine dispute as to whether its actions reporting and collecting the Icon debt constitute an intentional violation of the FDCPA.  Ultimately whether I.Q. Data's actions were reasonable and whether its explanation for the cause of the error is credible are questions of fact more appropriately left for a jury.  *Accord Allen v. Scott*, No. 3:10-CV-02005-F, 2011 WL 13079866, at \*5 (N.D. Tex. May 18, 2011) (noting that the merit of a bona fide error defense is necessarily a fact-intensive inquiry, involving "questions of intent, reasonableness and a defendant's credibility . . . more appropriately left for the jury to decide").  The Court should therefore deny the motion for summary judgment so that the jury can address I.Q. Data's affirmative defense on a more complete record.

## VI.  Conclusion and Recommendation

Having considered I.Q. Data's motions, the responses and replies thereto, the summary judgment record, and the governing law the undersigned **recommends** that Defendant I.Q. Data International, Inc.'s Motion for Summary Judgment Pursuant to the Bona Fide Error Defense [#24] and Defendant I.Q. Data International, Inc.'s Motion for Summary Judgment [#25] be **DENIED**.

## VII.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The party shall file the objections with the Clerk of Court and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which

objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**IT IS SO ORDERED.**

SIGNED this 14th day of August, 2023.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE