1            UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS

2

              San Antonio Division

3

4  DENYONNA N. REED,

5      Plaintiff,

6      v.                Case No.
                       5:22-cv-00068-FB-ESC

7  IQ DATA INTERNATIONAL, INC.,

8      Defendant.

9  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~

10         VIDEOCONFERENCE DEPOSITION of

11           MICHAEL GULBRANSON

12        Designated Representative of

13        IQ DATA INTERNATIONAL, INC.

14

15           January 24, 2023

16           12:00 p.m. CST

17

18

19

20

21  Job No.:  35942

22  Reported by:  Katherine S. Hruneni

1   BY MR. BADWAN:

2        Q.      What is Exhibit 6?

3        A.      It appears to be the consumer work card.

4        Q.      Okay.  And is that for the account that

5   IQ Data tried to collect from Ms. Reed?

6        A.      It appears that way; yes.

7        Q.      Okay.  And when was the account placed

8   with IQ Data for collection?

9        A.      It shows that it was assigned 11/17/2021.

10       Q.      Okay.  And who was the consumer that

11  allegedly owed the debt?

12       A.      It shows two names provided us by our

13  client.  It was Denyo Reed, your client; and the

14  second person was Alexia Bartholomew.

15       Q.      Okay.  Would you agree with me that the

16  name, where it says right here "Name," the first name

17  is spelled D-e-n-y-o?

18       A.      That is correct.

19       Q.      And would you agree with me that

20  Ms. Reed's name is D-e-n-y-o-n-n-a?

21       A.      I don't know the spelling of her name,

22  exactly how it is, so -- if you can show me

1   something, I'll agree with it.

2        Q.     Okay.  Let's take a look at the complaint,

3   which is Exhibit 2.

4             Would you agree with me that Ms. Reed's

5   name is different -- spelled differently than the name

6   that appears on the work card in Exhibit 6?

7        A.     Yes; it is spelled differently.  Kind of

8   looks like a Michael/Mike type of situation.

9        Q.     Okay.  Is it your understanding that people

10  by the name of Denyonna go by the name Denyo?

11       A.     There's so many different names in the

12  world.  I've not heard the name Denyonna before.

13       Q.     Yeah; I've never heard the name Denyo.  I

14  have an issue with your characterization it's like

15  Michael and Mike.  But we'll proceed.

16             So is it fair to say that Icon Apartments

17  represented to IQ Data that Denyo Reed and Alexia

18  Bartholomew owe a debt to Icon Apartments?

19       A.     Yes; that would be fair.

20       Q.     Okay.  Now, what was the address provided

21  by Icon Apartments to IQ Data for Denyonna Reed?

22       A.     According to this document, it says 1300

1      A.       Could you scroll down to that date range,

2  please.

3      Q.       Sure.

4      A.       Could you scroll up, please.

5               It looks like the -- yeah; thank you.  It

6  looks like that there has been an address change.

7  And so with that address being supplied, they sent

8  another initial notice to ensure the consumer

9  received this.

10     Q.       Okay.  And would you agree with me that

11 the initial notice marked as Exhibit 3 alleges that

12 Ms. Reed owes Icon Apartments $896.06?

13              MR. HAMEL:  Objection.  Form.

14              THE WITNESS:  This letter does indicate

15     that.

16 BY MR. BADWAN:

17     Q.       Okay.  Let's go to next Exhibit 4.  Now,

18 what's this document called internally at IQ Data?

19     A.       Could you go to the top of it, please.

20     Q.       Yes, sir; this is the very top.

21     A.       Yeah; so it's basically the -- it's like

22 a ledger.

1      Q.      Okay.  And where does IQ Data obtain this

2   document from?

3      A.      The clients transmitted information, and

4   then it is parsed into this document.

5      Q.      Okay.  Is this all the information that

6   Icon Apartments provided to IQ Data relating to the

7   debt that IQ Data tried to collect from Ms. Reed?

8              MR. HAMEL:  Objection.  Form.

9              THE WITNESS:  I believe they also

10        supplied other PDFs and things of that nature.

11   BY MR. BADWAN:

12      Q.      Okay.  And we'll get to that.

13              So once IQ Data receives this document,

14   after it received it, what did it do with the

15   information contained in it?

16      A.      What did it do with the information

17   contained in it?  It was placed into the account, and

18   an account was created.

19      Q.      Okay.  And what kind of information is

20   provided on this document?

21      A.      It looks to be some data about

22   move-in/move-out/lease dates, consumers' names, and

```
 1              address.

 2     BY MR. BADWAN:

 3          Q.      That wasn't my question, Mr. Gulbranson.

 4     My question was very simple.   My answer was, why did

 5     IQ Data try to collect a debt from Ms. Reed?

 6                  MR. HAMEL:  Objection.  Form.

 7                  THE WITNESS:  Because our client placed

 8          an account into our office with her name.

 9                  MR. BADWAN:  Okay.  Now I'd introduce

10          Exhibit 5.

11                  (Deposition Exhibit 5 hereafter

12          electronically marked for identification.)

13     BY MR. BADWAN:

14          Q.      Mr. Gulbranson, are you familiar with

15     Exhibit 5?

16          A.      Yes.

17          Q.      And what is it, sir?

18          A.      This looks like a lease contract.

19          Q.      Okay.  And is this the lease contract

20     associated with debt that IQ Data tried to collect

21     from Ms. Reed?

22          A.      I do not know if there's other subsequent
```

1  subleases or whatnot.  But this lease contract has

2  the name of Alexia Bartholomew.

3       Q.    Okay.  And why -- who sent this over to

4  IQ Data?

5       A.     That would be our client.

6       Q.     Would that be Icon Apartments in this

7  case?

8       A.     That would be the property management

9  company for Icon.

10      Q.     Okay.  And do you recall -- well, can you

11 testify to when IQ Data received this document from

12 Icon Apartments or its property manager?

13      A.     It appears at the date of assignment,

14 maybe a day or two before for the information to be

15 downloaded.

16      Q.    So no later than November 17th, 2021 --

17 or no later than December 19th, 2021?

18      A.     To be honest, I don't know when we

19 actually received this lease, if was in subsequent

20 conversation with the client we asked for it, or if

21 it was in the initial packet of information.  That, I

22 don't know.

1          Q.      Okay.  Well, you just testified a minute

2    ago that you received it at the time, so it's a

3    little conflicting, but that's fine.  That's your

4    testimony and you'll stick with it.

5              Now, you can't tell me when IQ Data

6    obtained this lease from Icon based on the account

7    notes or the work card?

8          A.      No.

9          Q.      Okay.  So it's impossible for you to

10   testify then when it was received.  It would be

11   speculation; correct?

12         A.      No; I could get it.  It's just -- you

13   said off this work card.  I'm sure I could probably

14   work with IT to maybe figure that out.  That's my

15   best guess for you, is that it came on the 17th,

16   based upon seeing miscellaneous correspondence

17   attached twice.

18         Q.      Understood; thank you.

19              According to the lease agreement that's

20   Exhibit 5, who was the tenant or the lessee?

21         A.      On this one lease, it shows Alexia

22   Bartholomew.

1      Q.      Okay.  And do you see Ms. Reed's name

2   anywhere on this lease?  I can scroll down it.

3               Did you see it anywhere?

4      A.      I did not see Ms. Reed's name on this

5   lease.

6      Q.      Okay.  So based on this lease, Ms. Reed

7   did not have a lease contract with Icon Apartments;

8   correct?

9      A.      Yeah; just on this lease.  But we don't

10  know if there's name changes, subleasing, roommates

11  added/deleted.

12      Q.      Okay.  Do you have any reason to believe

13  that Denyonna Reed and Alexia Bartholomew are the

14  same person?

15      A.      I don't have reason to believe it, but it

16  happens all the time where people change names.

17      Q.      Okay.  Is it your understanding or belief

18  that Alexia Bartholomew changed her name to Denyonna

19  Reed?

20      A.      At this current point in time, after I

21  learned the history on this account, no.

22      Q.      Okay.  Did you ever come to discover

1    Social from her signing a lease previously.

2         Q.      Okay.  And who told you that?  Who told

3    IQ Data that?

4         A.      Who told IQ Data that?

5         Q.      Yes.

6         A.      The client.

7         Q.      The client; so Icon Apartments?

8         A.      Yes.

9         Q.      Okay.  How did IQ Data link the debt as

10   belonging -- or link Ms. Reed with this debt?

11        A.      Once again, it was -- when it was

12   transmitted over, that account had the two names on

13   it.

14        Q.      Okay.  That one page that was Exhibit 4

15   had Denyo Reed, not Denyonna Reed; correct?

16        A.      That is correct.

17        Q.      Okay.  And would you agree with me then

18   that the lease didn't have Denyonna Reed's name or

19   Denyo Reed's name on it; correct?

20        A.      Ms. Bartholomew's lease did not.

21        Q.      Okay.  So is it fair to say that IQ Data

22   solely relied on Exhibit 4 in determining that

1   Ms. Reed owed the subject debt?

2               MR. HAMEL:  Objection.  Form.

3               THE WITNESS:  We relied on the

4       transmitting of information from the client.

5   BY MR. BADWAN:

6       Q.    All right.  And what information was

7   transmitted from Icon Apartments to IQ Data regarding

8   this debt?

9       A.    Some of those particulars are on that

10  Exhibit 4 that you referred to.  I do not know every

11  data point that was transmitted over.

12      Q.    Okay.  And you understand that was one of

13  our requests for production, for IQ Data to produce

14  all documents and information received from Icon

15  Apartments regarding the subject debt?

16      A.    That's what you're telling me.

17      Q.    Okay.  And did IQ Data, in fact, produce

18  all information that Icon Apartments provided to

19  it --

20              MR. HAMEL:  Objection.  Form.

21              THE WITNESS:  From my best of knowledge,

22      yes.

1    Q.      Would you agree with me that, had the

2    employee reviewed the lease, he would have likely

3    figured out that Ms. Reed's dispute had veracity?

4    A.      No.

5    Q.      Tell me why not.

6    A.      Once again, people change names all the

7    time, especially in this day and age.  There's also

8    the aspect that there is tons of additional roommates

9    added, roommates subtracted.  There's also subleasing

10   aspects.

11           It's not as cut and dry as what you're

12   saying, sir.

13   Q.      It just seems to me it would be safer to

14   just delete it pending the investigation.  And if the

15   investigation reveals that they do owe the debt, you

16   report it again.  But that's just me.

17           MR. HAMEL:  Object to the sidebar.

18   BY MR. BADWAN:

19   Q.      Now, okay, so what communication did IQ

20   Data send Icon Apartments on January 13th, 2022?

21   A.      What indication?

22   Q.      What communication.

1    BY MR. BADWAN:

2         Q.      Okay.  Did the investigation reveal that

3    Ms. Reed owed the debt?

4         A.      It just showed that there was no -- there

5    wasn't documentation that we had showing that -- why

6    Z1 was added.

7         Q.      Okay.  So there was no indication, or

8    evidence, or documentation to show that Ms. Reed was

9    liable for the debt?

10              MR. HAMEL:  Objection.  Form.

11              THE WITNESS:  At that time, no.

12   BY MR. BADWAN:

13        Q.      Okay.  So why didn't IQ Data delete it

14   then, the credit reporting?

15        A.      Once again, clients sometimes do not send

16   us all the documents.  There also -- like I stated

17   before, there are name changes, there are subleases,

18   and there are multiple people taken -- or added onto

19   leases as the lease time goes on.  Happens daily.

20        Q.      After speaking to Ms. Reed on

21   December 23rd, 2021, did IQ Data ever communicate to

22   the credit bureaus that Ms. Reed does, in fact, owe

1  BY MR. BADWAN:

2        Q.      And IQ data credit reported it; correct?

3             MR. HAMEL:  Objection.  Form.

4             THE WITNESS:  Just because your client

5        states it's not owed doesn't mean it's not owed.

6        We get lied to every single day, Mr. Badwan.

7  BY MR. BADWAN:

8        Q.    I'm sure you do.  I'm sure you do.  I'm

9  sure you deal with frivolous disputes.  But I think

10  this case was not frivolous, and it did cause some

11  harm, so --

12       A.      Well, there's -- but also, though, when

13  we spoke to the consumer, she never told us that she

14  filled out a lease and signed a lease.

15             I think if your client would have just

16  indicated like, "Hey, here's the story.  I signed a

17  lease.  I decided not to do it.  I moved out.  Maybe

18  that's why Icon has me on there."

19             She knew about that apartment complex,

20  and never brought it up.  She just said fraud.

21       Q.    So it's Ms. Reed's fault that IQ Data was

22  reporting on her credit report false information?

```
 1              What's your personal knowledge then of

 2    these phone calls?

 3         A.      I listened to the calls.

 4              MR. HAMEL:   Form.

 5    BY MR. BADWAN:

 6         Q.      You listened to the calls; okay.  And

 7    what happened during those calls?

 8         A.      The first call, she said that she

 9    notated -- I'm going to be paraphrasing because,

10    obviously, I can't quote it word-for-word.  But she

11    stated that she noted this on her bureau.

12              She stated fraud, that she didn't live

13    there.  She at that point never communicated, though,

14    she did sign a lease and an application with the

15    client.  And then we told her that we'd send her out

16    the fraud packet.

17              And then she called back in, not too long

18    after, and wanted the name of the other person on the

19    account, and reiterated that it was fraud, and also,

20    once again, did not bring up that she did do -- she

21    knew of Icon.

22         Q.      Okay.  And at that point -- so now we're
```

```
 1          disbelieve you, from what statements you're

 2          saying, as you're an officer of the court.

 3   BY MR. BADWAN:

 4          Q.      Correct; thank you.

 5                  Based on my notes, there was two calls on

 6   March 9th, 2022.  In the second one, Ms. Reed called

 7   in to make a dispute again.  She wants to speak to a

 8   supervisor, and the IQ representative tells her she

 9   can't transfer her to a supervisor.

10                  Do you have any reason to believe that's

11   not true?

12          A.      Per your notes and your being an officer

13   of the court, I do not believe you would be lying.

14          Q.      Why was she not able to speak to a

15   supervisor?

16          A.      Very simple; we were in litigation.

17          Q.      Did you tell her that?

18          A.      They are not instructed to get into

19   conversations about litigation, because they're not

20   educated to.

21          Q.      Okay.  What, if anything, could Ms. Reed

22   have done to compel IQ Data to delete its credit
```

1  reporting prior to April 7th, 2022?

2          MR. HAMEL:  Objection.  Form.

3          THE WITNESS:  A proactive approach, I

4      would believe, would be to, one, communicate to

5      us that she did in fact sign a lease with them

6      and canceled it.

7          I think that would have construed a very

8      simple solution to what the circumstances were

9      on the account, rather than just stating fraud,

10     because they are two completely different

11     aspects.

12         One is stealing information; and one is

13     possibly a mistake of contracting -- not

14     contracting -- of conducting information

15     transfer in error.

16         So I think, you know, that would have

17     been very, very helpful.  So I'll leave it at

18     that.  That would have been very helpful.  I

19     think it would have cleared it up on that day.

20         And then we would have had to validate it

21     with the client afterwards.  But I think it

22     would have been able to tell a story, to be able

DENYONNA N. REED vs IQ DATA INTERNATIONAL                    Job 35942
Michael Gulbranson January 24, 2023                          Page 183

1        to make sense of it all.

2              Fraud kind of threw it for a whole

3        different loop because, once again, that's

4        stealing somebody's information for the purposes

5        of opening credit unlawfully.

6    BY MR. BADWAN:

7        Q.      How did IQ Data finally discover that

8    Ms. Reed does not owe this debt?

9              MR. HAMEL:  Objection.  Form.

10             THE WITNESS:  That's stuff that happened

11        after the lawsuit was initiated and counsel took

12        it over.  So I couldn't answer to that question

13        in particular in detail.

14   BY MR. BADWAN:

15       Q.     So you don't know how?

16             MR. HAMEL:  Objection.  Form.

17             THE WITNESS:  I do not know.

18   BY MR. BADWAN:

19       Q.     Okay.  Are you aware that IQ Data has

20   raised a bona fide error defense?

21       A.     I am not -- I have heard of that phrase

22   in this situation, but I don't know what that means

1  You stated that.

2         Q.     No, no; I'm asking you.  Did IQ Data

3  require Icon Apartments to submit documents

4  supporting that Ms. Reed owed the subject debt?

5         A.     We asked for it.

6         Q.     When?

7         A.     It was in the notes.  It said right

8  there, "Sent email to client," when we went through

9  them.

10        Q.     Okay.  We'll get to that email.

11               Would you agree with me that your

12  declaration states that, "IQ Data reviews the

13  materials provided by the creditor for obvious errors

14  before initiating any communication with the debtor

15  and before reporting the debt"?

16        A.     Yeah; we do look for obvious errors.

17        Q.     Okay.  Were there any obvious errors in

18  the documents produced by Icon Apartments to IQ Data

19  relating to the subject debt?

20        A.     I wouldn't say obvious.  I mean, in

21  hindsight, you can tell that there were errors

22  provided by Icon, since we now know everything.  But

DENYONNA N. REED vs IQ DATA INTERNATIONAL                    Job 35942
Michael Gulbranson January 24, 2023                          Page 192

1   obvious?  No.

2        Q.      Okay.  So the fact that Ms. Reed's name

3   was not in the lease is not an obvious error?

4        A.      As stated before, people change their

5   names, add/subtract roommates, sublease.

6        Q.      Okay.

7        A.      So obvious errors are like the account

8   came over for a billion dollars.

9        Q.      Okay; well, right.  Not only is

10  Ms. Reed's name absent from the lease, but she also

11  disputed, multiple times; right?

12              MR. HAMEL:  Objection.  Form.

13              THE WITNESS:  She stated fraud.

14  BY MR. BADWAN:

15       Q.      Well, doesn't the fact that her name is

16  not in the lease support her position that she

17  doesn't owe the debt?

18              MR. HAMEL:  Objection.  Form.

19              THE WITNESS:  Once again, sir, she stated

20      fraud.

21  BY MR. BADWAN:

22       Q.      Okay.  Would you agree with me that the

1   declaration states that, "If any errors are

2   identified, IQ Data contacts the original creditor

3   and requires them to address the errors and/or

4   provide additional information or documents related

5   to the debt at issue"?

6        A.      I do agree that's what it says.

7        Q.      And did IQ Data require Icon Apartments

8   to address the fact that Ms. Reed was not on the

9   lease prior to initiating contact with Ms. Reed?

10       A.      We sent an email asking them to support

11  that.

12       Q.      But wasn't that email sent after you

13  contacted Ms. Reed?

14       A.      Yes.

15       Q.      So that means the error was not

16  identified until after you talked to Ms. Reed;

17  correct?

18       A.      There wasn't an obvious error.

19       Q.      Okay.  And I guess -- so how do you

20  define obvious?

21       A.      Obvious, I would think, jumps out at you.

22  Like I stated, you know, there's an example of the

```
 1                MR. HAMEL:  Objection.  Form.

 2    BY MR. BADWAN:

 3         Q.      Unless you disagree.

 4                Can you reconcile those statements for

 5    me?

 6                MR. HAMEL:  Objection.  Form.

 7                THE WITNESS:  I do disagree.

 8    BY MR. BADWAN:

 9         Q.      Okay.  Tell me why you disagree.

10         A.      I've already stated this multiple times.

11    We do rely on our clients, as we're allowed to by

12    law.  We do look for obvious errors.  If they are

13    identified, we will contact.

14                Your -- this situation was obviously not

15    obvious; and no errors were identified, because there

16    was nothing standing out.  A name is not standing

17    out.

18         Q.      Would you agree with me the declaration

19    states that IQ Data will not credit report

20    information it has reasonable cause to believe is

21    inaccurate?

22         A.      "Reasonable cause" I think is the key
```

1    words there.

2         Q.      Okay.  I just asked you to agree with me

3    if that's what the declaration says.

4              Do you want me to repeat it?

5         A.      I agree that the declaration states "if

6    IQ Data has reasonable cause to believe that the

7    information is inaccurate."

8         Q.      Did IQ Data have reasonable cause to

9    believe that Ms. Reed owed the subject debt?

10        A.      We relied on our client stating that she

11   did.

12        Q.      So the reasonable cause was reliance on

13   your client; correct?

14              MR. HAMEL:  Objection.  Form.

15              THE WITNESS:  Yes.

16   BY MR. BADWAN:

17        Q.      Okay.  And had IQ Data just looked at the

18   lease, they would have probably decided Ms. Reed

19   likely doesn't owe this debt.

20              MR. HAMEL:  Objection.  Form.

21              THE WITNESS:  I disagree.  And I've made

22        that statement before.  There are multiple --

 1                    (Unintelligible crosstalk.)

 2                    MR. HAMEL:  Can you let my client finish

 3          his answer first?

 4    BY MR. BADWAN:

 5          Q.      Sure.

 6          A.      There are multiple situations in which a

 7    consumer's name can get added or changed.

 8          Q.      Would you agree with me that IQ Data

 9    reported inaccurate information regarding the account

10    on Ms. Reed's credit reports?

11                    MR. HAMEL:  Objection.  Form.

12                    THE WITNESS:  I would agree that we put

13          this on the bureau with the information provided

14          us by our client.

15    BY MR. BADWAN:

16          Q.      And would you agree with me that the

17    information was false, because Ms. Reed does not owe

18    the debt; correct?

19                    MR. HAMEL:  Objection.  Form.

20                    THE WITNESS:  Ms. Reed does not owe the

21          debt; correct.

22    /

1    BY MR. BADWAN:

2          Q.      Okay.  Blame the victim.

3          A.      I'm not blaming the victim, sir.

4                MR. HAMEL:  Objection.  Form.  And I'll

5          object to the sidebar, as well.

6    BY MR. BADWAN:

7          Q.      Would you consider -- do you believe that

8    IQ Data promptly deleted the inaccurate credit

9    reporting on Ms. Reed's credit reports?

10         A.      With all the circumstances involved,

11   including the lawsuit initiated by your client and

12   you; yes.

13         Q.      So in IQ Data's world, waiting five

14   months to delete after a dispute is prompt action?

15               MR. HAMEL:  Objection.  Form.

16               THE WITNESS:  It all depends on the

17         circumstances, sir.

18   BY MR. BADWAN:

19         Q.      And in this circumstance, five months was

20   prompt?

21               MR. HAMEL:  Objection.  Form.

22               THE WITNESS:  Due to the lawsuit and

1          needing to get information regarding it, and the

2          fact that your consumer wasn't up front with

3          some of the information at hand; yes.

4     BY MR. BADWAN:

5          Q.      So it was Ms. Reed's fault.

6                  MR. HAMEL:  Objection.  Form.

7                  THE WITNESS:  I said it would be helpful

8          if she would have supplied that information.

9     BY MR. BADWAN:

10         Q.      Okay.  Did IQ Data follow its FCRA policy

11    in its handling of Ms. Reed's multiple disputes?

12         A.      Off the surface, it appears that way.

13         Q.      Okay.  And so waiting five months to

14    delete after a dispute is consistent with IQ Data's

15    FCRA policy?

16                 MR. HAMEL:  Objection.  Form.  He's

17         answered this question already.

18    BY MR. BADWAN:

19         Q.      You need to answer, sir.

20         A.      Each situation is different, and they all

21    bring different circumstances and time frames.

22         Q.      And -- but in this situation, it was

```
 1  BY MR. BADWAN:

 2       Q.      Okay.  So you believe Ms. Reed misled

 3  you?

 4              MR. HAMEL:  Objection.  Form.

 5              THE WITNESS:  I believe Ms. Reed did not

 6       give us information that would be helpful to the

 7       situation that she was knowledgeable about.

 8  BY MR. BADWAN:

 9       Q.      Give me a second.  I think I'm done.

10  Just want to make sure I got everything.

11       A.      Okay.

12              (Pause.)

13       Q.      I want to go back to the interrogatories

14  really quick.  Something caught my eye, and I wanted

15  to address it with you.

16              So interrogatory 23, in the response

17  says -- would you read it with me?  It says, "Subject

18  to and without waiving said objections, plaintiff

19  could have responded to IQ Data's letter dated

20  December 27, 2021, requesting that she provide IQ

21  Data with certain information to support her claim

22  and assist IQ Data's investigation of the validity of
```

**EXHIBIT**
**1**

### UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

DENYONNA N. REED,

    Plaintiff,

v.

IQ DATA INTERNATIONAL, INC.,

    Defendant.

Case No. 5:22-cv-00068-FB-ESC

      **PLEASE TAKE NOTICE** that the undersigned will take the deposition by oral examination of certain designated representative(s) of the following party on the date and time indicated below:

### IQ Data International, Inc. ("IQ Data") – January 24, 2023 at 12:00 p.m. CST

      The deposition will take place via videoconference. The testimony will be recorded by stenographic means by a person authorized to administer oaths, who is a disinterested and unrelated party, for all purposes allowable under the applicable Federal Rules of Civil Procedure and continuing thereafter from day to day until completed.

      IQ Data is hereby notified of its duty, pursuant to Fed. R. Civ. P. 30(b)(6), to designate one or more officers, directors, agents or other persons who will testify on its behalf and, for each person so designated, to set forth the matters upon which the person will testify:

### AREAS OF INQUIRY

1.     All phone calls between IQ Data to Plaintiff.

2.     The alleged debt that IQ Data was attempting to collect from Plaintiff ("subject debt").

3.     Account notes for the subject debt.

4.     Call logs that reflect all calls placed in connection with the subject debt.

5.      All documents relating to Plaintiff and/or the subject debt.

6.       The placement of the subject debt with IQ Data.

7.      IQ Data's records pertaining to the Plaintiff and/or the subject debt.

8.      Communications between Plaintiff and IQ Data.

9.      Communications between IQ Data and the creditor that placed the subject debt with IQ Data for collection ("Creditor") relating to Plaintiff and/or the subject debt.

10.     Communications between IQ Data and any third party relating to Plaintiff and/or the subject debt.

11.     Information provided to IQ Data by the Creditor at the time the Creditor placed the subject debt with IQ Data for collection.

12.     All documents and/or evidence that establish that Plaintiff's owes the subject debt.

13.     Plaintiff's disputes of the subject debt.

14.     Communications between IQ Data and the credit reporting agencies relating to Plaintiff and/or the subject debt.

15.     IQ Data's investigations into Plaintiff's dispute(s) of the subject debt .

16.     Steps taken by IQ Data to verify the balance and/or validity of the subject debt prior to initiating collection efforts to collect the subject debt.

17.     IQ Data's policies and procedures relating to the Fair Debt Collection Practices Act ("FDCPA").

18.     Identities of all IQ Data employees and/or agents that communicated with Plaintiff.

19.     Call recordings of phone calls between Plaintiff and IQ Data.

20.     IQ Data's call recording practices and/or policies.

21.     IQ Data's data retention policy, including call recording retention.

22.     Any proof in IQ Data's possession that Plaintiff owes the subject debt.

23.     IQ Data's responses to Plaintiff's discovery requests.

24.     All documents/recordings produced by IQ Data in this matter.

25.     The affirmative defenses raised by IQ Data in its Answer to Plaintiff's Complaint,
        including the bona fide error defense.

26.     IQ Data's defenses to Plaintiff's claims.

27.     Insurance policies that may cover a judgment against IQ Data in this case.

28.     Written correspondences sent by IQ Data to Plaintiff

29.     IQ Data's credit reporting of the subject debt to Experian, Trans Union, and/or
        Equifax.

30.     The reason IQ Data ceased credit reporting the subject debt.

31.     Whether IQ Data owns or ever owned the subject debt.

32.     The contract between the Creditor and IQ Data that governs the debt collection
        services IQ Data rendered on behalf of the Creditor in connection with the collection
        of the subject debt.

33.     Communications between IQ Data and IQ Data's representatives that spoke to
        Plaintiff in the relevant time period.

34.     The personnel files of IQ Data's representatives that spoke to Plaintiff in the relevant
        time period.

Dated: December 6, 2022                     Respectfully submitted,

                                            /s/ Mohammed O. Badwan

                                            Mohammed O. Badwan, Esq.
                                            SULAIMAN LAW GROUP, LTD.
                                            2500 South Highland Avenue
                                            Suite 200
                                            Lombard, Illinois 60148
                                            (630) 575-8180
                                            mbadwan@sulaimanlaw.com
                                            *Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

The undersigned, one of the attorneys for Plaintiff, certifies that on December 6, 2022, he

caused a copy of the foregoing Notice of Deposition, to be served by electronic mail on:

**Lee H. Staley**
**Ben E. Hamel**
Serpe, Jones, Andrews, Callender & Bell PLLC
lstaley@serpejones.com
bhamel@serpejones.com
*Counsel for Defendant*


*/s/ Mohammed O. Badwan*

**EXHIBIT 2**

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

|  |  |
|---|---|
| DENYONNA N. REED, | CIVIL ACTION |
| Plaintiff, |  |
| v. | COMPLAINT 5:22-cv-00068 |
| IQ DATA INTERNATIONAL, INC., |  |
| Defendant. | JURY TRIAL DEMANDED |

## COMPLAINT

**NOW COMES** DENYONNA N. REED ("Plaintiff"), by and through her attorneys, Sulaiman Law Group, Ltd., complaining of the Defendant, IQ DATA INTERNATIONAL, INC. ("Defendant") as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this action seeking redress for violations of the Fair Debt Collection Practices Act ("FDCPA") pursuant to 15 U.S.C. §1692 *et seq.* and the Texas Debt Collection Act ("TDCA"), Tex. Fin. Code Ann. §392 *et. seq.*

### JURISDICTION AND VENUE

2.      Subject matter jurisdiction is conferred upon this Court by the FDCPA and 28 U.S.C. §§1331 and 1337, as the action arises under the laws of the United States. Supplemental Jurisdiction exists for Plaintiff's TDCA claim.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391b(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial circuit.

## PARTIES

4.      Plaintiff is a consumer and natural person over 18-years-of-age who, at all times relevant, is a "consumer" as defined by 15 U.S.C. § 1692a(3).

5.      Defendant is a collection agency located at 21222 30th Drive SE Suite 120 Bothell, Washington, 98021.

6.      Defendant is a "debt collector" as defined by 15 U.S.C. § 1692a(6) as its principal business purpose is the collection of defaulted debts owed to others.

7.      Defendant acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers at all times relevant to the instant action.

## FACTS SUPPORTING CAUSE OF ACTION

8.      On or around March 2020, Plaintiff was home searching for available apartments to rent when she expressed a potential interest in renting an apartment from Icon Apartments located in the state of Texas.

9.      After the approval of her credit application with Icon Apartments, Plaintiff decided to rent from another apartment complex and did not agree to a lease with Icon Apartments.

10.     On December 20, 2021, Plaintiff discovered that Defendant began reporting a debt allegedly owed to Icon Apartments for $894. ("alleged subject debt" or "subject debt").

11.     Plaintiff was confused on why Defendant began reporting the alleged subject debt as she was never a resident or signed a lease with Icon Apartments.

12.     Plaintiff attempted to reach Icon Apartments to discuss the subject debt, but was unsuccessful due to its office closing for the holidays.

13.     Alternatively, Plaintiff placed an outgoing call to Defendant in hopes to gather more information regarding the alleged subject debt.

14.     During the call, Plaintiff verbally disputed the subject debt with Defendant who explained she would need to file a fraud form and provided no further help to Plaintiff.

15.     Unsatisfied with her previous call, Plaintiff called Defendant once more and worked with another representative of Defendant.

16.      After verifying her personal information once more, Plaintiff was told by Defendant that her name was mistaken with another individual by the name of Alexandra who shares the Plaintiff's date of birth.

17.     Defendant offered once more the same fraud form that Plaintiff could complete for disputes.

18.     Moreover while speaking with Defendant, Plaintiff was informed that her name was also added to an unknown lease at Icon Apartments stemming from the subject debt, despite never actually signing any lease agreement.

19.     Plaintiff felt extremely worried that there could be negative consequences if she did not pay the debt, even though she did not owe the subject debt.

20.     Defendant's inaccurate reporting and lack of urgency to rectify the problem on Plaintiff's credit report has cause the Plaintiff much distress and damages her good reputation as a consumer.

21.     Defendant's misleading conduct has severely disrupted Plaintiff's daily life and general well-being as Plaintiff constantly feared serious consequences.

22.     Concerned about the violations of her rights, Plaintiff was forced to seek the assistance of counsel to file this action to prevent Defendant from further deception in the future, thus incurring costs and expenses.

## COUNT I – DEFENDANT'S VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

23.     Plaintiff restates and realleges paragraphs 1 through 22 as though fully set forth herein.

24.     Plaintiff is a "consumer" as defined by FDCPA §1692a(3).

25.     The alleged debt in which Defendant attempting to collect upon is a "debt" as defined by FDCPA §1692a(5) as it arises out of a transaction due or asserted to be owed or due to another for personal, family, or household purposes.

26.     Defendant is a "debt collector" as defined by §1692a(6) because its primary business purpose is to collect defaulted debts and uses credit reporting, mail and/or the telephones to collect delinquent consumer accounts.

27.     Defendant is a "debt collector" as defined by §1692a(6) because it regularly collects defaulted debts owed or asserted to be owed or due to another.

28.     Defendant used the mail to collect the alleged debt and, as such, engaged in "communications" as defined in FDCPA §1692a(2).

29.     Defendant violated 15 U.S.C. §§1692e, e(2), e(8), and f through its unlawful collection practices.

### a.  Violations of FDCPA §1692e

30.     Defendant violated §1692e by using false, deceptive, and misleading representation in connection to collection of the alleged debt. The alleged debt was not owed at the time Defendant demanded payment from Plaintiff as the alleged debt was not accrued by Plaintiff.

4

31.     Furthermore, Defendant violated §1692e(2) when it falsely misrepresented the character, amount, or legal status of the alleged debt as Defendant sought to collect a debt that Plaintiff was not legally obligated to pay. Plaintiff was never a resident of Icon Apartments and never signed a lease.

32.     Defendant violated §1692e(8) by reporting the alleged subject debt to Plaintiff's credit report despite knowing that information to be false and misleading.

33.     Specifically, Plaintiff had no legal obligation to pay the subject debt because she was never a resident of Icon Apartments.

34.     Defendant knew the information it was relaying to Plaintiff was false and misleading, but did so in hopes that the unsophisticated consumer would avoid jumping through additional hoops-and-ladders, submit, and pay subject account.

**b.  Violation of FDCPA §1692f**

35.     Defendant violated §1692f when it used unfair and unconscionable means to collect the alleged debt. The alleged debt was not owed at the time Defendant demanded payment, but Defendant sent subject account to the bureaus anyway in hopes that Plaintiff would make a payment.

36.     As an experienced debt collector, Defendant knew or should have known the ramifications of collecting on a debt that was not owed at the time it made demands for payment.

37.     Upon information and belief, Defendant has no system in place to identify and cease collection of debts not owed.

38.     As pled above, Plaintiff has been harmed and suffered damages as a result of Defendant's illegal actions.

5

**WHEREFORE**, Plaintiff DENYONNA N. REED requests that this Honorable Court:

a. Declare that the practices complained of herein are unlawful and violate the aforementioned statute;

b. Award Plaintiff statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

c. Award Plaintiff costs and reasonable attorney fees as provided under 15 U.S.C. §1692k; and

d. Award any other relief as this Honorable Court deems just and appropriate.

## COUNT II – VIOLATIONS OF THE TEXAS DEBT COLLECTION ACT

39. Plaintiff restates and realleges paragraphs 1 through 38 as though fully set forth herein.

40. Plaintiff is a "consumer" as defined by Tex. Fin. Code Ann. § 392.001(1).

41. The alleged debt is a "debt" and a "consumer debt" as defined by Tex. Fin. Code Ann. § 392.001(2) as it is an obligation, or alleged obligation, arising from a transaction for personal, family, or household purposes.

42. Defendant is a "debt collector" as defined by Tex. Fin. Code Ann. § 392.001(6) and (7).

**a. Violations of TDCA § 391.304**

43. The TDCA, pursuant to Tex. Fin. Code Ann. § 392.304(8), states that, "…...a debt collector may not use fraudulent, deceptive, or misleading representation that employs…...misrepresenting the character, extent, or amount of the consumer debt…………"

44. Defendant violated § 392.304(8) when it falsely misrepresented the character, amount, or legal status of the alleged debt as Defendant sought to collect a debt that Plaintiff was not legally obligated to pay. Plaintiff was never a resident of Icon Apartments and never signed a lease.

45. Specifically, Plaintiff had no legal obligation to pay the subject debt because she was never a resident of Icon Apartments.

46. Defendant knew the information it was relaying to Plaintiff was false and misleading, but did so in hopes that the unsophisticated consumer would avoid jumping through additional hoops-and-ladders, submit, and pay subject account.

47. As alleged above, Plaintiff was harmed by Defendant's actions and inactions.

**WHEREFORE**, Plaintiff DENYONNA N. REED requests that this Honorable Court:

 a. Declare that the practices complained of herein are unlawful and violate the aforementioned statute;

 b. Entitling Plaintiff to injunctive relief pursuant to Tex. Fin. Code Ann. § 392.403(a)(1);

 c. Award Plaintiff actual damages, pursuant to Tex. Fin. Code Ann. § 392.403(a)(2);

 d. Award Plaintiff punitive damages, in an amount to be determined at trial, for the underlying violations;

 e. Award Plaintiff costs and reasonable attorney fees as provided under Tex. Fin. Code Ann. § 392.403(b) ; and

 f. Award any other relief as the Honorable Court deems just and proper.

**Plaintiff demands trial by jury.**

Dated: January 26, 2022        Respectfully Submitted,

               /s/ Marwan R. Daher
               Marwan R. Daher, Esq.
               *Counsel for Plaintiff*
               Sulaiman Law Group, Ltd
               2500 S Highland Ave, Suite 200
               Lombard, IL 60148
               Telephone: (630) 575-8181
               mdaher@sulaimanlaw.com

# IQ Data International, Inc.

**EXHIBIT**

**3**

21222 30th Drive SE, Suite 120, Bothell, WA  98021-7012

Hours: Monday-Tuesday, 9AM TO 6PM PST, Wednesday-Friday, 8AM TO 5PM PST • Toll Free 888-2

Send all Written Disputes to: P.O. Box 340, Bothell, WA 98041-0340

To:  DENYO REED
1401 Patricia Apt 610
San Antonio, TX 78213-1155

Date: 12/28/21

**Reference: 0008767827**

**IQ Data is a debt collector.**  We are trying to collect a debt that you owe to ICON APTS (TX).
We will use any information you give us to help collect the debt.

## Our information shows:

You have a remaining balance owed to ICON APTS (TX) from applying to, cosigning for, or residing in a rental unit, or from a related surety bond.

| | | |
|---|---|---|
| As of 04/08/20, you owed: | $ | 812.09 |
| Between 04/08/20 and today: | | |
| You were charged this amount in interest: | + $ | 83.97 |
| You were charged this amount in fees: | + $ | 0.00 |
| You paid or were credited this amount toward the debt: | - $ | 0.00 |
| **Total amount of the debt now:** | $ | **896.06** |

## How can you dispute the debt?

- **Call or write to us by 02/07/22, to dispute all or part of the debt.** If you do not, we will assume that our information is correct.

- **If you write to us by 02/07/22,** we must stop collection on any amount you dispute until we send you information that shows you owe the debt. You may use the form below or write to us without the form. You may also include supporting documents.

## What else can you do?

- **Write to ask for the name and address of the original creditor, if different from the current creditor.** If you write by 02/07/22, we must stop collection until we send you that information. You may use the form below or write to us without the form.

- **Go to www.cfpb.gov/debt-collection to learn more about your rights under federal law.** For instance, you have the right to stop or limit how we contact you.

- Contact us about your payment options.

<u>Notice:</u> **See reverse side for important information.**

29CORENT01ID1_168360387

✂

## How do you want to respond?

*Check all that apply:*

**Mail this form to:**
IQ Data International, Inc.
P.O. Box 340
Bothell, WA 98041-0340

- ☐ **I want to dispute the debt because I think:**
  - ☐ This is not my debt.
  - ☐ The amount is wrong.
  - ☐ Other (please describe on reverse or attach additional information).
- ☐ **I want you to send me the name and address of the original creditor.**
- ☐ **I enclosed this amount:**  $ _____

Make your check payable to *IQ Data International* or visit iqdata-inc.com. Include the reference number 0008767827.



000001

DENYO REED
1401 Patricia Apt 610
San Antonio TX 78213-1155

IQ Data International
P.O. Box 340
Bothell, WA 98041-0340

IQD 000009

Your outstanding principal balance will accrue interest at a rate of 006.00 percent per annum.

As of the date of this letter, you owe $896.06. Because of interest, late charges and other charges that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown on this letter, an adjustment may be necessary after we receive your payment, in which event we will inform you before depositing the payment for collection. For further information, write to us or call 1-888-248-2509.

IQD 000010

**EXHIBIT**

**4**

**Account Number: 0008767827**
**Client Reference Number: 1088*1806*ebc36dae-8a7c-475c-9575-01c4dc87e163**

**Property Information**
ICON APTS (TX)
ATTN: LEASING OFFICE/ MANAGER
ATTN: LEASING OFFICE/ MANAGER
SAN ANTONIO, TX

**Lease Information**
Property Code: ebc36dae-8a7c-475c-9575-01c4dc87e163
Unit Code: 1806
Lease ID: 8cebbe93-5800-4be4-af83-9836bda0c26c
Move In Date: 2/28/2020
Move Out Date: 4/8/2020
Lease Start Date: 2/28/2020
Lease End Date: 1/31/2021
Monthly Rent: $715.00

**Resident Information**

| Addresses on File | Employment Information | All Phone Numbers For Resident |
|---|---|---|
| Name: Denyo Reed | | |
| Address: 1300 Patricia Dr | Emergency Contact Info | |
| C/S/Z: San Antonio, TX 78213 | | |

**Resident Information**

| Addresses on File | Employment Information | All Phone Numbers For Resident |
|---|---|---|
| Name: Alexia Bartholomew | | |
| Address: 1300 Patricia Dr | Emergency Contact Info | |
| C/S/Z: San Antonio, TX 78213 | | |

**Charges**

| Transaction ID | Transaction Date | Transaction Description | Transaction Amount | Transaction Due |
|---|---|---|---|---|
| 0f915aab320e44789945b620f637546e | 2020-04-01 | Water Charge | 5.91 | 5.91 |
| 38cdfa7800ca4edea4105f47a51774b1 | 2020-04-08 | Pest Control Fees | 1.33 | 1.33 |
| 3aa44bf655244c3fa1f7fe4e384f6eb7 | 2020-04-08 | Trash Charge | 1.33 | 1.33 |
| 6dbdb2a410494442b017db406f003ad6 | 2020-04-01 | Water Charge | 0.50 | 0.50 |
| 767137aa03f846039416de08133ffd67 | 2020-04-08 | Resident Rent | 190.67 | 190.67 |
| 81af69cb6e344d099156f05cd7e24790 | 2020-04-01 | Sewer | 4.41 | 4.41 |
| e8e87312d6d546fbbacd293719759b83 | 2020-04-01 | Sewer | 0.19 | 0.19 |
| fac4915c8fe747b7822fd7b20f738ac8 | 2020-04-08 | Lease Termination Fee | 607.75 | 607.75 |
| | Total: | | 812.09 | 812.09 |

IQD 000013

**EXHIBIT 5**

*This Lease Contract is valid only if filled out before January 1, 2022.*

# Apartment Lease Contract

**This is a binding contract. Read carefully before signing.**

## Moving In — General Information

**1. Parties.** This Lease Contract ("Lease") is between you, the resident(s) (*list all people signing the Lease*):

Alexia Bartholomew

and us, the owner: Icon Apartments

**(name of apartment community or title holder). You are renting Apartment No.** 1806 **, at** 1300 Patricia Drive

(street address) in San Antonio

(city), Texas 78213 (zip code) for use as a private residence only. The terms "you" and "your" refer to all residents listed above or, in the event of a sole resident's death, to someone authorized to act for the estate. The terms "we," "us," and "our" refer to the owner listed above and not to property managers or anyone else. *Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease is the entire agreement between you and us.*

**2. Occupants.** The apartment will be occupied only by you and (*list all other occupants not signing the Lease*):

—and no one else. Anyone not listed here cannot stay in the apartment for more than 7 days in one week without our prior written consent, and no more than twice that many days in any one month. *If the previous space isn't filled in, 2 days total per week will be the limit.*

**3. Lease Term.** The initial term of the Lease begins on the 28th day of February (month), 2020 (year), and ends at 11:59 p.m. the 31st day of January (month), 2021 (year). After that, this Lease will automatically renew month-to-month unless either party gives at least 60 days' written notice of termination or intent to move out as required by Par. 36. *If the number of days isn't filled in, notice of at least 30 days is required.*

**4. Security Deposit.** The total security deposit for all residents is $ 0.00 , due on or before the date this Lease is signed. This amount [*check one*]: ☐ does *or* ☒ does not include an animal deposit. Any animal deposit will be designated in an animal addendum. Security-deposit refund check and any deduction itemizations will be by [*check one*]:
☒ one check jointly payable to all residents and mailed to any one resident we choose, *or*
☐ one check payable to and mailed to _____

(specify name of one resident).
If neither option is *checked here*, the first option applies. See Par. 40 and 41 for security-deposit return information.

**5. Keys, Move-Out, and Furniture.** You'll be given 2 apartment key(s), 1 mailbox key(s), and _____ other access devices for _____
*Before moving out, you must give our representative advance written move-out notice as stated in Par. 36.* The move out date

Prorated rent of $ 49.31 is due for the remainder of the [*check one*]: ☐ 1st month *or* ☐ 2nd month, on the _____ day of _____ (month), _____ (year). *You must pay your rent on or before the 1st day of each month (due date). There is no grace period for the payment of rent, and you agree that not paying rent on or before the 1st of each month is a material breach of this Lease. Cash is not acceptable without our prior written permission. You cannot withhold or offset rent unless authorized by law.* We may, at our option, require at any time that you pay all rent and other sums in one single payment by any method we specify.

**Late Fees.** If you don't pay rent in full by 11:59 p.m. on the 3rd day (3rd or greater) of the month, you must pay us the following initial late fee immediately and without demand in addition to the unpaid rent: ☒ 10 % of one month's rent as stated in this paragraph or ☐ $ 75.00 .

In addition, for _____ days until rent and late fees are paid in full, you must pay a daily late fee of $ 10.00 per day or _____% of one month's rent per day.

You'll also pay a charge of $ 75.00 for each returned check or rejected electronic payment, plus initial and daily late fees, until we receive acceptable payment. If you don't pay rent on time, you'll be in default and subject to all remedies under state law and this Lease.

**7. Utilities and Services.** We'll pay for the following items, if checked: ☐ gas ☒ water ☒ wastewater ☐ electricity ☐ trash/recycling ☐ cable/satellite ☒ master antenna ☐ Internet ☐ stormwater/drainage ☐ other _____ .
You'll pay for all other utilities and services, related deposits, and any charges or fees on such utilities and services during your Lease term. See Par. 12 for other related provisions regarding utilities and services.

**8. Insurance.** *Our insurance doesn't cover the loss of or damage to your personal property.* You are [*check one*]:
☐ required to buy and maintain renter's or liability insurance (see attached addendum), *or*
☒ not required to buy renter's or liability insurance.
*If neither option is checked, insurance is not required but is still strongly recommended. Even if not required, we urge you to get your own insurance for losses due to theft, fire, water, pipe leaks, and similar occurrences.* Renter's insurance doesn't cover losses due to a flood. Information on renter's insurance is available from the Texas Department of Insurance.

**9. Special Provisions.** The following or attached special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease and will supersede any conflicting provisions of this printed Lease form.
No cash or third party checks accepted. No checks accepted after the 3rd. Residents failing to fulfill lease term, resident is responsible to pay back all concessions received. If the resident does not renew the lease will continue on a month to month basis. Will pay current market rent and an additional $100.00 MTM Fee. A $5 Pest

ICON 000014

**10.2 Not a Release.** The reletting charge is neither a Lease cancellation nor a buyout fee. It is a liquidated amount covering only part of our damages—for our time, effort, and expense in finding and processing a replacement resident. These damages are uncertain and hard to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of our damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs as far as they can be determined. The reletting charge doesn't release you from continued liability for future or past-due rent; charges for cleaning, repairing, repainting, or dealing with unreturned keys; or other sums due.

**11. Security Devices.**

**11.1 What We Provide.** *Texas Property Code secs. 92.151, 92.153, and 92.154 require, with some exceptions, that we provide at no cost to you when occupancy begins: (A) a window latch on each window; (B) a doorviewer (peephole) on each exterior door; (C) a pin lock on each sliding door; (D) either a door-handle latch or a security bar on each sliding door; (E) a keyless bolting device (deadbolt) on each exterior door; and (F) either a keyed doorknob lock or a keyed deadbolt lock on one entry door. Keyed locks will be rekeyed after the prior resident moves out. The rekeying will be done either before you move in or within 7 days after you move in, as required by law. If we fail to install or rekey security devices as required by law, you have the right to do so and deduct the reasonable cost from your next rent payment under Texas Property Code sec. 92.165(1). We may deactivate or not install keyless bolting devices on your doors if (A) you or an occupant in the dwelling is over 55 or disabled, and (B) the requirements of Texas Property Code sec. 92.153(e) or (f) are satisfied.*

**11.2 Who Pays What.** We'll pay for missing security devices that are required by law. *You'll pay for: (A) rekeying that you request (unless we failed to rekey after the previous resident moved out); and (B) repairs or replacements because of misuse or damage by you or your family, your occupants, or your guests.* You must pay immediately after the work is done unless state law authorizes advance payment. You must also pay in advance for any additional or changed security devices you request.

**12. Other Utilities and Services.** Television channels that are provided may be changed during the Lease term if the change applies to all residents. You may use utilities only for normal household purposes and must not waste them. If your electricity is interrupted, you must use only battery-operated lighting (no flames). You must not allow any utilities (other than cable or Internet) to be cut off or switched for any reason—including disconnection for not paying your bills—until the Lease term or renewal period ends. If a utility is submetered or prorated by an allocation formula, we'll attach an addendum to this Lease in compliance with state-agency rules. If a utility is individually metered, it must be connected in your name and you must notify the provider of your move-out date so the meter can be timely read. If you delay getting it turned on in your name by the Lease's start date or cause it to be transferred back into our name before you surrender or abandon the apartment, you'll be liable for a $_____ charge (not to exceed $50 per billing period), plus the actual or estimated cost of the utilities used while the utility should have been billed to you. If you're in an area open to competition and your apartment is individually metered, you may choose or change your retail electric provider at any time. If you qualify, your provider will be the same as ours, unless you choose a different provider. If you do choose or change your provider, you must give us written notice. You must pay all applicable provider fees, including any fees to change service back into our name after you move out.

guests, or our representatives who at your request perform services not contemplated in this Lease.

**13.3 Damage and Wastewater Stoppage.** *Unless damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacements, and damage of the following kind if occurring during the Lease term or renewal period: (A) damage to doors, windows, or screens; (B) damage from windows or doors left open; and (C) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment.*

**13.4 No Waiver.** We may require payment at any time, including advance payment to repair damage that you are liable for. Delay in demanding sums you owe is not a waiver.

**14. Contractual Lien and Property Left in Apartment.**

**14.1 Lien Against Your Property for Rent.** *All property in the apartment (unless exempt under Texas Property Code sec. 54.042) is subject to a contractual lien to secure payment of delinquent rent (except as prohibited by Texas Government Code sec. 2306.6738, for owners supported by housing-tax-credit allocations).* For this purpose, "apartment" excludes common areas but includes the interior living areas and exterior patios, balconies, attached garages, and any storerooms for your exclusive use.

**14.2 Removal After We Exercise Lien for Rent.** *If your rent is delinquent, our representative may peacefully enter the apartment, and remove and/or store all property subject to lien.* All property in the apartment is presumed to be yours unless proved otherwise. After the property is removed, a written notice of entry must be left in a conspicuous place in the apartment—including a list of items removed, the amount of delinquent rent due, and the name, address, and phone number of the person to contact. The notice must also state that the property will be promptly returned when the delinquent rent is fully paid.

**14.3 Removal After Surrender, Abandonment, or Eviction.** We, or law officers, may remove or store all property remaining in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) if you're judicially evicted or if you surrender or abandon the apartment (see definitions in Par. 41).

**14.4 Storage.**

(A) *No duty.* We'll store property removed under a contractual lien. We may—but we have no duty to—store property removed after judicial eviction, surrender, or abandonment of the apartment.

(B) *No liability.* We're not liable for casualty, loss, damage, or theft, except for property removed under a contractual lien.

(C) *Charges you pay.* You must pay reasonable charges for our packing, removing, storing, and selling of any property.

(D) *Our lien.* We have a lien on all property removed and stored after surrender, abandonment, or judicial eviction for all sums you owe, with one exception: our lien on property listed under Texas Property Code sec. 54.042 is limited to charges for packing, removing, and storing.

**14.5 Redemption.**

(A) *Property on which we have a lien.* If we've seized and stored property under a contractual lien for rent as authorized by law, you may redeem the property by paying all delinquent rent due at the time of seizure. But if notice of sale (see Par. 14.6(C)) is given before you seek redemption, you may redeem only by paying the delinquent rent plus our reasonable charges for packing, removing, and storing.

(B) *Property after surrender, abandonment, or judicial eviction.* If we've removed and stored property after surrender, abandonment, or judicial eviction,

GD 000015

(B) **Animals.** An animal removed after surrender, abandonment, or eviction may be kenneled or turned over to a local authority, humane society, or rescue organization.

(C) **Sale of property.** Property not thrown away or given to charity may be disposed of only by sale, which must be held no sooner than 30 days after written notice of the date, time, and place of sale is sent by both regular mail and certified mail (return receipt requested) to your last known address. The notice must itemize the amounts you owe and provide the name, address, and phone number of the person to contact about the sale, the amount owed, and your right to redeem the property. The sale may be public or private; is subject to any third-party ownership or lien claims; must be to the highest cash bidder; and may be in bulk, in batches, or item-by-item. If the proceeds from the sale are more than you owe, the excess amount must be mailed to you at your last known address within 30 days after sale.

**15. Failing to Pay First Month's Rent.** If you don't pay the first month's rent when or before the Lease begins, all future rent for the Lease term will be automatically accelerated without notice and become immediately due. We also may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights, remedies and obligations under Par. 10 and 32 apply to acceleration under this paragraph.

**16. Rent Increases and Lease Changes.** No rent increases or Lease changes are allowed before the initial Lease term ends, except for those allowed by special provisions in Par. 9, by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under Par. 19. If, at least 5 days before the advance-notice deadline referred to in Par. 3, we give you written notice of rent increases or Lease changes that become effective when the Lease term or renewal period ends, this Lease will automatically continue month-to-month with the increased rent or Lease changes. The new modified Lease will begin on the date stated in the notice (without needing your signature) unless you give us written move-out notice under Par. 36. The written move-out notice under Par. 36 applies only to the end of the current Lease or renewal period.

**17. Delay of Occupancy.**

**17.1 Lease Remains In Force.** We are not responsible for any delay of your occupancy caused by construction, repairs, cleaning, or a previous resident's holding over. This Lease will remain in force subject to:
(A) abatement of rent on a daily basis during delay, *and*
(B) your right to terminate the lease in writing as set forth below.

**17.2 Your Termination Rights.** Termination notice must be in writing. After termination under 17.1(B), you are entitled only to refund of any deposit(s) and any rent you paid. Rent abatement or Lease termination does not apply if the delay is for cleaning or repairs that don't prevent you from moving into the apartment.

**17.3 Notice of Delay.** If there is a delay of your occupancy and we haven't given notice of delay as set forth immediately below, you may terminate this Lease up to the date when the apartment is ready for occupancy, but not later.
(a) If we give written notice to any of you or your occupants when or after the Lease begins—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date—you may terminate the Lease within 3 days after you receive written notice, but no later.
(b) If we give any of you written notice before the date the Lease begins and the notice states that a construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease within 7 days after receiving written notice, but no later. The readiness date stated in the writ-

ing instructions for care of our property. We may regulate: (A) the use of patios, balconies, and porches; (B) the conduct of furniture movers and delivery persons; and (C) activities in common areas. We may make reasonable changes to written rules, and those rules can become effective immediately if the rules are distributed and applicable to all units in the apartment community and do not change the dollar amounts on pages 1 or 2 of this Lease.

**19.2 Some Specifics.** Your apartment and other areas reserved for your private use must be kept clean. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. You will use balconies with care and will not overload them. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care and in accordance with apartment rules and posted signs.

**19.3 Limitations on Conduct.** Glass containers are prohibited in or near pools and all other common areas. Within the apartment community, you, your occupants, and your guests must not use candles or kerosene lamps or heaters without our prior written approval, or cook on balconies or outside. You, your occupants, and your guests must not solicit business or contributions. Conducting any kind of business (including child-care services) in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes.

**19.4 Exclusion of Persons.** We may exclude from the apartment community any guests or others who, in our judgment, have been violating the law, violating this Lease or our rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area anyone who refuses to show photo identification or refuses to identify himself or herself as a resident, an occupant, or a guest of a specific resident in the community.

**19.5 Notice of Convictions and Registration.** You must notify us within 15 days if you or any of your occupants are convicted of (A) any felony, or (B) any misdemeanor involving a controlled substance, violence to another person, or destruction of property. You must also notify us within 15 days if you or any of your occupants register as a sex offender. Informing us of a criminal conviction or sex-offender registration doesn't waive any rights we may have against you.

**20. Prohibited Conduct.** You, your occupants, and your guests may not engage in the following activities:
(a) criminal conduct, regardless of whether or where arrest or conviction occurs, including but not limited to: manufacturing, delivering, or possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by law; discharging a firearm in the apartment community; or, except when allowed by law, displaying or possessing a gun, knife, or other weapon in the common area, or in a way that may alarm others;
(b) behaving in a loud or obnoxious manner;
(c) disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community;
(d) disrupting our business operations;
(e) storing anything in closets containing gas appliances;
(f) tampering with utilities or telecommunications;
(g) bringing hazardous materials into the apartment community;
(h) using windows for entry or exit;
(i) heating the apartment with a gas-operated cooking stove or oven; *or*
(j) making bad-faith or false allegations against us or our

IQD-000016

(f)  is in a space marked for office visitors, managers, or staff;

(g)  blocks another vehicle from exiting;

(h)  is in a fire lane or designated "no parking" area;

(i)  is in a space that requires a permit or is reserved for another resident or apartment;

(j)  is on the grass, sidewalk, or patio;

(k)  blocks a garbage truck from access to a dumpster;

(l)  has no current license or registration, and we have given you at least 10 days' notice that the vehicle will be towed if not removed; *or*

(m)  is not moved to allow parking lot maintenance.

## 22. Release of Resident.

**22.1 Generally. *You may have the right under Texas law to terminate the Lease early in certain situations involving family violence, certain sexual offenses, or stalking.*** Otherwise, unless you're entitled to terminate this Lease under Par. 9, 17, 23, 31, or 36, you won't be released from this Lease for any reason—including voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of coresidents, loss of employment, bad health, property purchase, or death.

**22.2 Death of Sole Resident.** If you are the sole resident and die during the Lease term, an authorized representative of your estate may terminate the Lease without penalty by giving at least 30 days' written notice. Your estate will be liable for your Lease obligations until the later of: (A) the termination date or (B) removal of all possessions in the apartment. Your estate will also be liable for all charges and damages until the apartment is vacated, and any removal or storage costs.

## 23. Military Personnel.

**23.1 Termination Rights. *You may have the right under Texas law to terminate the Lease in certain situations involving military deployment or transfer.*** You may terminate the Lease if you enlist, are drafted into, or are commissioned in the U.S. Armed Forces. You also may terminate the Lease if:

(a)  you are (1) a member of the U.S. Armed Forces or Reserves on active duty, or (2) a member of the National Guard called to active duty for more than 30 days in response to a national emergency declared by the President; *and*

(b)  you (1) receive orders for a permanent change of station, (2) receive orders to deploy with a military unit or as an individual in support of a military operation for 90 days or more, or (3) are relieved or released from active duty.

**23.2 How to Terminate Under This Par. 23.** You must furnish us a copy of your military orders, such as permanent-change-of-station orders, call-up orders, or deployment orders (or letter equivalent). Military permission for base housing doesn't constitute a permanent-change-of-station order. You must deliver to us your written termination notice, after which the Lease will be terminated under this military clause 30 days after the date your next rental payment is due. After your move-out, we'll return your security deposit, less lawful deductions.

**23.3 Who May Be Released.** For the purposes of this Lease, orders described in (b) under Par. 23.1 above will release only the resident who qualifies under both (a) and (b) above and receives the orders (plus any resident who signs the Lease). In addition, the resident's spouse or legal dependents living in the resident's household. A coresident who is not the spouse or dependent of a military resident cannot terminate under this military clause.

**23.4 Your Representations.** Unless you state otherwise in Par. 9, you represent when signing this Lease that:

(a)  you do not already have deployment or change-of-station orders;

(b)  you will not be retiring from the military during th

to follow any Security Guidelines Addendum attached to this Lease. *No security system is failsafe. Even the best system can't prevent crime. Always act as if security systems don't exist since they are subject to malfunction, tampering, and human error. The best safety measures are the ones you take as a matter of common sense and habit.*

**24.2 Your Duty of Due Care.** You, your occupants, and your guests must exercise due care for your own and others' safety and security, especially in using smoke alarms and other detection devices, door and window locks, and other safety or security devices. Window screens are not for security or to keep people from falling out of windows.

**24.3 Alarm and Detection Devices.**

**(A)** *What we'll do.* We'll furnish smoke alarms or other detection devices required by law or city ordinance. We may install additional detectors not so required. We'll test them and provide working batteries when you first take possession of your apartment. Upon request, we'll provide, as required by law, a smoke alarm capable of alerting a person with a hearing-impairment disability.

**(B)** *Your duties.* You must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report alarm or detector malfunctions to us. Neither you nor others may disable alarms or detectors. *If you damage or disable the smoke alarm, or remove a battery without replacing it with a working battery, you may be liable to us under Texas Property Code sec. 92.2611 for $100 plus one month's rent, actual damages, and attorney's fees.* You'll be liable to us and others if you fail to report malfunctions, or fail to report any loss, damage, or fines resulting from fire, smoke, or water.

**24.4 Loss.** Unless otherwise required by law, we're not liable to any resident, guest, or occupant for personal injury or damage, loss of personal property, or loss of business or personal income, from any cause, including fire, smoke, rain, flood, water leaks, hail, ice, snow, lightning, wind, explosions, interruption of utilities, pipe leaks, theft, vandalism, and negligent or intentional acts of residents, occupants, or guests. We have no duty to remove any ice, sleet, or snow but may remove any amount with or without notice. Unless we instruct otherwise, during freezing weather you must for 24 hours a day: (A) keep the apartment heated to at least 50° Fahrenheit, (B) keep cabinet and closet doors open, and (C) drip hot- and cold-water faucets. You'll be liable for any damage to our and others' property caused by broken water pipes due to your violating these requirements.

**24.5 Crime or Emergency.** Immediately dial 911 or call local medical-emergency, fire, or police personnel in case of accident, fire, smoke, suspected criminal activity, or any other emergency involving imminent harm. You should then contact our representative. None of our security measures are an express or implied warranty of security—or a guarantee against crime or of reduced risk of crime. Unless otherwise provided by law, we're not liable to you, your occupants, or your guests for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. Even if previously provided, we're not obliged to furnish security personnel, patrols, lighting, gates, fences, or other forms of security unless required by law. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you, your occupants, or your guests are affected by a crime, you must make a written report to the appropriate local law-enforcement agency and to our representative. You must also give us the law-enforcement agency's incident-report number upon request.

## 25. Condition of the Premises and Alterations.

**25.1 As-Is. *We disclaim all implied warranties.*** You accept the

LOD 000017

outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless allowed by law or we've consented in writing. You may install a satellite dish or antenna, but only if you sign our satellite-dish or antenna lease addendum, which complies with reasonable restrictions allowed by federal law. You must not alter, damage, or remove our property, including alarm systems, detection devices, furniture, telephone and television wiring, screens, locks, and security devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (made with or without our consent) become ours unless we agree otherwise in writing.

**25.3 Fair Housing.** In accordance with fair-housing laws, we'll make reasonable accommodations to our rules, policies, practices, or services. We'll allow reasonable modifications under these laws to give disabled persons access to and use of this apartment community. We may require you to sign an addendum regarding the implementation of any accommodations or modifications, as well as your restoration obligations, if any.

## 26. Requests, Repairs, and Malfunctions.

**26.1 Written Requests Required.** *If you or any occupant needs to send a notice or request—for example, for repairs, installations, services, ownership disclosure, or security-related matters—it must be written, signed, and delivered to our designated representative in accordance with our policies* (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, crime in progress, or fair-housing accommodation or modification). Our written notes on your oral request do not constitute a written request from you. Our complying with or responding to any oral request regarding security or any other matter doesn't waive the strict requirement for written notices under this Lease.

**26.2 Required Notifications.** You must promptly notify us in writing of water leaks, mold, electrical problems, malfunctioning lights, broken or missing locks or latches, and other conditions that pose a hazard to property, health, or safety.

**26.3 Utilities.** We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately.

**26.4 Casualty Loss and Equipment Repair.** We'll act with customary diligence to make repairs and reconnections, taking into consideration when casualty-insurance proceeds are received. Unless required by statute after a casualty loss, or during equipment repair, your rent will not abate in whole or in part. Air-conditioning problems are normally not emergencies. If air-conditioning or other equipment malfunctions, you must notify us as soon as possible on a business day.

**26.5 Our Right to Terminate.** If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate this Lease by giving you at least 7 days' written notice. We also have the right to terminate this Lease during the Lease term by giving you at least 30 days' written notice of termination if we are demolishing your apartment or closing it and it will no longer be used for residential purposes for at least 6 months. If the Lease is so terminated, we'll refund prorated rent and all deposits, less lawful deductions. We may also remove and dispose of personal property if we believe it causes a health or safety hazard.

## 27. Animals.

**27.1 No Animals Without Consent.** *No animals (including mammals, reptiles, birds, fish, rodents, amphibians, arachnids, and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless we've given written permission.* If we allow an ani-

(not to exceed $100 per animal) and a daily charge of $ __10.00__ per animal (not to exceed $10 per day per animal) from the date the animal was brought into your apartment until it is removed. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), you must pay for all cleaning and repair costs, including defleaing, deodorizing, and shampooing.

**(B)** *Removal and return of animal.* We may remove an unauthorized animal by (1) leaving, in a conspicuous place in the apartment, a written notice of our intent to remove the animal within 24 hours; and (2) following the procedures of Par. 28. We may keep or kennel the animal, or turn it over to a humane society, local authority or rescue organization. When keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. You must pay for the animal's reasonable care and kenneling charges. We'll return the animal to you upon request if it has not already been turned over to a humane society, local authority or rescue organization.

**28. When We May Enter.** If you or any guest or occupant is present, then repairers, servicers, contractors, government representatives, lenders, appraisers, prospective residents or buyers, insurance agents, persons authorized to enter under your rental application, or our representatives may peacefully enter the apartment at reasonable times for reasonable business purposes. If nobody is in the apartment, then any such person may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary) for reasonable business purposes if written notice of the entry is left in a conspicuous place in the apartment immediately after the entry. Law officers with a search or arrest warrant or those in hot pursuit may be allowed to enter. We are under no obligation to enter only when you are present, and we may, but are under no obligation to, give prior notice or make appointments.

**29. Multiple Residents.** Each resident is jointly and severally liable for all Lease obligations. If you or any guest or occupant violates the Lease or rules, all residents are considered to have violated the Lease. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant constitute notice from all residents. Your notice of Lease termination may be given only by a resident. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Any resident who defaults under this Lease will indemnify the nondefaulting residents and their guarantors.

### Replacements

## 30. Replacements and Subletting.

**30.1 When Allowed.** Replacing a resident, subletting, licensing or assigning a resident's rights is allowed *only when we consent in writing.* If a departing or remaining resident finds a replacement resident acceptable to us before moving out and we expressly consent to the replacement, subletting, or assignment, then:
(a) a reletting charge will not be due;
(b) a reasonable administrative (paperwork) fee will be due, and a rekeying fee will be due if rekeying is requested or required; *and*
(c) the departing and remaining residents will remain liable for all Lease obligations for the rest of the original Lease term.

**30.2 Procedures for Replacement.** If we approve a replacement resident, then, at our option: (A) the replacement resident must sign this Lease with or without an increase in the total security deposit; or (B) the remaining and replacement residents must sign an entirely new Lease. Unless we agree otherwise in writing, the departing resident's security deposit will automatically transfer to the replacement

IOD 000018

## Responsibilities of Owner and Resident

**31. Our Responsibilities.**

**31.1 Generally.** We'll act with customary diligence to:
(a) keep common areas reasonably clean, subject to Par. 25;
(b) maintain fixtures, hot water, heating, and air-conditioning equipment;
(c) substantially comply with all applicable laws regarding safety, sanitation, and fair housing; **and**
(d) make all reasonable repairs, subject to your obligation to pay for damages for which you're liable.

The time, manner, method and means of performing maintenance and repairs, including whether or which vendors to use, are within our sole discretion.

**31.2 Your Remedies.** *If we violate any of the above, you may possibly terminate this Lease and exercise other remedies under Texas Property Code Sec. 92.056 by following this procedure:*
(a) all rent must be current, and you must make a written request for repair or remedy of the condition—after which we'll have a reasonable time for repair or remedy;
(b) if we fail to do so, you must make a second written request for the repair or remedy (to make sure that there has been no miscommunication between us)—after which we'll have a reasonable time to repair or remedy; **and**
(c) if the repair or remedy still hasn't been accomplished within that reasonable time period, you may immediately terminate this Lease by giving us a final written notice.
*You also may exercise other statutory remedies, including those under Texas Property Code sec. 92.0561.*

**31.3 Request by Mail.** Instead of giving the two written requests referred to above, you may give us one request by certified mail, return receipt requested, by registered mail, or by any trackable mail or delivery method through the postal service or a private delivery service—after which we'll have a reasonable time to repair or remedy. "Reasonable time" accounts for the nature of the problem and the reasonable availability of materials, labor, and utilities. Your rent must be current when you make any request. We'll refund security deposits and prorated rent as required by law.

**32. Default by Resident.**

**32.1 Acts of Default.** You'll be in default if: (A) you don't timely pay rent or other amounts you owe; (B) you or any guest or occupant violates this Lease, apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (C) you abandon the apartment; (D) you give incorrect or false answers in a rental application; (E) you or any occupant is arrested, charged, detained, convicted, or given deferred adjudication or pretrial diversion for (1) an offense involving actual or potential physical harm to a person, or involving the manufacture or delivery of a controlled substance, marijuana, or drug paraphernalia as defined in the Texas Controlled Substances Act, or (2) any sex-related crime, including a misdemeanor; (F) any illegal drugs or paraphernalia are found in your apartment; or (G) you or any occupant, in bad faith, makes an invalid habitability complaint to an official or employee of a utility company or the government.

**32.2 Eviction.** *If you default or hold over, we may end your right of occupancy by giving us at least a 24-hour written notice to vacate.* Notice may be given by: (A) regular mail; (B) certified mail, return receipt requested; (C) personal delivery to any resident; (D) personal delivery at the apartment to any occupant over 16 years old; (E) affixing the notice to the inside of the apartment's main entry door; or (F) securely affixing the notice to the outside of the apartment's main entry door as allowed by law. Notice by mail under (A) or (B) will be considered delivered on the earlier of actual delivery, or 3 days after the notice

out, or you or any occupant gives oral or written notice of intent to move out before the Lease term or renewal period ends; and (B) you haven't paid all rent for the entire Lease term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent will also be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

**32.4 Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then (A) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (B) rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (C) you'll be liable to us (subject to our mitigation duties) for all rent for the full term of the previously signed Lease of a new resident who can't occupy because of the holdover; and (D) at our option, we may extend the Lease term—for up to one month from the date of notice of Lease extension—by delivering written notice to you or your apartment while you continue to hold over.

**32.5 Other Remedies.** We may report unpaid amounts to credit agencies as allowed by law. If we or our debt collector tries to collect any money you owe us, you agree that we or the debt collector may contact you by any legal means, including texting, calling your cell phone, and using an automated dialer. If you default, you will pay us, in addition to other sums due, any amounts stated to be rental discounts or concessions agreed to in writing. Upon your default, we have all other legal remedies, including Lease termination and statutory lockout under Texas Property Code sec. 92.0081, *except as lockouts and liens are prohibited by Texas Government Code sec. 2306.6738 for owners supported by housing-tax-credit allocations.* A prevailing party may recover reasonable attorney's fees and all other litigation costs from the nonprevailing parties, except a party may not recover attorney's fees and litigation costs in connection with a party's claims seeking personal-injury, sentimental, exemplary or punitive damages. We may recover attorney's fees in connection with enforcing our rights under this Lease. All unpaid amounts you owe, including judgments, bear 18% interest per year from the due date, compounded annually. You must pay all collection-agency fees if you fail to pay sums due within 10 days after we mail you a letter demanding payment and stating that collection-agency fees will be added if you don't pay all sums by that deadline. You are also liable for a charge (not to exceed $150) to cover our time, cost and expense for the lawful removal of an animal or in any eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid.

**32.6 Mitigation of Damages.** If you move out early, you'll be subject to Par. 10 and all other remedies. We'll exercise customary diligence to relet and minimize damages. We'll credit all later rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

## General Clauses

**33. Other Important Provisions.**

**33.1 Representatives' Authority; Waivers; Notice.** *Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease or any part of it unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives, unless in writing.* Any dimensions and sizes provided to you relating to the

ICSD 000079

must be addressed to the email address we provide for notice purposes or submitted through an online portal.

**33.2 Miscellaneous.** All remedies are cumulative. Exercising one remedy won't constitute an election or waiver of other remedies. All provisions regarding our nonliability or nonduty apply to our employees, agents, and management companies. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf. This Lease binds subsequent owners. This Lease is subordinate to existing and future recorded mortgages, unless the owner's lender chooses otherwise. All Lease obligations must be performed in the county where the apartment is located. If you have insurance covering the apartment or your personal belongings at the time you or we suffer or allege a loss, you agree to waive any insurance subrogation rights. All notices and documents may be in English and, at our option, in any other language that you read or speak. The term "including" in this Lease should be interpreted to mean "including but not limited to." Nothing in this Lease constitutes a waiver of our remedies for a breach under your prior lease that occurred before the lease term in Par. 3 begins.

**33.3 Severability.** If any provision of this Lease is invalid or unenforceable under applicable law, it won't invalidate the remainder of the Lease or change the intent of the parties. Neither an invalid clause nor the omission of initials on any page invalidates this Lease.

**34. Payments.** Payment of each sum due is an independent covenant. When we receive money, other than sale proceeds under Par. 14 or water payments subject to government regulation, we may apply it at our option and without notice first to any of your unpaid obligations, then to current rent. We may do so regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than rent and late fees are due upon our demand. After the due date, we do not have to accept any payments.

**35. TAA Membership.** We represent that, at the time of signing this Lease, we, the management company representing us, or any locator service that procured you is a member in good standing of both the Texas Apartment Association and the affiliated local apartment association for the area where the apartment is located. The member is either an owner/management-company member or an associate member doing business as a locator service (whose name and address must be disclosed on page 8). If not, the following applies: (A) this Lease is voidable at your option and is unenforceable by us (except for property damages); and (B) we may not recover past or future rent or other charges. The above remedies also apply if both of the following occur: (1) the Lease is automatically renewed on a month-to-month basis more than once after membership in TAA and the local association has lapsed; and (2) neither the owner nor the management company is a member of TAA and the local association during the third automatic renewal. A signed affidavit from the affiliated local apartment association attesting to nonmembership when the Lease or renewal was signed will be conclusive evidence of nonmembership. Governmental entities may use TAA forms if TAA agrees in writing.

## When Moving Out

**36. Move-Out Notice.**

**36.1 Requirements and Compliance.** Your move-out notice doesn't release you from liability for the full term of the Lease or renewal term. You'll still be liable for the entire Lease term if you move out early except under Par. 9, 17, 22, 23, or 31. *Your move-out notice must comply with each of the following:*

(a) We must receive advance written notice of your move-out date. You must give notice in advance by at least the number of days required in Par. 3 or in special provisions—even if the Lease has become a month-to-month lease. Unless we require more than 30 days' notice, if you give notice on the first day of the month you intend to move out, it will suffice for move-out on the last day of that

a written acknowledgment of your notice. If we fail to give a reminder notice, 30 days' written notice to move out is required. If we terminate the Lease, we must give you the same advance notice—unless you are in default.

**37. Move-Out Procedures.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the Lease term or renewal period ends unless all rent for the entire Lease term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under Par. 10 and 32. You're prohibited by law from applying any security deposit to rent. You can't stay beyond the date you're supposed to move out. All residents, guests, and occupants must surrender or abandon the apartment before the 30-day period for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**38. Cleaning.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges—including charges for cleaning carpets, draperies, furniture, walls, etc. that are soiled beyond normal wear (that is, wear or soiling that occurs without negligence, carelessness, accident, or abuse).

**39. Move-Out Inspection.** You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final accounting or refunding.

**40. Security Deposit Deductions and Other Charges.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing alarm or detection-device batteries at any time; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone, Internet, television services, or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized security devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under Par. 14; removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges under Par. 6 and 27; government fees or fines against us for violation (by you, your occupants, or your guests) of local ordinances relating to alarms and detection devices, false alarms, recycling, or other matters; late-payment and returned-check charges; and other sums due under this Lease. You'll be liable to us for: (A) charges for replacing any keys and access devices referenced in Par. 5 if you don't return them all on or before your actual move-out date; (B) accelerated rent if you've violated Par. 32; and (C) a reletting fee if you've violated Par. 10. *We may also deduct from your security deposit our reasonable costs incurred in rekeying security devices required by law if you vacate the apartment in breach of this Lease.*

**41. Deposit Return, Surrender, and Abandonment.**

**41.1 Your Deposit.** We'll mail you your security-deposit refund (less lawful deductions) and an itemized accounting of any deductions, no later than 30 days after surrender or abandonment, unless laws provide otherwise.

**41.2 Surrender.** You have *surrendered* the apartment when: (A) the move-out date has passed and no one is living in the apartment in our reasonable judgment; *or* (B) apartment keys and access devices listed in Par. 5 have been turned in to us—whichever happens first.

**41.3 Abandonment.** You have *abandoned* the apartment when all of the following have occurred: (A) everyone ap-

IQD 000020

## SUMMARY OF KEY INFORMATION

*The Lease will control if there's a conflict with this summary.*

- Address: **1300 Patricia Drive**    Unit # ___**1806**___
- Beginning date of Lease (Par. 3) ___02/28/2020___    ■ Ending date of Lease (Par. 3) ___01/31/2021___
- Number of days notice for termination (Par. 3) ___60___    ■ Consent for guests staying more than ___7___ days (Par. 2)
- Total security deposit (Par. 4)   $ ___0.00___    ■ Animal deposit (if any)   $ _____
- Security deposit (Par. 4) ☐ does **OR** ☒ does not include an animal deposit.
- Security deposit refund check will be by (Par. 4) (*check one*) ☒ one check jointly payable to all residents (default), **OR** ☐ one check payable to and mailed to _____
- # of keys/access devices (Par. 5) for **2** unit, **1** mailbox, ____other _____
- Your move-out notice will terminate Lease on (Par. 5): (*check one*) ☐ last day of month **OR** ☒ exact day designated in notice
- Check here ☐ if the dwelling is to be furnished (Par. 5)    Check here ☐ if there is a concession addendum
- Rent to be paid (Par. 6): (*check all that apply*) ☒ at the onsite manager's office, ☒ through our online payment site, **OR** ☐ at _____
- Check here if included in monthly rent: ☐ garage, ☐ storage, ☐ carport, ☐ washer/dryer, or ☐ other _____
- Total monthly rent (Par. 6)   $ ___715.00___    ■ Prorated rent (Par. 6) for (*check one*) ☐ first month **OR** ☐ second month   $ ___49.31___
- Late fees if rent is not paid on or before (Par. 6) ___3rd___
- Initial late fee (Par. 6)   $ _75.00_ or _10_%    ■ Daily late fee (Par. 6)   $ _10.00_ or ____%
- Returned-check charge (Par. 6)   $ ___75.00___    ■ Animal violation charges (Par. 27)
- Monthly animal rent (if any)   $ ___15.00___    Initial $ ___100.00___ Daily $ ___10.00___
- Monthly pest control (if any)   $ ___5.00___    ■ Monthly trash / waste (if any)   $ ___5.00___
- Utilities paid by owner (Par. 7): (*check all that apply*) ☐ electricity, ☐ gas, ☐ water, ☐ wastewater, ☐ trash/recycling, ☐ cable/satellite, ☐ master antenna, ☐ Internet, ☐ stormwater/drainage, ☐ other _____
- Utility connection charge (Par. 12)   $ _____    ■ You are: (*check one*) ☐ required to buy insurance **OR** ☒ not required to buy insurance (Par. 8)
- Agreed reletting charge (Par. 10)   $ ___607.75___
- Special provisions (Par. 9): **No cash or third party checks accepted. No checks accepted after the 3rd. Residents failing to fulfill lease term, resident is responsible to pay back all concessions received. If the resident does not renew the lease will continue on a month to month basis. Resident will pay current market rent and an additional $100.00 MTM Fee. A $5 Pest Control & $5 Trash charge will be added monthly.**

### Signatures and Attachments

**42. Attachments.** We will provide you with a copy of the Lease as required by statute. This may be in paper format, in an electronic format if you request it, or by e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease and given to you at signing. When an Inventory and Condition form is completed, both you and we should retain a copy. The items checked below are attached to and become a part of this Lease and are binding even if not initialed or signed.

- ☐ Access Gate Addendum
- ☐ Additional Special Provisions
- ☐ Allocation Addendum for: ☐ electricity ☐ water ☐ gas ☐ central system costs ☐ trash/recycling ☐ cable/satellite ☐ stormwater/drainage ☐ services/government fees
- ☐ Animal Addendum
- ☐ Apartment Rules or Community Policies
- ☐ Asbestos Addendum (if asbestos is present)
- ☐ Bed Bug Addendum
- ☐ Early Termination Addendum
- ☐ Enclosed Garage, Carport, or Storage Unit Addendum
- ☐ Intrusion Alarm Addendum
- ☐ Inventory & Condition Form
- ☐ Lead Hazard Information and Disclosure Addendum
- ☐ Lease Contract Addendum for Units Participating in Government Regulated Affordable Housing Programs
- ☐ Lease Contract Guaranty (guaranties, if more than one)
- ☐ Legal Description of Apartment (optional, if rental term longer than one year)
- ☐ Military SCRA Addendum
- ☐ Mold Information and Prevention Addendum
- ☐ Move-Out Cleaning Instructions
- ☐ Notice of Intent to Move Out Form
- ☐ Parking Permit or Sticker (quantity:_____)
- ☐ Rent Concession Addendum
- ☐ Renter's or Liability Insurance Addendum
- ☐ Repair or Service Request Form
- ☐ Satellite Dish or Antenna Addendum
- ☐ Security Guidelines Addendum
- ☐ PUC Tenant Guide to Water Allocation

**43. Class Action Waiver.** You agree that you will not participate in any class action claims against us or our representatives. You must file any claim against us individually, and *you expressly waive your ability to bring, represent, join or otherwise maintain a class action, collective action or similar proceeding against us in any forum.*

YOU UNDERSTAND THAT, WITHOUT THIS WAIVER, YOU COULD BE A PARTY IN A CLASS ACTION LAWSUIT. *BY SIGNING THIS LEASE, YOU ACCEPT THIS WAIVER AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY.* THE PROVISIONS OF THIS PAR. 43 SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE.

Resident initials: *ALB*

**You are legally bound by this document. Please read it carefully. A facsimile or electronic signature on this Lease is as binding as an original signature.**

**Before submitting a rental application or signing a Lease, you may take a copy of these documents to review and/or consult an attorney. Additional provisions or changes may be made in the Lease if agreed to in writing by all parties.**

**You are entitled to receive a copy of this Lease after it is fully signed. Keep it in a safe place. This lease is the entire agreement between you and us. You are NOT relying on any oral representations.**

*Resident or Residents (all sign below)*

*Alexia Lenage Bartholomew*    02/28/2020
(Name of Resident)    Date signed

_____    _____
(Name of Resident)    Date signed

_____    _____
(Name of Resident)    Date signed

IQD 000021



www.wehnermultifamily.com

*Wehner Multifamily LLC supports The Fair Housing Act as amended, prohibiting discrimination based on race, color, national origin, ancestry, physical or mental disability, religion, sex, age, familial status, marital status, sexual orientation or unfavorable discharge from military service.*

# Icon Apartments

We are delighted that you are interested in making this community your home. In order to assist you in making your final decision the following qualifications will be required from every prospective resident.

### Applicant Qualifying Criteria and Requirements

**RENTAL APPLICATION:** A rental application must be completed, signed and submitted for each adult over the age of 18. The rental application(s) will be reviewed when submitted to ensure all information is complete to determinate your eligibility.

**IDENTIFICATION:** Valid picture Driver's License or State ID and SSN are required. Other accepted forms of ID are: Passport, Visa, Military ID, Permanent Resident Card, Consular ID, ITIN, etc.

**RENTAL HISTORY:** Applicant (s) must have current rental history or proof of mortgage. No more than two late payments in a 12 month period, term of lease/contract fulfilled and no more than two documented lease violations. If the applicant(s) have a bad debt to another community the applicant(s) will be required to pay an additional deposit/administration fee that could be up to a full month rent and/or a risk fee. First time renters may qualify with regular deposit/administration fee (special on deposit do not apply to first time renters)

**INCOME:** Must be verifiable. Total monthly household gross income must be at least 2.5 times total gross monthly income. If applicable, Housing applicants must make 2.5 times their portion of rent. Proof of income is required for all applicants (pay stubs, W2's, tax returns and bank deposit statement, etc.).

**EMPLOYMENT:** Present Employment will be verified for length of employment and salary. Applicant must be employed for at least 6 months. If employed less than (2) years with current employer, we may also verify prior employment. Written verification from employer is required. If employment verification form is not obtained, applicant must provide valid proof of income.

**CO-SIGNER:** Co-signer must not have any automatic rejections and adhere to all qualifying guidelines. The co-signer's income must be 5 times their rent and the applicant's rent amount combined.

**CREDIT AND CRIMINAL BACKGROUND CHECK:** A credit report and a background search will be processed through Wehner Multifamily LLC or its agents.

**CRITERIA FOR OCCUPANTS:** Immediate family members under the age of 18 or legal dependent must not have any automatic rejections. All others 18 years old and up need to apply for lessee status and fill out an application.

**OCCUPANCY STANDARDS:** If the applicant(s) plus family or roommate(s) will occupy the dwelling, the family/roommate size must be appropriate for home I.e. no more than two adults per bedroom in most circumstances per local ordinance.

### Applicants may be denied for the following reasons:
- Falsification of application by applicant(s)
- Incomplete application by applicant(s)
- Insufficient income
- Poor credit history of any applicant (credit report)
- Poor rental history of any applicant (rental verification is obtain) such as; Non-Payment of rent or frequent late payments.
- Lease violations such as, but not limited to: poor housekeeping; poor supervision of minor occupants; unruly or destructive applicants; and/or applicant's minor occupants or applicant's guest; violence to a person or property by applicant(s), etc.
- More than two evictions in the past five years or more than 2 broken leases in the past three years
- Applicants with certain offenses, regardless if the status is active, probation, parole, adjudication withheld and/or deferred adjudication

**Credit History:** Wehner Multifamily LLC and its agents reserve the right to reject the application of any individual with 100% negative credit, any unpaid rental housing debt, evictions, and more than 3 rental or mortgage late payments in a 12 month period. Foreclosures, closed bankruptcy or medical collections are not counted against the applicant.

**Criminal History:** Wehner Multifamily LLC and its agents reserve the right to reject the application of any individual who had received deferred adjudication or conviction of a misdemeanor or a felony offense. Examples of these offenses include, but are not limited to, the following:

| | |
|---|---|
| • All ViCAP felony and misdemeanor convictions, and other felony and misdemeanor convictions | No time limit |
| • Sexual Offenses | No time limit |
| • Terrorism convictions | No time limit |
| • Drug Possession or Distribution charges | 10 Years(Felony) / 5 Years(Misdemeanor) from completion of sentence |
| • Cruelty to animal charges | 10 Years(Felony) / 5 Years(Misdemeanor) from completion of sentence |
| • Theft of Property (Exclude by check) | 10 Years(Felony) / 5 Years(Misdemeanor) from completion of sentence |
| • Damage to Property | 10 Years(Felony) / 5 Years(Misdemeanor) from completion of sentence |
| • Violence | 10 Years(Felony) / 5 Years(Misdemeanor) from completion of sentence |
| • Injury to persons | 10 Years(Felony) / 5 Years(Misdemeanor) from completion of sentence |

All applications will be reviewed on a case by case basis to determine if the applicant is qualified. In the event that the applicant doesn't meet the criminal background criteria, credit criteria, and/or doesn't have sufficient or good rental history, it would be up to manager's discretion to approve the application, in such instance, the applicant may be required to pay a non-refundable risk fee equal to an additional administration fee or up to one month rent.

ICO 000022

**Only certified funds will be accepted for all: Application, Holding/Admin fees, Deposit or Rental Monies for First Month's Rent.**



TEXAS APARTMENT ASSOCIATION
**M E M B E R**

# Rental Application for Residents and Occupants

Each co-resident and each occupant over 18 must submit a separate Application.

## ABOUT YOU

Full name (exactly as it appears on driver license or govt. ID card)
Alexia Lenage Bartholomew

Former name (if applicable)

Gender __Female__ Birthdate __09/18/1980__ Social Security # __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__

Driver license # __26272416__ State __TX__

Government ID # _____ State *(if applicable)* _____

Home phone _____ Cell phone __(254) 251-6294__

Work phone _____ Email address __@__

Marital status ☑single ☐ married    U.S. citizen? ☑yes ☐ no    Do you or does any occupant smoke? ☐ yes ☑no

I am applying for the apartment located at _____

Is there another co-applicant? ☐ yes ☑no

Co-applicant name _____ Email _____

Co-applicant name _____ Email _____

Co-applicant name _____ Email _____

Co-applicant name _____ Email _____

## OTHER OCCUPANTS

Full name _____ Relationship _____
Birthdate _____ Social Security # _____
Driver license # _____ State _____
Government ID # _____ State *(if applicable)* _____

Full name _____ Relationship _____
Birthdate _____ Social Security # _____
Driver license # _____ State _____
Government ID # _____ State *(if applicable)* _____

Full name _____ Relationship _____
Birthdate _____ Social Security # _____
Driver license # _____ State _____
Government ID # _____ State *(if applicable)* _____

Full name _____ Relationship _____
Birthdate _____ Social Security # _____
Driver license # _____ State _____
Government ID # _____ State *(if applicable)* _____

## WHERE YOU LIVE

Current home address (where you live now) __11710 Parliament Street #2705__

City __San Antonio__ State __TX__ Zip __78213__

Do you ☑ rent or ☐ own?   Beginning date of residency: __10/15/2020__ Monthly payment $ __755.00__

Apartment name __Blue Swan Apartments__

Name of owner or manager __Felicia__

Phone _____ Reason for leaving __Finding new home__

Previous home address (most recent) _____

IQD 000023

## YOUR WORK, continued

Gross monthly income $ _1862.96_ Position _Veteran_

Supervisor _____ Phone _____

Previous employer (most recent) _____

Address _____

City _____ State _____ Zip _____

Work phone _____ Dates: From _N | A_ To _____

Gross monthly income $ _____ Position _____

Supervisor _____ Phone _____

## ADDITIONAL INCOME
*(Income must be verified to be considered.)*

Type _Disability Compensation_ Source _VA_ Gross monthly amount $ _1862.96_

Type _____ Source _____ Gross monthly amount $ _____

## CREDIT HISTORY

If applicable, please explain any past credit problem: _____
_____
_____

## RENTAL AND CRIMINAL HISTORY

*Check only if applicable.*

Have you or any occupant listed in this Application ever:
- ☐ been evicted or asked to move out?
- ☐ moved out of a dwelling before the end of the lease term without the owner's consent?
- ☐ declared bankruptcy?
- ☐ been sued for rent?
- ☐ been sued for property damage?
- ☐ been convicted or received probation (other than deferred adjudication) for a felony, sex crime, or any crime against persons or property?

Please indicate below the year, location, and type of each felony, sex crime, or any crime against persons or property  for which you were convicted or received probation. We may need to discuss more facts before making a decision. You represent the answer is "no" to any item not checked above. _____
_____

## HOW DID YOU FIND US?

- ☐ Online search (website address) _____
- ☐ Referral from a person or locator? Name _____
- ☑ Social media (please be specific) _Facebook_
- ☐ Other _____

## EMERGENCY CONTACT          *Emergency contact person over 18 who will not be living with you:*

Name _Phyllis Wesley_ Relationship _Mother_

Address _1181 Balsam Avenue_

City _Baton Rouge_ State _LA_ Zip _70807_

Home Phone _____ Cell Phone _(323)901-9972_

Work Phone _____ Email Address _____

If you die or are seriously ill, missing, or incarcerated according to an affidavit of (*check one or more*) ☐ the above person, ☐ your spouse, or ☐ your parent or child, we may allow such person(s) to enter your dwelling to remove all contents, as well as your property in the mailbox, storerooms, and common areas. If no box is checked, any of the above are authorized at our option. If you are seriously ill or injured, you authorize us to call EMS or send for an ambulance at your expense. We're not legally obligated to do so.

## YOUR VEHICLES      *(If applicable)*

IQD 000024

*List all vehicles owned or operated by you or any occupants (including cars, trucks, motorcycles, trailers, etc.)*

| **YOUR ANIMALS** | *(if applicable)* |
|---|---|

You may not have any animal in your unit without management's prior authorization in writing. If we allow your requested animal, you must sign a separate animal addendum, which may require additional deposits, rents, fees or other charges.

Kind _____   N / A   Weight _____
Breed _____   Age _____

Kind _____   N / A   Weight _____
Breed _____   Age _____

## Application Agreement

The following Application Agreement will be signed by you and all co-applicants prior to signing a Lease. While some of the information below may not yet apply to your situation, there are some provisions that may become applicable prior to signing a Lease. In order to continue with this Application, you'll need to review the Application Agreement carefully and acknowledge that you accept the terms.

1. **Apartment Lease information.** The Lease contemplated by the parties will be the current TAA Lease. Special information and conditions must be explicitly noted on the Lease.

2. **Approval when Lease is signed in advance.** If you and all co-applicants have already signed the Lease when we approve the Application, our representative will notify you (or one of you if there are co-applicants) of our approval, sign the Lease, and then credit the application deposit of all applicants toward the required security deposit.

3. **Approval when Lease isn't yet signed.** If you and all co-applicants have not signed the Lease when we approve the Application, our representative will notify you (or one of you if there are co-applicants) of the approval, sign the Lease when you and all co-applicants have signed, and then credit the application deposit of all applicants toward the required security deposit.

4. **If you fail to sign Lease after approval.** Unless we authorize otherwise in writing, you and all co-applicants must sign the Lease within 3 days after we give you our approval in person or by telephone or within 5 days after we mail you our approval. If you or any co-applicant fails to sign as required **your Application will be deemed withdrawn**, and we may keep the application deposit as liquidated damages, and terminate all further obligations under this Agreement.

5. **If you withdraw before approval.** If you or any co-applicant withdraws an Application or notifies us that you've changed your mind about renting the dwelling unit, we'll be entitled to retain all application deposits as liquidated damages, and the parties will then have no further obligation to each other.

6. **Approval/non-approval.** If we do not approve your Application within 7 days after the date we received a completed Application, your Application will be considered "disapproved." Notification may be in person or by mail or telephone unless you have requested that notification be by mail. You must not assume approval until you receive actual notice of approval. The 7-day time period may be changed only by separate written agreement.

7. **Refund after non-approval.** If you or any co-applicant is disapproved or deemed disapproved under Paragraph 6, we'll refund all application deposits within 30 days of such disapproval. Refund checks may be made payable to all co-applicants and mailed to one applicant.

8. **Extension of deadlines.** If the deadline for approving or refunding under paragraphs 6 or 7 falls on a Saturday, Sunday, or a state or federal holiday, the deadline will be extended to the end of the next business day.

9. **Keys or access devices.** We'll furnish keys and/or access devices only after: (1) all parties have signed the Lease and other rental documents referred to in the Lease; and (2) all applicable rents and security deposits have been paid in full.

10. **Application submission.** Submission of an Application does not guarantee approval or acceptance. It does not bind us to accept the applicant or to sign a Lease. Images on our website may represent a sample of a unit and may not reflect specific details of any unit. For information not found on our website regarding unit availability, unit characteristics, pricing or other questions, please call or visit our office.

11. **Notice to or from co-applicants.** Any notice we give you or your co-applicant is considered notice to all co-applicants; and any notice from you or your co-applicant is considered notice from all co-applicants.

## Disclosures

1. **Application fee (non-refundable).** You agree to pay to our representative the non-refundable application fee in the amount indicated in paragraph 3. Payment of the application fee does not guarantee that your Application will be accepted. The application fee offsets the cost of screening an applicant for acceptance.

2. **Application deposit (may or may not be refundable).** In addition to any application fees, you agree to pay to our representative an application deposit in the amount indicated in paragraph 3. The application deposit is not a security deposit. The application deposit will be credited toward the required security deposit when the Lease has been signed by all parties; OR, it will be refunded under paragraph 7 if the applicant is not approved; OR it will be retained by us as liquidated damages if you fail to sign or withdraw under paragraphs 4 and 5 of the Application Agreement.

3. **Fees due.** Your Application will not be processed until we receive your completed Application (and the completed Application of all co-applicants, if applicable) and the following fees:

   A. Application fee (non-refundable): $ _____
   B. Application deposit (may or may not be refundable) $ _____   IQD 000025

4. **Completed Application.** Your Application will not be considered "complete" and will not be processed until we receive the

## Payment Authorization

I authorize **Icon Apartments**

(name of owner/agent) to collect payment of the application fee and application deposit in the amounts specified under paragraph 3 of the Disclosures.

***Non-sufficient funds and dishonored payments.*** If a check from an applicant is returned to us by a bank or other entity for any reason, if any credit card or debit card payment from applicant to us is rejected, or if we are unable, through no fault of our own or our bank, to successfully process any ACH debit, credit card, or debit card transaction, then:

1. Applicant shall pay a charge of $ **75.00** for each returned payment; and
2. We reserve the right to refer the matter for criminal prosecution.

## Acknowledgment

You declare that all your statements in this Application are true and complete. **Applicant's submission of this Application, including payment of any fees and deposits, is being done only after applicant has fully investigated, to its satisfaction, those facts which applicant deems material and necessary to the decision to apply for a rental unit.** You authorize us to verify your information through any means, including consumer-reporting agencies and other rental-housing owners. **You acknowledge that you had an opportunity to review our rental-selection criteria, which include reasons your Application may be denied, such as criminal history, credit history, current income and rental history. You understand that if you do not meet our rental-selection criteria or if you fail to answer any question or give false information, we may reject the Application, retain all application fees as liquidated damages for our time and expense, and terminate your right of occupancy.** Giving false information is a serious criminal offense. In lawsuits relating to the Application or Lease, the prevailing party may recover from the non-prevailing party all attorney's fees and litigation costs. We may at any time furnish information to consumer-reporting agencies and other rental-housing owners regarding your performance of your legal obligations, including both favorable and unfavorable information about your compliance with the Lease, the rules, and financial obligations. Fax or electronic signatures are legally binding. You acknowledge that our privacy policy is available to you.

***Right to review the Lease.*** Before you submit an Application or pay any fees or deposits, you have the right to review the Application and Lease, as well as any community rules or policies we have. You may also consult an attorney. These documents are binding legal documents when signed. We will not take a particular dwelling off the market until we receive a completed Application and any other required information or monies to rent that dwelling. Additional provisions or changes may be made in the Lease if agreed to in writing by all parties. You are entitled to a copy of the Lease after it is fully signed.

Images on our website may represent a sample of a unit and may not reflect specific details of any unit. For information not found on our website regarding availability, unit characteristics or other questions, please call or visit our office.

**This Application and the Lease are binding documents when signed. Before submitting an Application or signing a Lease, you may take a copy of these documents to review and/or consult an attorney. Additional provisions or changes may be made in the Lease if agreed to in writing by all parties.**

_____          _9 | 28 | 2020_____
Applicant's signature                   Date

FOR OFFICE USE ONLY
1. Apt. name or dwelling address (street, city): _____
2. Person accepting application: _____

Unit # or type: _____
Phone: _____

IQD 000026

AMRENT
PO BOX 3027
PITTSBURGH PA 15230

**Phone:** 800-324-3681
**FAX:** 800-324-4595

## Decision Report

| **PREPARED FOR:** WEHNER MULTIFAMILY, LLC ICON APTS 1300 PATRICIA DR SAN ANTONIO TX 78213 | **ATTN:** ANDREA CAMPA | **LENDER CASE #:** 200228114422498 **COMPUTER ID #:** 720059114460186 | **DATE RCVD:** 02/28/2020 **DATE COMP:** 02/28/2020 **REPORT TYPE:** INDIVIDUAL |
|---|---|---|---|

## Applicant

**INPUT INFORMATION**
**NAME:** ALEXIA BARTHOLOMEW
3903 BARRINGTON ST
SAN ANTONIO TX 78217

**DOB:**
09/18/1980

**CURRENT ADDRESS:**
11710 PARLIAMENT ST
**APT#:** 2705
SAN ANTONIO TX 78213
**From** 11/19

**PREVIOUS ADDRESS:**
3903 BARRINGTON ST
**APT#:** 2013
SAN ANTONIO TX 78217
**From** 11/18

**PREVIOUS ADDRESS:**
807 STETSON AV
KILLEEN TX 76543

**PRESENT EMPLOYMENT:**
STUDENT
**From** 04/17

**PREVIOUS EMPLOYMENT:**
LEARNING ZONE CHILD C
**POSITION:** TEACHER
**From** 03/15

## Decision Results

✔ APPLICANT MEETS PROPERTY CRITERIA.

## Credit Summary

| | PAYMENTS | BALANCES | LIMITS | TRADES | 30 | 60 | 90 |
|---|---|---|---|---|---|---|---|
| REVOLVING | 76 | 1,500 | 1,700 | 2 | 1 | 0 | 0 |
| INSTALLMENT | 489 | 24,781 | 31,266 | 5 | 2 | 0 | 0 |
| REAL ESTATE | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| OPEN/OTHER | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| **TOTAL** | **565** | **26,281** | **32,966** | **8** | **3** | **0** | **0** |

```
ALEDFWKC 02/21/22  15:37:28    Print Debtor Work Card            PAGE  1
Clt ICON APTS (TX)                         Ac# IQD  WEH068 0008767827
Rf# 1088*1806*EBC36DAE-8A7C-475C-9
Nm1 REED,DENYO                  Desk   IHC Sts  DNC  Assignd         812.09
Nm2 BARTHOLOMEW,ALEXIA          Assigned    11/17/21 PrincDue        812.09
Adr 1401 PATRICIA               L/Charge    04/08/20 In  6.00 %       91.31
    APT 610                     L/Paymnt             Attorney          .00
    SAN ANTONIO, TX 78213       L/Letter    12/27/21 Court             .00
PhN 850-288-7354    832-371-2318 L/Worked   02/18/22 Other            .00
                                L/Trust              JudInt            .00
                                N/Review    01/15/22 Misc              .00
Msg                                                  CntgcyFe          .00
                                                     Tot Due        903.40
                                                     Tot Paid          .00
----------------------------------- HISTORY -----------------------------------
Date     Time  Uid Description                   CR  Dsk NxtRv Txt NextLtr  Sts
-------- ----- --- ----------------------------- --  --- ----- --- ------- ---
11/17/21 13:30 HAB New Assignment                Y   955 11/17   1 11/17 NEW
11/17/21 13:33 HAB SCANNED MISC CORRESPONDENCE   Y   955 11/17            NEW
    ATTACHED MISCELLANEOUS DOCUMENTS TO THIS ACCOUNT,  PLEASE REVIEW
11/17/21 13:57 SAA SCANNED MISC CORRESPONDENCE   Y   955 11/17            NEW
    ATTACHED MISCELLANEOUS DOCUMENTS TO THIS ACCOUNT,  PLEASE REVIEW
11/17/21 16:40 HIL Dsk Chg:955 To DXH            Y   DXH 11/17   1 11/17 NEW
11/17/21 16:40 HIL Global Edit:WEHMV             Y   DXH 11/17   1 11/17 NEW
    #DS="955"
11/17/21 17:40 VCS Ltr to 01 INITIAL NOTICE-DBTR 1 Y DXH 11/17 R01 2 11/17 NEW
11/17/21 17:40 VCS Ltr to 02 INITIAL NOTICE-DBTR 2 Y DXH 11/17 R02 3 11/17 NEW
11/17/21 17:40 VCS Ltr/Ser Completed             Y   DXH 11/17            NEW
11/18/21 02:36 DH  Dsk Chg:DXH To 039            Y   039 11/17            NEW
11/18/21 02:36 DH  Desk Reassignment             Y   039 11/17            NEW
11/18/21 09:52 KDJ Account Memo Modified         Y   039 11/17            NEW
    Account Memo change from:
    RESMAN
11/18/21 09:52 KDJ CML-CHECKED MATCH LIST        Y   039 11/18            NEW
    CML-CHECKED MATCH LIST
    NONE 45+
11/18/21 09:52 KDJ THN-PHONE HOME#, NO MSG LEFT  Y   039 11/18            NEW
    THN-PHONE HOME#, NO MESSAGE LEFT
    6294- NAC
11/18/21 11:11 KPP THN-PHONE HOME#, NO MSG LEFT  Y   039 11/18            NEW
    THN-PHONE HOME#, NO MESSAGE LEFT
    *6294
    NO ASNWERNO MSG
11/18/21 11:14 KPP Demographics Change           Y   039 11/18            NEW
    Name: PHYLISS WESTLY
    Addr1: MOTHER EMC
    Phn1: 3239079972
    DOB:
    New Name/Address Sequence Number Added: 11.
11/18/21 11:15 KPP CHECKED CLIENT MEDIA          Y   039 11/18            NEW
    CCM-CHECKED CLIENT MEDIA FOR DEBTOR INFORMATION
    ADDED ADDL NO TO WC
11/18/21 11:15 KPP TRN-CALLED RELATIVE-NO MSG LFT Y  039 11/18            NEW
    TRN-PHONE RELATIVE, NO MESSAGE LEFT
```

```
ALEDFWKC 02/21/22  15:37:28     Print Debtor Work Card                    PAGE  2
    *9972
    NO ASNWE RNO MSG
11/18/21 13:03 SAA SCANNED MISC CORRESPONDENCE      Y  039 11/18            NEW
    ATTACHED MISCELLANEOUS DOCUMENTS TO THIS ACCOUNT,  PLEASE REVIEW
11/18/21 13:25 CLD TRN-CALLED RELATIVE-NO MSG LFT   Y  039 11/18            NEW
    TRN-PHONE RELATIVE, NO MESSAGE LEFT
    9972
11/18/21 14:45 KDJ Demographics Change              Y  039 11/18            NEW
    Phn1 Chg: TO 8502887354
    Phn2 Chg: TO 8323712318
    Sequence# 01
11/18/21 14:45 KDJ Demographics Change              Y  039 11/18            NEW
    Name: TLO - Z1 CONT
    Phn1: 8504196562
    DOB:
    New Name/Address Sequence Number Added: 30.
11/18/21 14:46 KDJ SKIP TRACING-INTERNET            Y  039 11/18            NEW
    SSI-SKIP TRACING ACCOUNT ON THE INTERNET
    TLO SEARCH USING FN/LN/ZIP: POSIBLE MATCH  "DENYONNA REED"
    DOB MATCHES
    (850) 288-7354 (CT) (M)
    (832) 371-2318 (CT) (M)
    (850) 419-6562 (CT) (M)
11/18/21 14:52 KDJ Demographics Change              Y  039 11/18            NEW
    Name: TLO -Z2
    Phn1: 2542450596
    Phn2: 2543834415
    DOB:
    New Name/Address Sequence Number Added: 31.
11/18/21 14:52 KDJ SKIP TRACING-INTERNET            Y  039 11/18            NEW
    SSI-SKIP TRACING ACCOUNT ON THE INTERNET
    TLO Z2: SEARCHED FN/LN/DOB:
    (254) 245-0596 (CT) (M) - BUSY
    (254) 383-4415 (CT) (M)- NO ANS
11/18/21 14:53 KDJ THN-PHONE HOME#, NO MSG LEFT     Y  039 11/18            NEW
    THN-PHONE HOME#, NO MESSAGE LEFT
    7354
    2318
    6294
    TSN-PHONED SKIP LEAD, NO MESSAGE LEFT
    0596
    4415
11/18/21 14:53 KDJ TSN-CALLED SKP LEAD-NO MSG LFT   Y  039 11/18            NEW
11/18/21 16:38 KDJ THN-PHONE HOME#, NO MSG LEFT     Y  039 11/18            NEW
    THN-PHONE HOME#, NO MESSAGE LEFT
    7354
    2318
    6294- NAC
    TAN-PHONED ASSOCIATE, NO MESSAGE LEFT
    9972
    TSN-PHONED SKIP LEAD, NO MESSAGE LEFT
    0596
    4415
```

```
ALEDFWKC 02/21/22  15:37:28    Print Debtor Work Card                PAGE  3
11/18/21 16:38 KDJ CALLED ASSOC-NO MSG LFT      Y  039 11/18            NEW
11/18/21 16:38 KDJ TSN-CALLED SKP LEAD-NO MSG LFT   Y  039 11/18        NEW
11/19/21 09:54 KDJ THN-PHONE HOME#, NO MSG LEFT     Y  039 11/19        NEW
     THN-PHONE HOME#, NO MESSAGE LEFT
     7354
     2318
     6294
     TSN-PHONED SKIP LEAD, NO MESSAGE LEFT
     6562
     0596
     4415
11/19/21 09:54 KDJ TSN-CALLED SKP LEAD-NO MSG LFT   Y  039 11/19        NEW
11/19/21 14:39 KDJ THN-PHONE HOME#, NO MSG LEFT     Y  039 11/19        NEW
     THN-PHONE HOME#, NO MESSAGE LEFT
     7354
     2318
     6294
     TSN-PHONED SKIP LEAD, NO MESSAGE LEFT
     6562
     0596
     4415
11/19/21 14:39 KDJ TSN-CALLED SKP LEAD-NO MSG LFT   Y  039 11/19        NEW
11/19/21 22:34 HIL SCANNED MISC CORRESPONDENCE      Y  039 11/19        NEW
     ATTACHED MISCELLANEOUS DOCUMENTS TO THIS ACCOUNT,  PLEASE REVIEW
11/19/21 22:34 HIL SCANNED MISC CORRESPONDENCE      Y  039 11/19        NEW
     ATTACHED MISCELLANEOUS DOCUMENTS TO THIS ACCOUNT,  PLEASE REVIEW
11/22/21 10:56 KDJ THN-PHONE HOME#, NO MSG LEFT     Y  039 11/22        NEW
     THN-PHONE HOME#, NO MESSAGE LEFT
     7354
     2318
     6294- NAC
     TAN-PHONED ASSOCIATE, NO MESSAGE LEFT
     9972
     TSN-PHONED SKIP LEAD, NO MESSAGE LEFT
     6562
     0596
     4415
11/22/21 10:56 KDJ CALLED ASSOC-NO MSG LFT      Y  039 11/22            NEW
11/22/21 10:56 KDJ TSN-CALLED SKP LEAD-NO MSG LFT   Y  039 11/22        NEW
11/22/21 15:16 KDJ THN-PHONE HOME#, NO MSG LEFT     Y  039 11/22        NEW
     THN-PHONE HOME#, NO MESSAGE LEFT
     7354
     2318
     6294- NAC
     TAN-PHONED ASSOCIATE, NO MESSAGE LEFT
     9972
     TSN-PHONED SKIP LEAD, NO MESSAGE LEFT
     6562
     0596
     TSB-PHONED SKIP LEAD, NUMBER CALLED IS BUSY
     4415
11/22/21 15:16 KDJ CALLED ASSOC-NO MSG LFT      Y  039 11/22            NEW
11/22/21 15:16 KDJ TSN-CALLED SKP LEAD-NO MSG LFT   Y  039 11/22        NEW
```

```
ALEDFWKC 02/21/22  15:37:28     Print Debtor Work Card                PAGE  4
11/22/21 15:16 KDJ TSB-CALLED SKP LEAD-#BUSY         Y  039 11/22          NEW
11/22/21 17:13 KDJ THN-PHONE HOME#, NO MSG LEFT      Y  039 12/22          NEW
    THN-PHONE HOME#, NO MESSAGE LEFT
    7354
    2318
11/22/21 17:13 KDJ Sts Chg:NEW To PNC                Y  039 12/22          PNC
11/22/21 17:13 KDJ DO NOT USE EXCEPT NEW TO PNC      Y  039 12/22          PNC
    PNC-NO PHONE CALL MADE...STATUS CHANGE FROM NEW TO PNC
12/15/21 04:57 NXP **ENTERED MAIL RETURNED**         Y  039 12/22          PNC
    #LW="153728" #RV="153758"
    ACCOUNT HAS BEEN FLAGGED RECEIVED MAIL RETURN-NO NEW ADDRESS
    Mail Return Letter# R01  Reason Non-Deliverable Address
12/15/21 04:57 NXP **ENTERED MAIL RETURNED**         Y  039 12/22          PNC
    #LW="153751" #RV="153758"
    ACCOUNT HAS BEEN FLAGGED RECEIVED MAIL RETURN-NO NEW ADDRESS
    Mail Return Letter# R02  Reason Non-Deliverable Address
12/15/21 09:13 KDJ CALLED CONSUMER 1 AT MOBILE       Y  039 01/15          PNC
    TELEPHONED CONSUMER 1 AT MOBILE
    7354
12/15/21 09:13 KDJ CALLED CONSUMER 1 AT HOME         Y  039 01/15          PNC
    TELEPHONED CONSUMER 1 AT HOME
    2318
12/15/21 09:13 KDJ CALLED CONSUMER 2 AT MOBILE       Y  039 01/15          PNC
    TELEPHONED CONSUMER 2 AT MOBILE
    6294
12/23/21 07:46 NJF Demographics Change               Y  039 01/15          PNC
    Addr1 Chg:1300 PATRICIA DR TO 1401 PATRICIA
    Addr2 Chg: TO APT 610
    MR Flag Chg:Y TO
    Sequence# 01
12/23/21 07:48 NJF IN1-INCOMING CALL-CONSUMER1       Y  039 01/15          PNC
    IN1-RECEIVED INCOMING CALL FROM CONSUMER1 REGARDING:
    7354 CLAIMS NEVER LIVED THERE DOESNT KNOW Z2
    SD FRAUD
12/23/21 07:48 NJF Z IS DISPUTING THIS ACCOUNT.      D  039 01/15          PNC
    WE HAVE RECEIVED A DISPUTE FROM THE CONSUMER IN WRITING OR VERBALLY.
    WE HAVE CHANGED THE CREDIT REPORTING TO INDICATE THE DISPUTED STATUS
12/23/21 07:49 NJF Rescheduled RLD 12/23/21 0748     D  039 01/15          PNC
    Rescheduled RLD 12/23/21 0748
    MAIL FRAUD PACKET
12/23/21 07:57 KJG IN1-INCOMING CALL-CONSUMER1       D  039 01/15          PNC
    IN1-RECEIVED INCOMING CALL FROM CONSUMER1 REGARDING:7354 GMID AOR MN
    MR,CLAIMS FRAUD NOT Z SD WNTS TO DISPUTE EOC
12/23/21 10:13 RLD MANAGER REVIEW COMPLETED          D  039 01/15          PNC
12/23/21 10:13 RLD Ltr to 01 FRAUD PACKET        SNT D  039 01/15 FRD      PNC
12/27/21 04:04 KXP Demographics Change               D  039 01/15          PNC
    MR Flag Chg:  TO N
    Sequence# 01
12/27/21 04:04 KXP COMPLIANCE DEPT REVIEW            D  039 01/15          PNC
    THE COMPLIANCE DEPARTMENT HAS REVIEWED THIS FILE
    SEND ID1 TO Z1 FOR ADDRESS CHANGE
12/27/21 04:04 KXP Ltr to 01 INITIAL NOTICE Z1   SNT D  039 01/15 ID1      PNC
12/27/21 14:09 NXC Sts Chg:PNC To DNC                D  039 01/15          DNC
```

```
ALEDFWKC 02/21/22  15:37:28    Print Debtor Work Card                    PAGE   5
12/27/21 14:09 NXC Dsk Chg:039 To DNC             D  DNC 01/15                  DNC
12/27/21 14:09 NXC COMPLIANCE DEPT REVIEW         D  DNC 01/15                  DNC
     CN#99991357545299011
     THE COMPLIANCE DEPARTMENT HAS REVIEWED THIS FILE
     RCVD CONSUMER DISPUTE VERIFICATION FROM EQUIFAX,
     Z1 DENYO DISPUTE 101 NOT LIABLE FOR ACT IF LIABLE -PROVIDE OR
     CONF ID
     FCRA STATES:CONSUMER STATES THAT THIS ACCOUNT IS BELONGS TO ALEXA
     BARATHOLONEW
     NO IMAGE ON ACDV
     VERIFIED ID BALANCE  AND DOCS
     NO SSN ON FILE
     *******DNC-ONE OR MORE DEBTORS REQUESTED DO NOT CONTACT********
     ACDV IN WIP LIST FOR FURTHER COMPLIANCE REVIEW
     PENDED DUE TO LAIBILITY VALIDATION- Z1(DENYO) NOT ON LEASE AND
     FCRA VALIDATION
12/27/21 14:09 NXC RCVD CDV FROM EQUIFAX          D  DNC 01/15                  DNC
12/27/21 14:09 NXC *CEASE COMMUNICATION*          D  DNC 01/15                  DNC
12/27/21 14:09 NXC ACDV IN WIP LIST               D  DNC 01/15                  DNC
12/27/21 14:10 NXC CAST REQUEST SUBMITTED         D  DNC 01/15                  DNC
     LOG #205149
12/28/21 06:12 HIL SCANNED MISC CORRESPONDENCE    D  DNC 01/15                  DNC
     ATTACHED MISCELLANEOUS DOCUMENTS TO THIS ACCOUNT,  PLEASE REVIEW
12/31/21 05:42 HIL SCANNED MISC CORRESPONDENCE    D  DNC 01/15                  DNC
     ATTACHED MISCELLANEOUS DOCUMENTS TO THIS ACCOUNT,  PLEASE REVIEW
01/07/22 11:08 SAA SCANNED MISC CORRESPONDENCE    D  DNC 01/15                  DNC
     ATTACHED MISCELLANEOUS DOCUMENTS TO THIS ACCOUNT,  PLEASE REVIEW
01/07/22 11:11 SAA SCANNED MISC CORRESPONDENCE    D  DNC 01/15                  DNC
     ATTACHED MISCELLANEOUS DOCUMENTS TO THIS ACCOUNT,  PLEASE REVIEW
01/13/22 12:43 NSS COMPLIANCE DEPT REVIEW         D  DNC 01/15                  DNC
     THE COMPLIANCE DEPARTMENT HAS REVIEWED THIS FILE
     RCVD CONSUMER DISPUTE VERIFICATION FROM EQUIFAX,
     Z1 DENYO DISPUTE 101 NOT LIABLE FOR ACT IF LIABLE -PROVIDE OR CONF ID
     FCRA STATES:CONSUMER STATES THAT THIS ACCOUNT IS BELONGS TO ALEXA
     BARATHOLONEW
     NO IMAGE ON ACDV
     PLACED IN WIP BY NXC 12/27/21
     CN: 99991357545299011
     REVIEWED DOCS, ONLY MOR SHOWS Z1, ACDV SUBMTITED AS ACCURATE BECAUSE
     DUE, EMAIL SENT TO CLIENT TO PROVIDE DOCUMENTATION WHEERE Z1 WAS
     ADDED, DNC NOT RELEASED
01/13/22 12:43 NSS RCVD CDV FROM EQUIFAX          D  DNC 01/15                  DNC
01/13/22 14:23 NSS COMPLIANCE SCANNED ADDL INFO   D  DNC 01/15                  DNC
     #LW="153780"
     COMPLIANCE SCANNED ADDITIONAL INFORMATION TO ACCOUNT, PLEASE REVIEW.
```

** End of Report **

**EXHIBIT**

**7**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DENYONNA N. REED | § | CIVIL ACTION |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | COMPLAINT 5:22-cv-00068 |
| | § | |
| I.Q. DATA INTERNATIONAL, INC. | § | |
| | § | |
| Defendant. | § | |

---

## AFFIDAVIT OF MICHAEL GULBRANSON

---

| | |
|---|---|
| STATE OF WASHINGTON | § |
| | § |
| COUNTY OF SNOHOMISH | § |

BEFORE ME, the undersigned authority, on this day personally appeared Michael Gulbranson, known to me to be the person whose name is signed to this affidavit, and having been duly sworn, upon his oath, stated as follows:

1.    My name is Michael Gulbranson, I am over the age of 18. I have never been convicted of a felony or a crime of moral turpitude, and I am otherwise fully competent to make this affidavit. All of the statements contained in this affidavit are true and correct and based upon my personal knowledge, training and experience.

2.    I am the Vice President of ARS, Leader, of IQ Data International, Inc. ("IQ Data").

3.    I have personal knowledge of IQ Data's policies and procedures as well as the statements made in IQ Data's Motion for Summary Judgment on all of Plaintiff's claims pursuant to the bona fide error defense under 15 U.S.C. § 1692k(c) and Tex. Fin. Code Ann. § 392.401.

4.    The statements made in IQ Data's Motion for Summary Judgment regarding IQ Data's policies and procedures are true and correct. Specifically, I have personal knowledge that:

    a.    IQ Data requires that all of its clients formally agree to only assign debts that are valid, due, and owed.
    b.    When an account is assigned to IQ Data for collection, IQ Data requires the original creditor to provide documents/information identifying the responsible individuals and supporting the balance due. IQ Data reviews the materials provided by the original creditor for obvious errors before initiating any

communications with the debtor and before reporting the debt. If any errors are identified, IQ Data contacts the original creditor and requires them to address the errors and/or provide additional information or documents relating to the debt at issue.

c. Prior to reporting consumer account information to the three major Credit Reporting Agencies ("CRAs") (Experian, Equifax, and TransUnion), IQ Data reviews the account information to ensure the information is accurate and has integrity, to the best of IQ Data's knowledge. Inaccurate information regarding a consumer's account will not be furnished if IQ Data has reasonable cause to believe that the information is inaccurate. Further, IQ Data will not furnish information if IQ Data determines it does not have integrity.

_____

Michael Gulbranson

SIGNED AND SWORN TO before me on this the 25 day of  October , 2022.

_____

Diana Roe

Notary Public in and for the State of  WA



2

IQD 000034

## I.Q. Data International Inc.

## CONSUMER DISPUTE POLICY

### I.  PURPOSE

The purpose of this policy is to define I.Q. Data International's (IQ Data) standards regarding recording, investigating, reporting, and responding to consumer disputes.  IQ Data appropriately responds to consumer disputes in a timely manner, in compliance with all applicable federal and state laws, including but not limited to the Fair Debt Collections Practices Act ("FDCPA") and the Fair Credit Reporting Act ("FCRA").

### II.  SCOPE

This policy covers IQ Data's dispute practices related to collection accounts placed with IQ Data for collection activities.

### III.  POLICY

### 3.1  Definition of a Dispute

A Dispute is a notification that a consumer, identified as the right party, denies all or part of a debt that IQ Data is attempting to collect.

Disputes may be submitted to IQ Data through a number of channels, including but not limited to mail or facsimile directly to IQ Data, through the credit bureaus via the e-Oscar system, or verbally on calls with IQ Data personnel.  Disputes may also be submitted via written Complaints routed to IQ Data from a regulator, such as the CFPB.  Complaints are defined as an articulation of a consumer's (or their representative's) dissatisfaction with the service provided by IQ Data or an allegation of wrongdoing by I.Q. Data.

### 3.2  Disputes Received During the Validation Period

Disputes received in writing, within thirty-days of the initial notice communication, shall be marked as disputed and all collection efforts ceased until verification of the debt, copy of a judgment (if applicable), and the name and address of original creditor is mailed to the consumer by IQ Data, in accordance with the Fair Debt Collection Practices Act.  Additionally, it is IQ Data policy, to send all additional supporting documentation available on the account to the consumer, in addition to the verification information and documentation.

| Revision #: 3 | Revision Date: 01/24/2018 |
|---|---|



**CONFIDENTIAL**

Written verification of the debt and supporting documentation will be sent standard US mail once every 12-month period per account and unique consumer, unless the written verification is returned to IQ Data as returned mail.

If a dispute is received verbally during the validation period, the debt will be marked as disputed, the IQ Data employee will accurately and thoroughly document the conversation in the account notes, and the consumer will be advised to send the dispute in writing along with any supporting documentation and information.

If a dispute is received via e-Oscar during the validation period, IQ Data will mark the debt as disputed and cease collection activity until such time the debt can be verified.

### 3.3.    Disputes Received after the Validation Period

IQ Data will conduct a reasonable investigation for any dispute received in writing by mail, facsimile, e-mail or e-Oscar, regardless of the age of the account.   IQ Data will also mark the debt as "Disputed".

Disputes received verbally after the validation period shall be marked as "Disputed", the IQ Data employee will accurately and thoroughly document the conversation in the account notes, and the consumer will be advised to send dispute in writing along with any supporting documentation and information.

If a dispute is received via e-Oscar after the validation period, IQ Data will mark the debt as "Disputed" and will perform a reasonable investigation based upon information received via the e-Oscar system.

If IQ Data receives a written dispute outside the validation period and the dispute contains sufficient information to warrant and support ceasing collection activities until an investigation can be completed, IQ Data will cease collection activities on the account during the period of time required to complete the investigation or until the investigation finds the dispute to be invalid.

Additionally, regardless of the dispute type, if IQ Data has not previously sent the consumer verification of the debt along with supporting account documentation on file, it is IQ Data's policy to send via standard US Mail the consumer verification and documentation, once every 12 months, unless the verification and documentation was returned as return mail.

### 3.4    Dispute Investigations

Investigations conducted by IQ Data to determine the validity of disputes will vary according to the nature of the dispute, but may include review of account

| Revision #: 3 | Revision Date: 01/24/2018 |
|---|---|


ASSURANT®

documentation, listening to recorded phone calls, review of system notes, contacting clients to obtain documents and/or information related to the account, and/or review of other information available.  IQ Data's Compliance Team is responsible for carrying out, documenting, and responding to dispute investigations.

If a Compliance Hold was placed on an account at any time to conduct an investigation of the consumer's dispute, only authorized personnel will be able to re-start collection activities upon completion of an IQ Data investigation.

<mark>If IQ Data is unable to verify the validity and accuracy of a debt as part of its investigation, IQ Data will cease collecting on the account and will notify its client that it is cancelling the account.</mark>

## 3.5   Response

The consumer, or entity which submitted the dispute on the consumer's behalf, will receive the results of the investigation within the timeframe prescribed by all applicable federal, state or other jurisdictional laws.

Other responses, such as requests for additional information, may be sent to consumers.  In order to complete the investigation, IQ Data may need additional information from the consumer and may send information requests to the consumer to ensure that IQ Data has enough information to properly investigate the dispute.

At no time may IQ Data employees advise consumers that the "burden of proof" is on the consumer to "prove" that the account is inaccurate.  Our responsibility is to advise the consumer of the dispute process and perform reasonable investigations of consumer disputes, and provide a response, as appropriate, to consumers.

## 3.6  Reporting to Credit Bureaus

If IQ Data is furnishing data to the credit bureaus and the consumer has dispute the account in any manner (verbally or in writing), at any time, IQ Data will report the account to the credit bureaus as disputed.

If the result of a dispute investigation determines that the debt may be invalid or that further collection activity is not warranted for any reason, IQ Data will send a request to the credit bureaus to delete all furnished information.

| Revision #: 3 | Revision Date: 01/24/2018 |
| --- | --- |



**EXHIBIT**

**9**

| | |
|---|---|
| **From:** | |
| **Sent:** | Thursday, January 13, 2022 12:49 PM |
| **To:** | 'ICON@WEHNERMULTIFAMILY.COM' |
| **Subject:** | LIABILITY DISPUTE/ REED,DENYO/ 1088*1806*EBC36DAE-8A7C-475C-9/ INT REF # 0008767827 |

**Importance:**      High

**Property Name: Icon Apts (TX)**
**Resident(s) name(s): Denyo Reed and Alexia Bartholomew**
**Unit#: 1806**
**Move out date: 04/08/20**
**Tcode/Resident code: 1088*1806*EBC36DAE-8A7C-475C-9**

*Good afternoon,*

*Our office received this account from Icon Apts on  11/17/21, to assist with the collection of the past-due final move-out charges of  $812.09*

*The above-named consumer has submitted a dispute indicating, Denyo states the balance belongs solely to Alexia*

*Could you please review your records and verify the account information submitted for collection is complete and accurate to the best of your knowledge by replying to this e-mail with the following documents, as they are pertinent to our response, maintaining credit reporting and collections efforts:*

- ***Application***
- ***Roommate addition documents***

*I understand you are busy however, this is a time-sensitive matter requiring a response by, 01/20/22, so our office may proceed with collection activity.  If we do not hear back from you, we may be required to cease collection activity and close the file.*

*Please do not hesitate to contact me by phone with any questions or concerns.*

Thank you,

Quality Control Assistant
IQ Data International, Inc. | 888-313-9662 EXT 1811
d/b/a Assurant Recovery Solutions
@assurant.com
@iqdata-inc.com

IQD 000011



Assurant Recovery Solutions is a registered trade name of I.Q. Data International, Inc.

This communication is from a debt collector attempting to collect a debt.  Any information obtained will be used for that purpose.

The information in this email is intended only for the individual(s) named in the addressee lines.
If the reader of this email, or the employee or agent responsible to deliver it to the named recipient(s) is not the intended recipient(s), you are hereby notified that any dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please notify us immediately and destroy the electronic communication along with any attachments. Thank you.

IQD 000012

**EXHIBIT**

**10**

## I.Q. Data International Inc.

## FAIR CREDIT REPORTING ACT POLICY

## 1. PURPOSE

The purpose of this policy is to establish and communicate standards which ensure compliance with the requirements of the Fair Credit Reporting Act ("FCRA") and applicable federal and state laws and regulations.

I.Q. Data International, Inc. ("I.Q. Data") is subject to the requirements of the FCRA and it is I.Q. Data's policy to comply with all applicable requirements of the FCRA.  I.Q. Data is both a consumer and a furnisher of consumer credit information to Credit Reporting Agencies ("CRAs").

Violations of the FCRA may expose I.Q. Data to financial, reputational, and regulatory risk, including but not limited to:

- Individual lawsuits;
- Class action lawsuits;
- Suspension or revocation of collection licenses; and/or
- Regulatory investigations and enforcement actions that may result in fines, civil monetary penalties, and/or injunctions.

## 2.  SCOPE

This policy applies to all employees of I.Q. Data and all collection activities.

## 3.  POLICY

### 3.1 I.Q. Data's Business Function

I.Q. Data's primary business is to engage in collection activity on behalf of our clients.  For purposes of this policy, this includes the following functions:

- Inbound and outbound calls conducted by internal call centers;
- Consumer data received by I.Q. Data from CRAs;
- Furnishing consumer account data to the three major CRAs; and
- Dispute resolution and other consumer relations matters.

| Revision # 4 | Revision Date: 1/24/2018 |
|---|---|

**IQ** Data

**CONFIDENTIAL**

I.Q. Data International Inc.                          Professional Practices Management System

Fair Credit Reporting Act Policy                                              CM 106

### 3.2    Responsibilities of Furnishers of Information to Credit Reporting Agencies

#### 3.2.1    Duty to Provide Accurate and Complete Information

Prior to reporting consumer account information to the three major CRAs (Experian, Equifax, and TransUnion), I.Q. Data will perform a review of the account information to ensure the information is accurate and has integrity.  Inaccurate information regarding a consumer's account will not be furnished if I.Q. Data has reasonable cause to believe that the information is inaccurate.  Further, I.Q. Data will not furnish information if I.Q. Data determines it does not have integrity.

As defined in the FCRA, "reasonable cause" means having specific knowledge that would cause a reasonable person to question the accuracy of the information.

Consumers, as part of I.Q. Data's day-to-day operations, are provided with a mailing address to submit notification that reported information may be inaccurate.  I.Q. Data's mailing address is provided in both written and verbal communications with consumers.  Accordingly, if a consumer provides notification that his/her information is inaccurate, and I.Q. Data confirms that it is inaccurate, the information will be corrected or will not be furnished.

#### 3.2.2 Duty to Correct and Update Information

When consumer information is furnished by I.Q. Data to CRAs about transactions with any consumer in the normal course of business and subsequently the information is deemed as not complete or accurate, the CRAs shall be promptly notified of that determination.  I.Q. Data shall provide CRAs with corrections to information and/or any information necessary to make the information complete and/or accurate.

#### 3.2.3.    Date of First Delinquency

I.Q. Data, as part of its data furnishing activities, furnishes the Date of First Delinquency as provided by I.Q. Data's creditor client as the "Move Out Date".  The "Move Out Date" may reflect the tenant's actual date of move out, the date the tenant's lease terminated, or the date the property management company obtained possession of the unit, depending on the circumstances surrounding how the

| Revision # 4 | Revision Date: 1/24/2018 |  |

unit was vacated.   This date is reflected on I.Q. Data's system of record as the "L/Charge Date".

Absent a finding by a client or by I.Q. Data of inaccuracy or incompleteness, the Date of First Delinquency is not subject to change.  I.Q. Data does not re-age accounts for purposes of data furnishing and has controls in place to systemically ensure that accounts are not re-aged and are removed from consumer credit reports in compliance with the FCRA's requirements to remove consumer credit data after a set period of time.

### 3.2.4  Accounts Closed at Consumer Request

The normal course of business as a debt collector does not involve open lines of credit, as the accounts are placed with I.Q. Data for collection activity after a consumer has defaulted on a written contract with our client.  Thus, the requirements of the FCRA regarding reporting of consumer-requested account closures are not applicable.

### 3.2.5  Duties With Regard to Consumer Direct Disputes

When I.Q. Data receives a Direct Dispute from a consumer, the notice of dispute must:
- Be sent to the address as designated by I.Q. Data;
- Identify the specific account information in dispute;
- Explain the basis for the dispute; and
- Include supporting documentation and/or information required to substantiate the basis of the dispute.

If the consumer disputes the completeness or accuracy of any information furnished to a CRA, the dispute resolution process is:
- Review the dispute and all relevant information provided by the consumer;
- Conduct a reasonable investigation of the dispute pursuant to established investigation procedures; and
- Report the results of its investigation to the consumer within 30 days (unless additional time is needed and the consumer is notified that the dispute investigation is not completed).

CRAs shall be notified that the information is disputed and the account shall be reported as "in dispute" to the CRAs while conducting the investigation; after the investigation is completed, the CRAs will be notified accordingly.

| Revision # 4 | Revision Date: 1/24/2018 |
|---|---|

**CONFIDENTIAL**

If the investigation determines that the disputed item of information is incomplete or unverifiable, the item will be promptly modified, deleted, or permanently blocked from reporting, as applicable.

If the investigation determines that the disputed item is accurate and complete, the consumer shall be notified in writing of the determination that the information is accurate and complete.

There are limits on I.Q. Data's obligations to comply with direct dispute requirements of the FCRA under 12 CFR 1022.43.  For example, if the dispute is prepared or submitted by a credit repair organization, I.Q. Data has no obligation to investigate.

### 3.2.6  Duties With Regard to Indirect Consumer Disputes

If a consumer notifies a CRA of a dispute concerning the completeness or accuracy of any information furnished by a CRA, upon receipt of the dispute from the CRA, the dispute resolution process is:

- Review all relevant information provided by the CRA, including information provided by the consumer and conduct a reasonable investigation pursuant to established procedures;
- Report the results of the investigation to the CRA that referred the dispute within 30 days;
- Report the results of the investigation to all CRAs to which information was originally furnished, in the event the investigation determines that the information was inaccurate or incomplete; and
- Promptly modify, delete or permanently block the information in its files.

If the investigation determines that the disputed item is accurate and complete, the CRAs shall be notified in writing of the determination that the information is complete.

### 3.2.7  Frivolous or Irrelevant Disputes

A reasonable investigation of a consumer dispute (Direct or Indirect) is not required if it is determined that the dispute is frivolous or irrelevant, including but not limited to:

| Revision # 4 | Revision Date: 1/24/2018 |
|---|---|

**EXHIBIT**

IQ Data 11   1/24/23 ksh

exhibitsticker.com

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DENYONNA N. REED | § | CIVIL ACTION |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | COMPLAINT 5:22-cv-00068 |
| | § | |
| I.Q. DATA INTERNATIONAL, INC. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT I.Q. DATA INTERNATIONAL, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S INTERROGATORIES

Pursuant to the Federal Rules of Civil Procedure, Defendant I.Q. Data International, Inc.

("IQ Data"), serves these Responses and Objections to Plaintiff's Interrogatories.

Respectfully submitted,

**SERPE ANDREWS, PLLC**

By: /s/ *Lee H. Staley*
      Lee H. Staley
      Attorney-In-Charge
      State Bar No. 24027883
      Federal Bar No. 30072
      lstaley@serpeandrews.com
      Benjamin E. Hamel
      State Bar No. 24103198
      Federal Bar No. 3184927
      bhamel@serpeandrews.com
2929 Allen Parkway, Suite 1600
Houston, Texas 77019
713/452-4400
713/452-4499 fax

**ATTORNEYS FOR DEFENDANT
I.Q. DATA INTERNATIONAL, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 28th day of September, 2022, a true and correct copy of the foregoing instrument has been served via email to:

Marwan R. Daher
Sulaiman Law Group, Ltd.
2500 S. Highland Ave. Suite 200
Lombard, IL 60148
(630) 575-8181
mdaher@sulaimanlaw.com

*/s/ Lee H. Staley*
Lee H. Staley

## <u>DEFENDANT I.Q. DATA INTERNATIONAL, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S INTERROGATORIES</u>

A.  In responding to these Interrogatories, IQ Data does not waive or intend to waive the attorney-client, work-product, or any other privilege or immunity that otherwise would entitle it to refuse to transmit the information it provides or objects to its use for any purpose, nor does IQ Data waive or intend to waive such privileges with respect to subsequent Interrogatories or any other form of discovery.  Nor, in so responding, does IQ Data concede the relevance or materiality to this action of the information provided.  Rather, IQ Data provides such information solely to avoid unnecessary discovery disputes and to expedite the pretrial preparation of this action without undue inconvenience to the parties or the Court.

B.  IQ Data has not yet completed its investigation of the facts relating to this action, it has not yet completed its own discovery in this action, and it has not begun its preparation for trial.  To the extent IQ Data obtains additional discoverable information as a result of such investigation, it will comply with its obligation, if any, to supplement these responses.  Therefore, the following answers are given without prejudice to IQ Data's right to provide, at or before the time of trial, subsequently discovered evidence or evidence relating to proof of facts later discovered to be material, including evidence produced at trial by IQ Data or its witnesses.  IQ Data's answers must be construed as given on the basis of its present knowledge.

1.  Identify (1) the entity that placed the subject debt with Defendant for collection; and (2) the date the subject debt was placed with Defendant for collection.

    **RESPONSE:** IQ Data objects to this Interrogatory on the basis that it is vague as to the term "entity" and seeks information that is not relevant to Plaintiff's claims.  Subject to and without waiving the foregoing objections, IQ Data responds as follows: (1) the subject account was placed with IQ Data to collect a balance allegedly owed to Icon Apartments by Plaintiff and another individual; (2) the subject account was placed with IQ Data on November 17, 2021.

2.      If Defendant contends that Plaintiff owes the subject debt, identify all facts and/or documents that support Defendant's contention.

**RESPONSE:** As of the date of this response, IQ Data does not contend that Plaintiff owes the subject debt.  Further answering, non-privileged, responsive documents are attached. Investigation continues.

3.      Identify all communications between Plaintiff and Defendant in the relevant time period, including (1) the date of the communication and (2) the substance of the communication.

**RESPONSE:** IQ Data objects to this Interrogatory as overbroad, indefinite to time, and without reasonable limitation in its scope because Plaintiff's claims are statutorily limited to alleged acts within one year from any alleged Fair Debt Collection Practices Act violation.  Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1).

4.      Identify all communications between Defendant and the CRAs relating to the subject debt in the relevant time period, including (1) the date of the communication and (2) the substance of the communication.

**RESPONSE:** IQ Data objects to this Interrogatory as overbroad, indefinite to time, and without reasonable limitation in its scope because Plaintiff's claims are statutorily limited to alleged acts within one year from any alleged Fair Debt Collection Practices Act violation.  IQ Data further objects to this Interrogatory on the basis that it seeks information that is not relevant to any party's claim or defense, nor is this Interrogatory proportional to the needs of the case. Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1).

5.      Identify all communications in the relevant time period between Defendant and the entity that placed the subject debt with Defendant for collection relating to Plaintiff and/or the subject debt, including (1) the date of the communication and (2) the substance of the communication.

**RESPONSE:** IQ Data objects to this Interrogatory as overbroad, indefinite to time, and without reasonable limitation in its scope because Plaintiff's claims are statutorily limited to alleged acts within one year from any alleged Fair Debt Collection Practices Act violation.  IQ Data also objects to this Interrogatory to the extent that it seeks information that is protected by the attorney-client and insurer-insured privileges, as well as the attorney work-product doctrine.  IQ Data further objects to this Interrogatory on the basis that it seeks information that is not relevant to any party's claim or defense, nor is this Interrogatory proportional to the needs of the case.  Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1).

6.      State the reason Defendant represented to the CRAs that the subject debt belongs to Plaintiff or that Plaintiff owes the subject debt.

**RESPONSE:** The subject account was assigned to IQ Data for collection of a balance allegedly owed to Icon Apartments by Plaintiff and another individual. Specifically, Plaintiff was identified in placement documents as a party to an Apartment Lease Contract with Icon Apartments, the putative creditor.   IQ Data relied, and was entitled to rely, on the accuracy of the information provided to it, until contrary information was received, developed, or discovered.

7.    Identify all communications between Defendant and any third party regarding Plaintiff and/or the subject debt in the relevant time period, including (1) the date of the communication and (2) the substance of the communication.

**RESPONSE:** IQ Data objects to this Interrogatory as overbroad, indefinite to time, and without reasonable limitation in its scope because Plaintiff's claims are statutorily limited to alleged acts within one year from any alleged Fair Debt Collection Practices Act violation.  IQ Data also objects to this Interrogatory to the extent that it seeks information that is protected by the attorney-client and insurer-insured privileges, as well as the attorney work-product doctrine.  IQ Data further objects to this Interrogatory on the basis that it seeks information that is not relevant to any party's claim or defense, nor is this Interrogatory proportional to the needs of the case.  Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1).

8.    If Defendant contends it did not violate the Fair Debt Collection Practices Act as Plaintiff alleges, state all facts that support Defendant's contention

**RESPONSE:** IQ Data objects to this Interrogatory as overbroad, indefinite to time, and without reasonable limitation in its scope because Plaintiff's claims are statutorily limited to alleged acts within one year from any alleged Fair Debt Collection Practices Act violation.  Subject to and without waiving said objections, Plaintiff was listed as a party to an Apartment Lease Agreement with Icon Apartments, the putative creditor.  The account went into default and was subsequently assigned to IQ Data for collection.  When Plaintiff informed IQ Data that debt did not belong to her, IQ Data immediately reported that the debt had been disputed.  IQ Data then requested certain information from Plaintiff and the putative creditor to assist with their investigation of the subject debt's validity. Upon discovery that the account was assigned by the creditor in error, IQ Data deleted its credit reporting of Plaintiff's account. Accordingly, IQ Data contends that it did not engage in any actionable conduct under the FDCPA, and/or the TDCA and did not engage in any conduct that was unconscionable, outrageous, intentional, and malicious or done with reckless disregard with respect to Plaintiff.  IQ Data also alleges that it never engaged in any knowing, willful, or fraudulent conduct with respect to Plaintiff.  Additionally, IQ Data was privileged and justified in making the alleged statements and representations.

9.    If Defendant contends that the subject debt appeared on Plaintiff's credit reports due to an error committed by the CRAs, state all facts that support Defendant's contention.

**RESPONSE:** IQ Data is not making this contention.

10.    Identify all emails, account notes, collection records, data records, statements, telephone recordings, oral communications, written communications, or any other form of data related to Plaintiff and/or the subject debt.

**RESPONSE:** IQ Data objects to this Interrogatory on the basis that it is overbroad and unduly burdensome. IQ Data further objects to this Interrogatory on the basis that it seeks information that is not proportional to the needs of the case. IQ Data also objects to this Interrogatory as calling for information that is protected from production by the attorney-client and insurer-insured privileges, as well as the attorney work-product doctrine. Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1).  Investigation continues.

11.    State the reason Defendant attempted the collect the subject debt from Plaintiff in the relevant time period.

**RESPONSE:** IQ Data objects to this Interrogatory as duplicative of prior Interrogatories. Subject to and without waiving said objections, please see answers to Interrogatory Nos. 6 and 8.

12.    Identify all communications between Plaintiff and Defendant in the relevant time period in which Plaintiff asserted that the subject debt does not belong to her or that she does not owe the subject debt.

**RESPONSE:** IQ Data objects to this Interrogatory as overbroad, indefinite to time, and without reasonable limitation in its scope because Plaintiff's claims are statutorily limited to alleged acts within one year from any alleged Fair Debt Collection Practices Act violation. IQ Data further objects to this Interrogatory on the basis that it seeks information that is not relevant to any party's claim or defense, nor is this Interrogatory proportional to the needs of the case.  Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1).

13.    Identify all facts or documents that demonstrate that Plaintiff owes the subject debt.

**RESPONSE:**  IQ Data objects to this Interrogatory as duplicative of prior Interrogatories. IQ Data objects to this Interrogatory as overbroad, indefinite to time, and without reasonable limitation in its scope because Plaintiff's claims are statutorily limited to alleged acts within one year from any alleged Fair Debt Collection Practices Act violation.  Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1). Please also see answers to Interrogatory Nos. 6 and 8. Investigation continues.

14.    State the reason Defendant continued reporting to the CRAs that Plaintiff owed the subject debt after Plaintiff advised Defendant that she does not owe the subject debt or that the subject debt does not belong to her.

**RESPONSE:** IQ Data objects to this Interrogatory as duplicative of prior Interrogatories. IQ Data objects to this Interrogatory on the basis that it seeks information that is unlikely

to lead to discoverable information that would reasonably be admissible and is not proportional to the needs of the case. IQ Data further objects to this Interrogatory as it is premised on disputed legal and factual conclusions. Subject to and without waiving said objections, see answers to Interrogatory Nos. 6 and 8. Investigation continues.

15. Identify all credit reporting disputes received by Defendant in the relevant time period relating to Plaintiff and/or the subject debt.

**RESPONSE:** IQ Data objects to this Interrogatory on the basis that its lack of temporal specificity renders it impermissibly vague, and also objects to this Interrogatory on the basis that it seeks information that is not relevant to any party's claim or defense and is not proportional to the needs of the case. Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1).

16. Identify all actions taken by Defendant in the relevant time period in response to Plaintiff's claim that she does not owe the subject debt or that subject the debt does not belong to her.

**RESPONSE:** IQ Data objects to this Interrogatory as duplicative of prior Interrogatories. IQ Data objects to this Interrogatory on the basis that it is overbroad and unduly burdensome. IQ Data further objects to this Interrogatory on the basis that it seeks information that is not proportional to the needs of the case. IQ Data also objects to this Interrogatory as calling for information that is protected from production by the attorney-client and insurer-insured privileges, as well as the attorney work-product doctrine. Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1). Please also see answers to Interrogatory Nos. 6 and 8. Investigation continues.

17. Identify and describe any investigation conducted by Defendant in the relevant time period relating to Plaintiff's dispute of the subject debt.

**RESPONSE:** IQ Data objects to this Interrogatory as duplicative of prior Interrogatories. IQ Data objects to this Interrogatory on the basis that it seeks information that is not proportional to the needs of the case. IQ Data also objects to this Interrogatory as calling for information that is protected from production by the attorney-client and insurer-insured privileges, as well as the attorney work-product doctrine. Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1). Please also see answers to Interrogatory Nos. 6 and 8. Investigation continues.

18. State the factual and legal bases for the affirmative defenses raised in Defendant's answer to Plaintiff's Complaint.

**RESPONSE:** IQ Data has asserted Affirmative Defenses Nos. 1-3, 5, 11-12, and 14-15 in order to preserve them and IQ Data reserves the right to present such evidence at trial in support of these defenses pending further discovery. IQ Data contends that it did not engage in any actionable conduct under the FDCPA, and/or the TDCA. IQ Data further contends that it acted in good faith as it was privileged and justified in making all of its statements and representations. Additionally, IQ Data contends that it reasonably relied on

the information that it was provided by the putative creditor. Moreover, assuming arguendo that IQ Data violated any provision of the FDCPA or TDCA as alleged in the Complaint, which it vehemently denies, discovery will show that the violation was not intentional and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid such error. 15 U.S.C. § 1692k(c).

19.     State the reason Defendant did not notify the CRAs that Plaintiff disputed the subject debt.

        **RESPONSE:** IQ Data objects to this Interrogatory as it is premised on legal and factual conclusions which are untrue. Subject to and without waiving said objections, IQ Data marked the account to report the disputed status of the subject debt immediately after Plaintiff disputed the subject debt. See non-privileged, responsive documents produced pursuant to Rule 33(d)(1).

20.     State the reason Defendant ceased credit reporting the subject debt as belonging to Plaintiff after Plaintiff filed a lawsuit against Defendant.

        **RESPONSE:** IQ Data objects to this Interrogatory as duplicative of prior Interrogatories. Subject to and without waiving the foregoing objection, see answer to Interrogatory No. 8.

21.     Identify all facts and documents that support Defendant's bona fide error defense.

        **RESPONSE:** IQ Data objects to this Interrogatory as duplicative of prior Interrogatories. IQ Data objects to this Interrogatory on the basis that its lack of temporal specificity renders it impermissibly vague. IQ Data also objects as this Interrogatory is not proportional to the needs of the case. Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1). Please also see answers to Interrogatory Nos. 6, 8, 14, 16, and 17.

22.     Identify all actions taken by Defendant to verify that the subject debt was owed by Plaintiff at the time the subject debt was placed with Defendant for collection.

        **RESPONSE:** IQ Data objects to this Interrogatory as duplicative of prior Interrogatories. IQ Data objects to this Interrogatory on the basis that its lack of temporal specificity renders it impermissibly vague, and also objects to this Interrogatory as it is not proportional to the needs of the case. IQ Data further objects to this Interrogatory to the extent it seeks information that is confidential and/or proprietary, or otherwise constitutes a trade secret. IQ Data also objects to this Interrogatory as calling for information that is protected from production by the attorney-client and insurer-insured privileges, as well as the attorney work-product doctrine. Subject to and without waiving said objections, non-privileged, responsive documents are produced pursuant to Rule 33(d)(1). Please also see answers to Interrogatory Nos. 6, 8, 14, 16, 17, and 20.

23.     Identify what actions, if any, Plaintiff could have taken to persuade Defendant that the debt did not belong to her or that she did not owe the subject debt.

        **RESPONSE:** IQ Data objects to this Interrogatory on the basis that it seeks information that is not relevant to any party's claim or defense, unlikely to lead to discoverable

information that would reasonably be admissible, and is not proportional to the needs of the case.  Subject to and without waiving said objections, Plaintiff could have responded to IQ Data's letter dated December 27, 2021, requesting that she provide IQ Data with certain information to support her claim and assist IQ Data's investigation of the validity of the subject debt in relation to Plaintiff.

24.    Identify what actions, if any, Plaintiff could have taken to compel Defendant to cease credit reporting the subject debt as belonging to Plaintiff.

**RESPONSE:** IQ Data objects to this Interrogatory as duplicative of prior Interrogatories. IQ Data objects to this Interrogatory on the basis that it seeks information that is not relevant to any party's claim or defense, unlikely to lead to discoverable information that would reasonably be admissible, and is not proportional to the needs of the case.  Subject to and without waiving said objections, Plaintiff could have responded to IQ Data's letter dated December 27, 2021, requesting that she provide IQ Data with certain information to support her claim and assist IQ Data's investigation of the validity of the subject debt in relation to Plaintiff.

25.    Identify the date Defendant first reported the subject debt to the CRAs.

**RESPONSE:** December 21, 2021.